# Exhibit A

AO 440 (Rev. 02/09)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Delaware

| | | |
|---|---|---|
| FESNAK AND ASSOCIATES, LLP | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.  09-680 |
| U.S. BANK NATIONAL ASSOCIATION & CITIBANK | ) | |
| *Defendant* | ) | |

*alias*

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Ted Cheesebrough, Esq.
U.S. Bank National Association
60 Livingston Avenue
St. Paul, MN 55107

A lawsuit has been filed against you.

Within 20 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Whitney W. Deeney, Esquire
Saul Ewing LLP
222 Delaware Avenue, 12th Floor
P.O. Box 1266
Wilmington, Delaware 19899

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date:    09/22/2009

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 02/09)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### District of Delaware

| | |
|---|---|
| FESNAK AND ASSOCIATES, LLP | ) |
| *Plaintiff* | ) |
| v. | ) |
| U.S. BANK NATIONAL ASSOCIATION & CITIBANK | ) |
| *Defendant* | ) |

Civil Action No.   09-680

*alias*

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Michael S. Helfer, Esq., General Counsel
Citibank, N.A./Citigroup, Inc.
153 East 53rd Street, 5th Floor
New York, New York 10043

A lawsuit has been filed against you.

Within 20 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Whitney W. Deeney, Esquire
Saul Ewing LLP
222 Delaware Avenue, 12th Floor
P.O. Box 1266
Wilmington, Delaware 19899

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

CLERK OF COURT

Date:  _____09/22/2009_____        _E. Strickler_
                                   *Signature of Clerk or Deputy Clerk*

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| FESNAK AND ASSOCIATES, LLP | U.S. BANK NATIONAL ASSOCIATION |
| | CITIBANK, N.A. |

(b) County of Residence of First Listed Plaintiff : ___Montgomery___
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant: ___Hennepin___
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorneys (Firm Name, Address, and Telephone Number)
Whitney W. Deeney, Esquire    302-421-6800
Saul Ewing LLP
222 Delaware Avenue, Suite 1200
Wilmington, Delaware 19801

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☒ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / ☐ 365 Personal Injury - Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability / **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 370 Other Fraud | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability / ☐ 371 Truth in Lending | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury / ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment / Habeas Corpus | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations / ☐ 530 General | **IMMIGRATION** | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare / ☐ 535 Death Penalty | ☐ 462 Naturalization Application | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 540 Mandamus & Other | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights / ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District (Specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. §1332

Brief description of cause: This is an action for specific performance of U.S. Bank N.A.'s obligations under the contract at issue, or, in the alternative, a declaratory judgment that Citibank, N.A. has no valid claim against escrowed funds held by U.S. Bank, N.A. pursuant to the contract, and that U.S. Bank, N.A. must release and distribute those funds.

## VII. REQUESTED IN COMPLAINT

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions): JUDGE _____ DOCKET NUMBER _____

DATE: 09/14/09

SIGNATURE OF ATTORNEY OF RECORD
*[signature]*

Whitney W. Deeney (No. 5055)

## FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FESNAK AND ASSOCIATES, LLP<br>A Pennsylvania Limited Liability Partnership<br>1777 Sentry Parkway<br>Gwynedd Hall, Suite 400<br>Blue Bell, PA 19422 | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | NO. |
| | : | |
| U.S. BANK NATIONAL ASSOCIATION<br>A National Association<br>U.S. Bancorp Center<br>800 Nicollet Mall<br>Minneapolis, MN 55402 | : | |
| | : | |
| and | : | |
| | : | |
| CITIBANK, N.A.<br>A National Association<br>153 East 53rd Street, 5th Floor<br>New York, NY 10043, | : | |
| | : | |
| Defendants. | : | |

## COMPLAINT IN EQUITY

### OVERVIEW

1.      This lawsuit seeks an injunction compelling specific performance of U.S. Bank's obligations under an Escrow Agreement. The Escrow Agreement, dated January 9, 2008, is attached to this Complaint as Exhibit 1 and incorporated by reference.

2.      In the alternative, this lawsuit seeks a declaratory judgment that Citibank has no valid claim against escrowed funds being held by U.S. Bank pursuant to the Escrow Agreement, and that U.S. Bank therefore must release and distribute the funds.

3.      Fesnak seeks a speedy resolution of this matter consistent with Federal Rules of Civil Procedure 57 and 65.

## THE PARTIES

4.      Fesnak is a Pennsylvania limited liability partnership with its principal place of business at 1777 Sentry Parkway, Gwynedd Hall, Suite 400, Blue Bell, Pennsylvania 19422.

5.      Upon information and belief, Defendant U.S. Bank National Association is a national association, with its main office at U.S. Bancorp Center, 800 Nicollet Mall, Minneapolis, Minnesota 55402, as designated in its articles of association.

6.      Upon information and belief, U.S. Bank is a subsidiary of U.S. Bancorp, a Delaware corporation.

7.      Upon information and belief, Defendant Citibank, N.A. is a national association, with its main office at 153 East 53rd Street, 5th Floor, New York, New York 10043, as designated in its articles of association.

8.      Citibank has branch offices and transacts business within this judicial district.

## JURISDICTION AND VENUE

9.      This civil action seeks the distribution of funds in excess of Three Million Dollars ($3,000,000).

10.     This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332, in that Fesnak and Defendants are citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

11.     This Court has in personam jurisdiction over Defendants by virtue of the fact that each Defendant conducts significant business activities within the District of Delaware.

12.     Venue is appropriate in this judicial district under 28 U.S.C. § 1391 because, among other reasons:  a) the Escrow Agreement is governed by Delaware substantive law; b) all parties explicitly consented to the jurisdiction of this Court in a related Merger Agreement; and c) the acquired company, PayQuik.com, was incorporated in this judicial district.

## THE ESCROW FUNDS

13.     In 2007 Citibank decided it wanted to purchase a company called PayQuik.com, Inc.

14.     As a first step in the acquisition, a Merger Agreement was executed on October 18, 2007.  The parties to the Merger Agreement were:  1) Citibank; 2) an entity called "Penelope Acquisition Sub, Inc." that Citibank established to facilitate the acquisition; 3) PayQuik.com; and 4) Fesnak, as Stockholders' Representative for the stockholders of PayQuik.com.  The Merger Agreement is attached as Exhibit 2 and incorporated herein.[1]

15.     The Merger Agreement contemplated that Citibank's acquisition of PayQuik.com would close on January 9, 2008.

16.     The acquisition closed on January 9, 2008.  The Escrow Agreement was executed that same day.  See Exhibit 2.

17.     Citibank paid approximately $40 million dollars to acquire PayQuik.com.  Ten percent of the acquisition price, or approximately $4 million dollars, was to be held in escrow. See Schedule 2.2 to Merger Agreement, attached hereto separately as Exhibit 3.

18.     A small portion of the Escrow Funds were used for a post-closing "true up" with Citibank.  See Exhibit 1, at Section 4(a) and Exhibit 2, at Section 2.8.  The balance of the Escrow

---

[1]  In the interest of judicial economy Fesnak attaches as Exhibit 2 the primary Merger Agreement document, without the numerous attached exhibits and schedules that are not pertinent to this Complaint.

Funds were to be held and invested by U.S. Bank in its role as Escrow Agent. See Exhibit 1, at

Section 3(b).

19.     The Escrow Funds constitute part of the consideration paid by Citibank to the

PayQuik.com stockholders as part of the deal.

## FESNAK AS THE STOCKHOLDERS' REPRESENTATIVE

20.     Fesnak was appointed as the Stockholders' Representative under the Merger

Agreement and given the full power to act on behalf of each Stockholder Party of PayQuik.com,

including the power to act for each Stockholder "with regard to matters pertaining to litigation."

See Exhibit 2, at Section 11.9(a)(ii).

21.     Fesnak received $250,000 in Stockholders' Representative Funds to be used in

carrying out its duties as the Stockholders' Representative. Id. at Section 2.12. To the extent

those funds are depleted, Fesnak is entitled to seek their replenishment from the Escrow Funds.

Id. at Section 11(b).

## THE ESCROW FUNDS SHOULD HAVE ALREADY BEEN RELEASED TO
## THE STOCKHOLDER PARTIES AND FESNAK

22.     The Stockholder Parties made a number of representations to Citibank in the

Merger Agreement.

23.     The Stockholder Parties agreed to indemnify Citibank for certain breaches of

those representations if Citibank made a timely claim that was found to have merit.

24.     With one limited exception not applicable here, the Stockholder Parties could

only be obligated to indemnify Citibank with the Escrow Funds. Id. at Section 11.2(e).

25.    Citibank was required to make an indemnification claim against the Escrowed Funds within a very precise window of time after the January 9, 2008 closing date and using very precise methods of notice. See Exhibit 1, at Section 4(b).

26.    Specifically, Citibank was required to give its written notice ("Indemnity Notice") to Fesnak and U.S. Bank "at any time prior to 11:59 pm New York time on the 18-month anniversary of the date of this Agreement." Id. at Section 4(b).

27.    This meant that the Indemnity Notice had to be given no later than 11:59 p.m. New York time on July 9, 2009. Id. July 9, 2009 is also referred to as the "Termination Date" of the Escrow Agreement. Id.

28.    The Escrow Agreement provides four different options for giving written notice, and provides very detailed and specific instructions on how to do so:

> Unless expressly specified otherwise herein, all notices or other communications required or permitted hereunder shall be in writing and ***shall be deemed given***: (i) on the date established by the sender as having been delivered personally, (ii) on the date delivered by a private courier as established by the sender by evidence obtained from the courier, (iii) ***on the date sent by facsimile (with a .pdf or other copy by electronic mail), with confirmation of transmission, if sent during normal business hours of the recipient, _if not, then on the next business day_***, or (iv) on the fifth business day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.

Id. at Section 8(a) (emphases added).

29.    Citibank attempted to send an Indemnity Notice on July 9, 2009. A true and correct copy of the attempted Indemnity Notice, as received by Fesnak, is attached hereto as Exhibit 4.

30.    The attempted Indemnity Notice was sent from Citibank's counsel via facsimile to Fesnak on July 9, 2009 at 19:21 (7:21 p.m.) Pacific time, or 10:21 p.m. New York time. See Exhibit 4.

31.     The attempted Indemnity Notice was sent from Citibank's counsel via facsimile to U.S. Bank on July 9, 2009 no earlier than 10:21 p.m. New York time, and in fact was sent to the Escrow Agent at 19:25 (7:25 p.m.) Pacific time, or 10:25 p.m. New York time.

32.     The attempted Indemnity Notice was transmitted by facsimile and electronic mail after the normal business hours of both Fesnak and U.S. Bank.

33.     Under the terms of the Escrow Agreement, this means that the attempted Indemnity Notice was deemed given on the next business day – July 10, 2009. See Exhibit 1, Section 8(a).

34.     The Escrow Agreement had terminated on July 9, 2009. Id. at Section 4(b).

35.     The attempted Indemnity Notice was given a calendar day too late and after the Escrow Agreement had terminated.

36.     Citibank therefore has made no timely or valid claim against the Escrow Funds.

37.     The Escrow Agreement provides that the Escrow Agent "*shall* distribute the balance, if any, of the remaining Escrow Funds" as soon as is practicable after the Termination Date. Id. at Section 4(d) (emphasis added).

38.     Because there is no valid claim against the Escrow Funds, U.S. Bank must distribute all of the Escrow Funds in accordance with Section 4(d) of the Escrow Agreement. Id.

39.     This may include a distribution to Fesnak, as the Stockholders' Representative, for replenishment of the $250,000 in Stockholders' Representative Funds to the extent the $250,000 has been depleted, and continues to be depleted, by this Escrow Fund disagreement. Id. The exact amount of the required distribution to Fesnak, if any, will be determined once this litigation is completed.

40.     By letter dated August 6, 2009, Fesnak instructed U.S. Bank to distribute the

Escrow Funds consistent with Section 4(d) of the Escrow Agreement.  A true and correct copy of

the August 6, 2009 letter is attached hereto as Exhibit 5.

41.     By letter dated August 11, 2009, U.S. Bank declined to release the Escrow Funds,

noting, among other things, Citibank's apparent disagreement with Fesnak's position.  A true and

correct copy of the August 11, 2009 letter is attached hereto as Exhibit 6.

## COUNT I – INJUNCTION COMPELLING SPECIFIC PERFORMANCE BY U.S. BANK

42.     Fesnak realleges and incorporates paragraphs 1 through 41 as if fully set forth

herein.

43.     Fesnak and Defendants entered into a valid and enforceable Escrow Agreement.

44.     Because Citibank failed to make a timely Indemnity Claim against the Escrow

Funds before the Escrow Agreement terminated, U.S. Bank must honor the unambiguous

language in the Escrow Agreement and it **"shall"** distribute the balance of those Funds consistent

with the procedures set forth in with Section 4(d) of the Escrow Agreement.  See Exhibit 1,

Section 4(d) (emphasis added).

45.     Despite clear written instructions from Fesnak to distribute the Escrow Funds,

U.S. Bank has declined to do so.  See Exs. 5 and 6.

46.     Section 9(o) of the Escrow Agreement, titled "Specific Performance," states:

> THE PARTIES AGREE THAT IRREPARABLE DAMAGE WOULD OCCUR
> IN THE EVENT THAT ANY OF THE PROVISIONS OF THIS AGREEMENT
> WERE NOT PERFORMED IN ACCORDANCE WITH THEIR SPECIFIC
> TERMS OR WERE OTHERWISE BREACHED.   IT IS ACCORDINGLY
> AGREED THAT THE PARTIES SHALL BE ENTITLED TO AN
> INJUNCTION OR INJUNCTIONS TO PREVENT BREACHES OF THIS
> AGREEMENT AND TO ENFORCE SPECIFICALLY (WITHOUT ANY
> REQUIREMENT TO POST ANY BOND OR OTHER COLLATERAL) THE
> TERMS AND PROVISIONS OF THIS AGREEMENT, IN ADDITION TO ANY

OTHER REMEDY TO WHICH THEY ARE ENTITLED AT LAW OR IN EQUITY.

Exhibit 1, Section 9(o) (capitalization in original).

47.     Consistent with Section 9(o) of the Escrow Agreement, Fesnak requests an injunction compelling U.S. Bank to specifically perform all tasks required by Section 4(d) of the Escrow Agreement and to distribute the Escrow Funds, in full, consistent with that provision.

48.     Fesnak and the PayQuik.com Stockholder Parties are being irreparably harmed by U.S. Bank's refusal to release the Escrow Funds at a time and in a manner precisely bargained for by the Stockholder Parties and Fesnak.

49.     Fesnak is likely to succeed on the merits of its claim.  Section 9(o) is clear, and U.S. Bank is required to distribute the Escrow Funds in full as there has been no timely or valid Indemnity Claim asserted against the Escrow Funds by Citibank.

50.     There is no harm to U.S. Bank or Citibank if the Escrow Funds are distributed in accordance with Section 4(d) of the Agreement because neither Defendant has a valid claim to the Escrow Funds.

51.     The balance of equities favors Fesnak and the Stockholder Parties it represents.

**WHEREFORE**, Plaintiff Fesnak and Associates, LLP respectfully requests that this Court issue a final and permanent injunction compelling Defendant U.S. Bank National Association to distribute the Escrow Funds in accordance with Section 4(d) of the Escrow Agreement.  Fesnak shall provide the Escrow Agent with a final accounting of the amounts to be distributed to Fesnak, if any, after entry of the injunction, and before distribution.

## COUNT II – DECLARATORY JUDGMENT

52.     Fesnak realleges and incorporates paragraphs 1 through 51 of this Complaint as if fully set forth herein.

53.     This Count II is pled in the alternative in the event the Court declines to issue a permanent injunction.

54.     Fesnak in the alternative requests that this Court issue a declaratory judgment consistent with 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 confirming that:  a) Citibank's Indemnity Notice was untimely and invalid under the terms of the Escrow Agreement; b) Citibank therefore has no valid claim against the Escrow Funds; and c) U.S. Bank accordingly must distribute the funds consistent with the Escrow Agreement.

55.     As the Stockholders' Representative, Fesnak has a legal interest in the Escrow Funds and in having the Escrow Funds distributed in accordance with Section 4(d) of the Agreement.

56.     As the Buyer seeking to assert a claim against the Escrow Funds, Citibank has an interest in contesting Fesnak's demand for full distribution of the Escrow Funds and is therefore a necessary party to this declaratory judgment action.

57.     The conflicting interests of Fesnak and Citibank are real and adverse.

58.     The conflicting interests of Fesnak and U.S. Bank have been set forth in detail above.

59.     Fesnak has instructed U.S. Bank to distribute the Escrow Funds in full because Citibank's Indemnity Notice was untimely.  See Exhibit 5.

60.     In response, U.S. Bank "acknowledge[d] that whether this notice was delivered in a timely manner is a matter of dispute between the Buyer and the Stockholders' Representative." See Exhibit 6.

61.     U.S. Bank further indicated that it "takes no position at this time as to whether the Indemnity Notice was timely delivered, but acknowledges that a genuine issue over contract interpretation exists." Id.

62.     Because of this conflict, U.S. Bank has stated that it will "refrain from taking any action" with regard to release of the Escrow Funds "until it shall be directed otherwise in writing … by a final order or judgment of a court of competent jurisdiction." Id.

63.     There is a genuine issue as to whether Citibank's Indemnity Notice was delivered in a timely fashion.  This issue is ripe for judicial determination.

64.     The Escrow Agent has acknowledged that a court order will resolve the issue.

**WHEREFORE**, in the alternative, Plaintiff Fesnak and Associates, LLP respectfully requests that this Court enter an order declaring that:  (1) Defendant Citibank, N.A.'s Indemnity Notice was deemed given to Fesnak and Associates, LLP and U.S. Bank National Association on July 10, 2009; (2) the Indemnity Notice was untimely and is not therefore enforceable under the Escrow Agreement; (3) Defendant Citibank, N.A. accordingly has no valid claim against the Escrow Funds; and (4) U.S. Bank must distribute the Escrow Funds, in full, consistent with Section 4(d) of the Escrow Agreement.

Respectfully submitted,

/s/ Whitney W. Deeney
Whitney W. Deeney (No. 5055)
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE   19801
(302) 421-6800
(302) 421-5883
wdeeney@saul.com
*Attorneys for Plaintiff Fesnak and Associates, LLP*

Dated:  September 14, 2009

**EXHIBIT 1**

**Execution Version**

<u>ESCROW AGREEMENT</u>

This ESCROW AGREEMENT (this "<u>Agreement</u>") is made as of this 9th day of January, 2008, by and among Citibank, N.A., a national association ("<u>Buyer</u>"), U.S. Bank National Association (the "<u>Escrow Agent</u>"), and Fesnak and Associates, LLP (the "<u>Stockholders' Representative</u>").

<u>Background</u>

WHEREAS, Buyer has entered into that certain Merger Agreement, dated as of October 18, 2007, by and among Buyer, PayQuik.com, Inc., a Delaware corporation (the "<u>Company</u>"), and Penelope Acquisition Sub, Inc., a Delaware corporation and wholly-owned subsidiary of Buyer (the "<u>Merger Agreement</u>"). Pursuant to the Merger Agreement, Buyer is required at the Effective Time to deposit $1,000,000 in cash by wire transfer of immediately available funds to the account designated by the Escrow Agent (the "<u>Initial Cash</u>") (such Initial Cash, plus any additional funds required to be deposited pursuant to Sections 2.3 and 2.4 of the Merger Agreement and any Escrow Earnings (as defined below), the "<u>Escrow Funds</u>").

NOW, THEREFORE, the parties hereto, each intending to be legally bound hereby, and in consideration of the mutual covenants herein and in the Merger Agreement, agree as follows:

1.  <u>Incorporation of Terms of Agreement</u>.

    The provisions of the Merger Agreement are hereby incorporated herein by reference, but only as the context of this Agreement may require and only as to Buyer, the Stockholders' Representative and the Stockholder Parties. Buyer and the Stockholders' Representative agree between themselves that capitalized terms used but not defined herein shall have the meaning set forth in the Merger Agreement.

2.  <u>Creation of the Escrow Account</u>.

    There is hereby created and established with the Escrow Agent the Escrow Account in which the Escrow Funds shall be held in the custody of the Escrow Agent in accordance with this Agreement.

3.  <u>Escrow Funds; Investment</u>.

    (a)    On the date of this Agreement, Buyer will deposit with the Escrow Agent the Initial Cash. On April 30, 2008, Buyer will deposit with the Escrow Agent any additional funds required to be deposited pursuant to Sections 2.3(a) and 2.4 of the Merger Agreement. Simultaneously with the deposit of additional funds with the Escrow Agent, Buyer and the Stockholders' Representative will provide the Escrow Agent with an amended <u>Schedule B</u> to this Agreement, which shall supersede the <u>Schedule B</u> attached hereto. The Escrow Agent will accept and acknowledge receipt of said sums and agrees to establish and maintain two separate accounts, one of which will be comprised of the percentage of the Escrow Funds set forth on <u>Schedule B</u> hereto (as may be amended from time to time) under the heading "Aggregate Compensation Escrow Percentage" (the "<u>Compensation Escrow Account</u>") and the other of which will be comprised of the percentage of the Escrow Funds set forth on Schedule B hereto

(as may be amended from time to time) under the heading "Aggregate Merger Consideration Escrow Percentage" (the "Merger Consideration Escrow Account," and together with the Compensation Escrow Account, the "Escrow Accounts"), in its capacity as Escrow Agent pursuant to the terms of this Agreement. The Compensation Escrow Account and any Escrow Earnings (as defined below) attributable to the Compensation Escrow Account shall be subject to the claims of Buyer's creditors in the event of Buyer's insolvency, according to "rabbi trust" terms substantially similar to those approved by the Internal Revenue Service (the "IRS") in Rev. Proc. 92-64. The Merger Consideration Escrow Account and any Escrow Earnings attributable to the Merger Consideration Escrow Account shall not be subject to any lien, attachment, trustee process or any other judicial process of any creditor. Earnings on the Escrow Funds (including any interest accrued thereon and any other profit realized therefrom) will be credited to the Escrow Funds (the actual amount from time to time of such earnings (and interest or other profit) is referred to in this Agreement as the "Escrow Earnings").

(b)     The Escrow Agent shall invest the Escrow Funds, as jointly instructed in writing by Buyer and the Stockholders' Representative, in any of the following (the "Permitted Investments"):  (i) obligations issued or guaranteed by the United States of America or any agency or instrumentality thereof with a maturity of not more than 30 days; (ii) certificates of deposit (including money market savings accounts and similar instruments) of or accounts with national banks, holding companies of national banks or corporations endowed with trust powers having, in any case, capital and surplus in excess of $250,000,000 at the time of investment, with a maturity in each case not to exceed 30 days; (iii) commercial paper at the time of investment and any renewal rated A-1 by Standard & Poor's Corporation or Prime-1 by Moody's Investor's Service, Inc.; (iv) money market funds substantially all of whose funds are invested in any of the foregoing clauses (i) through (iii); and (v) investment in the Escrow Agent's "Insured Money Market Account" ("IMMA"), as described in Annex A hereto. If otherwise qualified, obligations of the Escrow Agent or any of its affiliates shall qualify as Permitted Investments. If the Escrow Agent has not received such joint written instruction, the Escrow Agent shall invest the Escrow Funds in the Escrow Agent's IMMA until such investment instruction is received.

(c)     As soon as is practicable following each month-end during the term of this Agreement, the Escrow Agent shall deliver to Buyer and the Stockholders' Representative a statement (a "Monthly Statement") setting forth:  (i) the value of the Escrow Accounts at such date; (ii) the amount of any Escrow Earnings earned or accrued with respect thereto during the period covered by such Monthly Statement; and (iii) the amounts, if any, paid from the Escrow Accounts with respect to the period covered by such Monthly Statement.

4.     Transfers from the Escrow Funds.

(a)     The Escrow Funds shall be used to pay all amounts due and owing to Buyer, if any, pursuant to the terms and conditions of Section 2.8 of the Merger Agreement. Upon determination that Buyer is entitled to a payment in accordance with Section 2.8 of the Merger Agreement, the Stockholders' Representative and Buyer shall promptly (and in any event no later than two (2) business days following such determination) deliver a written notice, signed by the Stockholders' Representative and Buyer, to the Escrow Agent instructing the Escrow Agent to pay to Buyer the appropriate amount, if any, from the Escrow Accounts. Upon receipt of such notice, the Escrow Agent shall pay to Buyer such amount, by wire transfer of immediately

available funds, from each of the Compensation Escrow Account and the Merger Consideration Escrow Account on a pro-rata basis determined by the respective percentages attributed to each such account on Schedule B hereto (as may be amended from time to time).

(b)    Buyer may, by giving written notice (an "Indemnity Notice") to the Stockholders' Representative and the Escrow Agent, make a claim against the Escrow Funds for any amounts claimed by it under Article XI of the Merger Agreement ("Claimed Amounts"), at any time prior to 11:59 pm New York time on the 18-month anniversary of the date of this Agreement (the "Termination Date"). Such Indemnity Notice shall contain such facts and information as are then reasonably available and the basis for payment or indemnification under the Merger Agreement. If the claim set forth in the Indemnity Notice is liquidated in amount, the Indemnity Notice shall so state and such amount shall be deemed the amount of the claim against the Escrow Funds. If the amount is not liquidated, then the Indemnity Notice shall so state and shall provide a reasonable estimate of such claim. In the event of an unliquidated claim, a claim shall be deemed asserted against the Escrow Funds, but no transfer shall be made on account thereof until the amount of such claim is liquidated and such transfer is to be made in accordance with Sections 4(c) and 4(d) below. If the Stockholders' Representative wishes to dispute the basis for the claims set forth in the Indemnity Notice or deny liability for some or all of the Claimed Amounts, the Stockholders' Representative shall deliver to Buyer and the Escrow Agent a written notice to such effect (a "Response Notice"). The Response Notice shall be accompanied by a written description of the basis for such denial. If, on the date that is thirty (30) days following the Escrow Agent's receipt of any Indemnity Notice, the Escrow Agent shall not have received a Response Notice, then the Stockholders' Representative shall be deemed to have consented to the payment of the claims in such Indemnity Notice (with such claim then becoming a "Non-Disputed Claim"), and the Escrow Agent shall pay the Claimed Amount to Buyer in accordance with the Indemnity Notice as soon as is practicable thereafter, by wire transfer of immediately available funds, from each of the Compensation Escrow Account and the Merger Consideration Escrow Account on a pro-rata basis determined by the respective percentages attributed to each such account on Schedule B hereto (as may be amended from time to time). With respect to any Non-Disputed Claim that is not liquidated at such time, Buyer shall provide notice of the liquidated amount to the Stockholders' Representative and the Escrow Agent promptly after such amount becomes liquidated (the "Liquidated Amount Notice"), and the Stockholders' Representative shall then have five (5) business days to dispute the amount of (but not the Stockholder Parties' liability for) such Non-Disputed Claim by sending a Response Notice to the Escrow Agent. If the Escrow Agent shall not have received a Response Notice by the end of the fifth business day following Escrow Agent's receipt of the Liquidated Amount Notice, then the Stockholders' Representative shall be deemed to have consented to the payment of the liquidated amount of the claims in such Indemnity Notice, and the Escrow Agent shall pay the Claimed Amount to Buyer in accordance with the Indemnity Notice as soon as is practicable thereafter, by wire transfer of immediately available funds, from each of the Compensation Escrow Account and the Merger Consideration Escrow Account on a pro-rata basis determined by the respective percentages attributed to each such account on Schedule B hereto (as may be amended from time to time).

(c)    With respect to any Claimed Amount for which the Stockholders' Representative has submitted a Response Notice, upon receipt of a written statement executed by Buyer and the Stockholders' Representative evidencing their agreement to the amounts and directions in

question (a "Transfer Instruction") or pursuant to a final award determined by a court of competent jurisdiction from which no appeal can be timely taken (a "Judgment Notice"), the Escrow Agent shall promptly transfer to Buyer, as directed by such Transfer Instruction or Judgment Notice, from each of the Compensation Escrow Account and the Merger Consideration Escrow Account on a pro-rata basis determined by the respective percentages attributed to each such account on Schedule B hereto (as may be amended from time to time), an amount that has an aggregate value equal to the final amount of the claim as provided in such Transfer Instruction or Judgment Notice. The Escrow Agent shall take the action specified in the Transfer Instruction or Judgment Notice as soon as is practicable after its receipt thereof.

(d)  As promptly as is practicable after the Termination Date, the Escrow Agent shall distribute the balance, if any, of the remaining Escrow Funds (i) to the Stockholders' Representative for any amounts it instructs the Escrow Agent in writing (with a copy to Buyer) to distribute to it (which shall be only amounts claimed by it under Section 11.9(b) of the Merger Agreement for the replenishment of the $250,000 paid by Buyer to the Stockholders' Representative to be held by the Stockholders' Representative as the Stockholders' Representative Funds pursuant to Section 2.12 of the Merger Agreement), from each of the Compensation Escrow Account and the Merger Consideration Escrow Account on a pro-rata basis determined by the respective percentages attributed to each such account on Schedule B hereto (as may be amended from time to time); (ii) from the Merger Consideration Escrow Account to the Stockholder Parties (other than Common Optionholders) pursuant to each holder's percentage interest set forth on Schedule B hereto (as may be amended from time to time) (the "Percentage Interest"); and (iii) from the Compensation Escrow Account to the Company on behalf of the Common Optionholders (whereupon Buyer shall cause the Surviving Corporation to pay the respective amount to each Stockholder Party entitled thereto in accordance with Schedule B hereto (as may be amended from time to time), less any required federal, state, local and foreign Tax withholding amounts, which Buyer shall cause to be paid to the applicable Taxing authorities and which shall be treated for all other purposes under this Agreement as distributed to the respective Stockholder Party).

Notwithstanding the foregoing, in the event of any Pending Claim (as hereinafter defined) at the time any of the foregoing payments are to be made, a portion of such payment equal to the amount of such Pending Claim (or the estimated amount set forth in the Indemnity Notice if such Pending Claim is unliquidated) shall be withheld, from each of the Compensation Escrow Account and the Merger Consideration Escrow Account on a pro-rata basis determined by the respective percentages attributed to each such account on Schedule B hereto (as may be amended from time to time) (and shall be available for payment in accordance with Section 4(b) above), until such time as the Pending Claim is finally resolved; provided that, to the extent applicable, Buyer and the Stockholders' Representative shall use commercially reasonable efforts to administer and interpret the Compensation Escrow Account in accordance with section 409A of the Internal Revenue Code of 1986, as amended (the "Code"), and if there is a Pending Claim on the business day immediately preceding the fifth anniversary of the consummation of the Merger and Buyer and the Stockholders' Representative reasonably determine that the short-term deferral and disputed payment provisions of section 409A of the Code and the regulations promulgated thereunder so permit, then Buyer and the Stockholders' Representative shall instruct the Escrow Agent in writing to pay the amounts withheld pending resolution of the Pending Claim attributable to the Compensation Escrow Account not later than March 15 of the

calendar year following the calendar year in which the Pending Claim is resolved. Notwithstanding the preceding provision, if and to the extent Buyer and the Stockholders' Representative reasonably determine that the short-term deferral and disputed payment provisions of section 409A of the Code and the regulations promulgated thereunder do not permit payment pursuant to the timing rules described in the preceding sentence, in order to avoid Tax penalties to any of the Stockholder Parties under section 409A of the Code, the Stockholders' Representative and Buyer shall instruct the Escrow Agent in writing to distribute amounts then held in the Compensation Escrow Account to the Stockholders' Representative (for distribution to the Stockholder Parties having an interest in the Compensation Escrow Account in accordance with the terms of the Merger Agreement and pursuant to the Percentage Interest in the Compensation Escrow Account) on the business day immediately preceding the fifth anniversary of the consummation of the Merger (a "409A Distribution") (it being understood that as a condition to making a 409A Distribution to a recipient thereof, such recipient shall have entered into a written agreement with Buyer, in form and substance reasonably satisfactory to Buyer, in which such recipient agrees to make its pro rata portion of any indemnification payment that would have been made from the Compensation Escrow Account had such 409A Distribution not been made). Upon resolution of any Pending Claim (whether by agreement of the parties or court order for which no appeal may be taken), any payment thereby required under Section 4(c) above shall be made, and the balance, if any, of such withheld payment shall be paid to the Stockholders' Representative or the Surviving Corporation, as applicable (for distribution to the Stockholder Parties in accordance with the terms of the Merger Agreement and pursuant to the Percentage Interest), all as provided in a written instruction from Buyer and the Stockholders' Representative. For purposes of this Agreement, "Pending Claim" means any claim that is included in an Indemnity Notice which claim remains unliquidated or has not been paid in full or otherwise discharged.

5.    Tax Matters.

(a)    Tax Treatment of Escrow Funds. The parties hereto intend that the Escrow Funds shall not be taxable to the Stockholder Parties unless and to the extent actually released and paid to the Stockholder Parties pursuant to this Agreement, and this Agreement shall be interpreted and applied in a manner consistent with such intent. In furtherance thereof, the parties acknowledge and agree that the Escrow Account and amounts deposited and earned therein shall be treated as owned by Buyer (and not the Stockholder Parties) for Tax purposes unless and until actually released and paid to the Stockholder Parties pursuant to this Agreement. The parties hereto further acknowledge and agree that the Stockholder Parties will treat the Merger as an installment sale for income Tax purposes in accordance with Section 453 of the Code and amounts deposited and earned in the Merger Consideration Escrow Account as payable to the Stockholder Parties pursuant to the terms of a contingent installment sale contract for Tax purposes.

(b)    Reporting of Income. The Escrow Agent shall report to the IRS, as of each calendar year-end, all income earned from the investment of any sum held in the Escrow Account as earned by Buyer. Buyer shall provide the Escrow Agent with an appropriate IRS W-9 Form or Tax identification number certification.

(c)     Preparation and Filing of Tax Returns.  Any information returns required to be prepared and filed will be prepared and filed by the Escrow Agent with the IRS in all years income is earned, whether or not income is received or distributed in any particular Tax year and any and all Tax informational statements required to be delivered with respect to payments from the Escrow Account to the Stockholder Parties shall be prepared, delivered, and filed by the Escrow Agent.  The Escrow Agent will require the Stockholder Parties to provide the Escrow Agent with an IRS Form W-9 or W-8, as applicable, and any other forms and documents that the Escrow Agent may reasonably request to determine the amount, if any, to be withheld and to complete such information returns and payee statements (collectively, the "Tax Reporting Documentation"), and the Escrow Agent shall provide copies of any such forms and documents to the Company and the Stockholder Parties.  The parties hereto understand that if such Tax Reporting Documentation is not provided to the Escrow Agent, then the Escrow Agent may be required by the Code to withhold a portion of any payments made pursuant this Agreement.

(d)     Payment of Taxes.  Notwithstanding anything to the contrary in this Agreement, the Escrow Agent shall release to Buyer, at least ten (10) days before any Tax payment is due by Buyer with respect to Escrow Funds, an amount equal to such Taxes payable by Buyer on the Escrow Funds as claimed by Buyer in a written request from Buyer specifically identifying the amount to be paid and the basis for the claim.  Buyer and the Stockholders' Representative agree that the release of amounts from the Escrow Account to the Stockholder Parties pursuant to this Agreement shall be treated as additional consideration paid, on the date of the release from the Escrow Account and on behalf of Buyer pursuant to this Agreement in exchange for shares of the Company's common stock, $0.01 par value per share, and preferred stock, par value $0.001 per share (on a fully diluted basis); provided, however, that a portion of the amounts so released shall be characterized and treated as interest paid to the Stockholder Parties equal to the amount, with respect to the cash released, that is required to be treated as interest to the Stockholder Parties pursuant to Section 1272 of the Code and Treasury Regulations §§ 1.1274-2(g) and 1.1275-4(c), as instructed by the Stockholders' Representative in a written notice to the Escrow Agent prior to any such release; and provided further, however, that absent receipt by Escrow Agent of such notice, the Escrow Agent shall have no reporting obligation hereunder.

(e)     Consistency.  The parties hereto agree to prepare all books, records, and filings, and otherwise treat the Merger in a manner consistent with this Section 5.

6.     Fees of the Escrow Agent.

The reasonable fees and out-of-pocket expenses of the Escrow Agent actually incurred by it in connection with the carrying out of its duties hereunder shall be paid from the Escrow Funds.  The annual escrow fee is $3,000, without pro-ration for partial years.  Such fee is subject to review and reasonable adjustment annually upon written notice to Buyer and the Stockholders' Representative.

7.     Duties of the Escrow Agent.

(a)     The Escrow Agent shall be liable as a depository only with its duties being only those specifically provided herein and which are ministerial in nature and not discretionary.  The Escrow Agent shall not be liable for any mistake of fact or error in judgment, or for any act or

failure to act of any kind taken in good faith and believed by it to be authorized or within the rights or powers conferred by this Agreement, unless there be shown willful misconduct or gross negligence. Anything in this Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable for special, indirect or consequential damage of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood for such loss or damage and regardless of the form of action. The Escrow Agent shall be entitled to consult with and engage the services of competent legal counsel of its choice with respect to any matter pertaining to this Agreement and shall be entitled to reimbursement for the reasonable and documented costs and expenses of such legal counsel.

(b)     The Escrow Agent shall not be liable in any respect on account of identity, authority or rights of persons executing or delivering, or purporting to execute or deliver, any document or item, and may rely absolutely and be fully protected in acting upon any item, document or other writing believed in good faith by it to be authentic in performing its duties hereunder.

(c)     The Escrow Agent and its directors, officers and agents shall be indemnified and held harmless on a joint and several basis by the parties to this Agreement from and against all costs, damages, liabilities and expenses which the Escrow Agent may incur or sustain in connection with or arising out of this Agreement, including, but not limited to, any costs, damages, liabilities and expenses that may be incurred as a result of claims or actions by third parties. The parties hereto acknowledge that the foregoing indemnities shall survive the resignation or the removal of the Escrow Agent or the termination of this Agreement.

(d)     The Escrow Agent shall have no duty to solicit any payments which may be due it or the Escrow Account. The Escrow Agent shall not be liable for any action taken or omitted by it in good faith except to the extent that a court of competent jurisdiction determines that the Escrow Agent's gross negligence or willful misconduct was the primary cause of any loss to the parties. The Escrow Agent may execute any of its powers and perform any of its duties hereunder directly or through agents or attorneys (and shall be liable only for the careful selection of any such agent or attorney) and may consult with competent counsel, accountants and other skilled persons to be selected and retained by it. The Escrow Agent shall not be liable for anything done, suffered or omitted in good faith by it in accordance with the advice or opinion of any such counsel, accountants or other skilled persons. In the event that the Escrow Agent shall be uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands from any party hereto which, in its reasonable opinion, conflict with any of the provisions of this Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held under the terms of this Agreement until it shall be directed otherwise in writing by all of the other parties hereto or by a final order or judgment of a court of competent jurisdiction.

(e)     The Escrow Agent retains the right to resign upon giving thirty (30) days prior written notice to all parties hereto.

(f)     The duties and responsibilities of the Escrow Agent hereunder shall be determined solely by the express provisions of this Agreement and no other or further duties or responsibilities shall be implied. The Escrow Agent shall not have any liability under, nor duty

to inquire into the terms and provisions of any written agreement or written instructions, other than outlined in this Agreement.

8.     Notices; Incumbency.

(a)     Unless expressly specified otherwise herein, all notices or other communications required or permitted hereunder shall be in writing and shall be deemed given: (i) on the date established by the sender as having been delivered personally, (ii) on the date delivered by a private courier as established by the sender by evidence obtained from the courier, (iii) on the date sent by facsimile (with a .pdf or other copy by electronic mail), with confirmation of transmission, if sent during normal business hours of the recipient, if not, then on the next business day, or (iv) on the fifth business day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such communications, to be valid, must be addressed as follows:

If to the Stockholders' Representative:

> Fesnak and Associates, LLP
> 1777 Sentry Parkway, Gwynedd Hall, Suite 400
> Blue Bell, PA 19422
> Attn:  Robert W. Fesnak
> Facsimile:  (267) 419-2200
> Email:  rfesnak@fesnak.com

with a required copy to:

> Morgan, Lewis & Bockius LLP
> 1701 Market Street
> Philadelphia, PA  19103-6993
> Attn:  Barbara J. Shander, Esquire
> Facsimile:  (215) 963-5001
> Email:  bshander@morganlewis.com

If to Buyer:

        Citibank, N.A.
        Citigroup Inc.
        153 East 53rd Street, 25th Floor
        New York, NY 10022
        Attn: Deputy General Counsel – M&A Legal
        Facsimile: (212) 793-2402
        Email: Gonzalezr@citi.com

With a required copy to:

        Paul, Hastings, Janofsky & Walker LLP
        3579 Valley Centre Drive
        San Diego, CA 92130
        Attn: Carl R. Sanchez
        Facsimile: (858) 720-2555
        Email: carlsanchez@paulhastings.com

If to the Escrow Agent:

        U.S. Bank National Association
        Corporate Trust Services
        225 Asylum Street, 23rd Floor
        Hartford, CT 06103
        Attn:   Philip G. Kane, Jr.
        Ref:    Citibank/PayQuik Escrow
        Tel:    (860) 241-6842
        FAX:  (860) 241-6881
        Email: philip.kanejr@usbank.com

     Notwithstanding the foregoing, notices addressed to the Escrow Agent shall be effective only upon receipt. If any notice or document is required to be delivered to the Escrow Agent and any other person, the Escrow Agent may assume without inquiry that each notice or document was received by such other person when it is received by the Escrow Agent.

     (b)     In the event a Transfer Instruction is given (other than in writing at the time of execution of this Agreement), whether or not in writing, the Escrow Agent is authorized to seek confirmation of such instructions by telephone call-back to the person or persons designated on Schedule A hereto, and the Escrow Agent may rely upon the confirmation of anyone purporting to be the person or persons so designated. The persons and telephone numbers for call-backs may be changed only in a writing received and acknowledged by the Escrow Agent. The Escrow Agent and the beneficiary's bank in any funds transfer may rely solely upon any account numbers or similar identifying numbers provided by Buyer or the Stockholders' Representative to identify (i) the beneficiary, (ii) the beneficiary's bank or (iii) an intermediary bank. The

parties to this Agreement acknowledge that these security procedures are commercially reasonable.

(c)    Buyer and the Stockholders' Representative shall each execute and deliver to the Escrow Agent a certificate of incumbency substantially in the form of Schedule C hereto for the purpose of establishing the identity of the representatives of Buyer and the Stockholders' Representative entitled to issue a Transfer Instruction to the Escrow Agent on behalf of each such party. In the event of any change in the identity of such representatives, a new certificate of incumbency shall be executed and delivered to the Escrow Agent by the appropriate party. Until such time as the Escrow Agent shall receive a new incumbency certificate, the Escrow Agent shall be fully protected in relying without inquiry on any then current incumbency certificate on file with the Escrow Agent.

9.    General Terms.

(a)    Governing Law. This Agreement shall be construed and enforced in accordance with the laws of the State of Delaware without regard to its provisions concerning conflict of laws.

(b)    Further Actions. The parties hereto agree to execute and deliver any and all papers and documents necessary to complete the actions contemplated hereby.

(c)    Assignment. Subject to Section 9(k), this Agreement and the rights and obligations hereunder shall not be assignable or transferable by any party without the prior written consent of the other parties hereto, except that Buyer may assign all or any portion of its rights hereunder to any of its Affiliates without the written consent of any other party to this Agreement (which assignment shall not relieve Buyer of its obligations hereunder). Any attempted assignment in violation of this Section 9(c) shall be void.

(d)    Binding Effect. This Agreement shall be binding upon the parties hereto and their respective successors and assigns.

(e)    Severability. If any provision of this Agreement (or any portion thereof) or the application of any such provision (or any portion thereof) to any person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision hereof (or the remaining portion thereof) or the application of such provision to any other persons or circumstances.

(f)    Entire Agreement. This Agreement, together with the Merger Agreement, contains the entire agreement among the parties hereto with respect to the subject matter hereof. This Agreement may not be amended or revised except by a written instrument signed by all the parties hereto.

(g)    Construction. Unless the context of this Agreement clearly requires otherwise, (i) references to the plural include the singular, the singular the plural, the part the whole, (ii) references to one gender include all genders, (iii) "including" has the inclusive meaning frequently identified with the phrase "but not limited to", (iv) references to "hereunder,"

"herein," "hereto" or "hereof" relate to this Agreement and (v) references to this Agreement shall include all Schedules hereto. The section and other headings contained in this Agreement are for reference purposes only and shall not control or affect the construction of this Agreement or the interpretation thereof in any respect. Section, subsection, schedule and exhibit references are to this Agreement unless otherwise specified. Each accounting term used herein that is not specifically defined herein shall have the meaning given to it under United States generally accepted accounting principles as in effect from time to time.

(h)     Counterparts. This Agreement may be executed and delivered (including by facsimile) in two or more counterparts, each of which shall be binding as of the date first written above. Each such copy shall be deemed an original, and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.

(i)     Waiver of Jury Trial. Each of the parties hereto hereby irrevocably waives any and all right to trial by jury in respect to any litigation directly or indirectly arising out of or related to this Agreement or the transactions contemplated hereby.

(j)     W-9 and Account Opening Information. Prior to execution of this Agreement, the Stockholders' Representative and Buyer shall provide the Escrow Agent with an IRS Form W-9, duly and properly completed and executed. The Escrow Agent shall withhold any Taxes required by law to be withheld from the Escrow Earnings and shall remit such Taxes to the appropriate authorities. Any amount so withheld shall be treated for all purposes hereof and for purposes of the Merger Agreement as having been paid to the person on whose behalf such amount was withheld.

(k)     Customer Identification Program. Each of the Buyer and the Stockholders' Representative acknowledge receipt of the notice set forth on Annex B attached hereto and made part hereof and that information may be requested to verify their identities.

(l)     Successor. Any corporation into which the Escrow Agent in its individual capacity may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Escrow Agent in its individual capacity shall be a party, or any corporation to which substantially all the corporate trust business of the Escrow Agent in its individual capacity may be transferred, shall be the Escrow Agent under this Agreement without further act.

(m)     Force Majeure. The Escrow Agent shall not be responsible for delays or failures in performance resulting from acts beyond its control. Such acts shall include but not be limited to acts of God, strikes, lockouts, riots, acts of war, epidemics, governmental regulations superimposed after the fact, fire, communication line failures, computer viruses, power failures, earthquakes or other disasters. The Escrow Agent shall not be liable for damages to the other parties hereto for any damages resulting from such failure to perform otherwise from such causes. Performance under this Agreement shall resume when the Escrow Agent is able to perform substantially.

(n)     Compliance with Court Orders. In the event that any escrow property shall be attached, garnished or levied upon by any court Order, or the delivery thereof shall be stayed or

11

enjoined by an Order, or any Order shall be entered by any court affecting the property deposited under this Agreement, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all Orders so entered or issued, which it is reasonably advised by competent legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Escrow Agent obeys or complies with any such Order, it shall not be liable to any of the parties hereto or to any other person, firm or corporation, by reason of such compliance notwithstanding such Order be subsequently reversed, modified, annulled, set aside or vacated.

(o)     <u>Specific Performance</u>.  THE PARTIES AGREE THAT IRREPARABLE DAMAGE WOULD OCCUR IN THE EVENT THAT ANY OF THE PROVISIONS OF THIS AGREEMENT WERE NOT PERFORMED IN ACCORDANCE WITH THEIR SPECIFIC TERMS OR WERE OTHERWISE BREACHED.  IT IS ACCORDINGLY AGREED THAT THE PARTIES SHALL BE ENTITLED TO AN INJUNCTION OR INJUNCTIONS TO PREVENT BREACHES OF THIS AGREEMENT AND TO ENFORCE SPECIFICALLY (WITHOUT ANY REQUIREMENT TO POST ANY BOND OR OTHER COLLATERAL) THE TERMS AND PROVISIONS OF THIS AGREEMENT, IN ADDITION TO ANY OTHER REMEDY TO WHICH THEY ARE ENTITLED AT LAW OR IN EQUITY.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, this Escrow Agreement has been executed by the undersigned as of the day and year first written above.

BUYER:

CITIBANK, N.A.

By: *A. B. Sarpeshkar*

Name:  Bharat Sarpeshkar
Title:   Vice President

ESCROW AGENT:

U.S. BANK NATIONAL ASSOCIATION

By: _____

Name:
Title:

STOCKHOLDERS' REPRESENTATIVE:

FESNAK AND ASSOCIATES, LLP

By: _____

Name:  Robert W. Fesnak
Title:   Managing Partner

IN WITNESS WHEREOF, this Escrow Agreement has been executed by the undersigned as of the day and year first written above.

BUYER:

CITIBANK, N.A.

By: _____
    Name: Bharat Sarpeshkar
    Title:   Vice President

ESCROW AGENT:

U.S. BANK NATIONAL ASSOCIATION

By: _____
    Name:   Arthur L. Blakeslee
    Title:   Vice President

STOCKHOLDERS' REPRESENTATIVE:

FESNAK AND ASSOCIATES, LLP

By: _____
    Name: Robert W. Fesnak
    Title:   Managing Partner

IN WITNESS WHEREOF, this Escrow Agreement has been executed by the undersigned as of the day and year first written above.

BUYER:

CITIBANK, N.A.

By: _____
    Name:
    Title:

ESCROW AGENT:

U.S. BANK NATIONAL ASSOCIATION

By: _____
    Name:
    Title:

STOCKHOLDERS' REPRESENTATIVE:

FESNAK AND ASSOCIATES, LLP

By: _____
    Name: Robert W. Fesnak
    Title: Managing Partner

[Escrow Agreement -- Signature Page]

<u>Schedule A</u>

Telephone Number(s) for Call-Backs and Person(s)
<u>Designated to Confirm Funds Transfer Instructions</u>

If to Buyer:

| Name | Telephone Number |
|------|------------------|
| 1.   Karl W. Bylciw | (212) 816-7128 |
| 2.   Joan Paschke | (716) 730-6069 |

If to the Stockholders' Representative:

| Name | Telephone Number |
|------|------------------|
| 1.   Robert W. Fesnak | (267) 419-2200 |

Telephone call-backs shall be made to Buyer and Stockholders' Representative if joint Transfer
Instructions are required pursuant to this Escrow Agreement.

## Schedule B

### Percentage Interest

Schedule B To Escrow Agreement dated January 9, 2008 among
Citibank, N.A., U.S. Bank National Association as Escrow Agent, and Fesnak and Associates, LLP

**Aggregate Compensation Escrow Percentage**
1.159844%

**Aggregate Merger Consideration Escrow Percentage**
98.840156%

| Stockholder Parties | Percentage Interest |
|---|---|
| Bhairav Trivedi | 12.907829% |
| David F. Noteware | 11.680083% |
| Shanker Trivedi | 0.992937% |
| David R. Noteware | 2.722791% |
| Sailesh G Joshi | 0.574841% |
| Anand Balasubramanyam | 0.459873% |
| Arnon Dreyfuss | 0.229936% |
| Harsh Dalal | 0.229936% |
| Umesh Joshi | 0.114968% |
| Yogesh Maniar | 0.057484% |
| Snehal Dave | 0.057484% |
| Mrugank Shastri | 0.057484% |
| Rajesgwari Jani | 0.057484% |
| Albert Cahana | 0.229936% |
| Yuval Bar Gil | 0.284891% |
| Samuel LuBarr Inc | 0.549548% |
| Nicholas Quercetti | 0.549548% |
| Ruhrberg Israel | 0.164864% |
| Zeev Ariel | 0.082432% |
| Katznelson Associates, LP | 0.274774% |
| Murex Investments I, LP | 14.167077% |
| N3P Investments, LLC | 19.576992% |
| LH Investors IV LLC | 2.642965% |
| Lighthouse Funds, LLC | 0.086226% |
| Ben Franklin Technology Partners | 1.139850% |
| Jeff Slowik | 3.141458% |
| Radhakrishan Sadasivam | 0.616537% |
| Rajendram Ravindran | 2.485876% |
| Sameer Singh | 0.617922% |
| Ambhar Boodhoo and Kanika Singh | 1.240229% |
| MentorTech Ventures | 10.748104% |
| Christian Ruppel | 0.615153% |
| Steven Sembler | 1.353337% |
| Brian Slowik | 0.492122% |
| Michael Luebbert | 1.424456% |
| Michael Swink | 2.247054% |
| Alex Peterhans | 1.343059% |
| Dick Corl | 2.037582% |
| Kamal Kant | 0.201194% |
| John Mendez | 0.949638% |
| Joe Kucharski | 0.086226% |
| Jason Jun | 0.086226% |
| RSA Ventures | 0.344905% |
| Don Gleklen | 0.076684% |
| **Total** | 100.000000% |

## Schedule C

Certificate of Incumbency

## CERTIFICATE OF INCUMBENCY

I, Robert W. Fesnak, Managing Partner of Fesnak and Associates, LLP (the "Stockholders' Representative"), do hereby certify that the persons named below have been duly elected and appointed, and this day are authorized signatories of the Stockholders' Representative, holding the respective titles set forth opposite their names, and the signatures set forth opposite each person's name is his genuine signature.

| Name | Title | |
|------|-------|---|
| Robert W. Fesnak | Managing Partner | *(signature)* |
| Sam M. Vinovich | Manager | *(signature)* |

IN WITNESS WHEREOF, I have hereunto set my hand this 8th day of January, 2008.

*(signature)*

Name: Robert W. Fesnak
Title:   Managing Partner

I, Sam M. Vinovich, Manager of the Stockholders' Representative, do hereby certify that Robert W. Fesnak is the duly elected and acting Managing Partner of the Stockholders' Representative and that the signature set forth above is his genuine signature.

*(signature)*

Name: Sam M. Vinovich
Title:   Manager

## CERTIFICATE OF INCUMBENCY

## C I T I B A N K, N.A.

I, Michael J. Tarpley, Assistant Secretary of Citibank, N.A. having its main office at 8900 Paradise Road, Las Vegas, Nevada and its principal place of business at 399, Park Avenue, New York, NY, DO HEREBY CERTIFY that the following is a true and correct copy of Section 2 of Article X of the existing By-Laws of CITIBANK, N.A. in full force and effect as of the date hereof.

"Execution of Instruments. All agreements, indentures, mortgages, deeds, conveyances, transfers, certificates, declarations, receipts, discharges, releases, satisfactions, settlements, petitions, schedules, accounts, affidavits, bonds, undertakings, proxies and other instruments or documents may be signed executed, acknowledged, verified, delivered or accepted in behalf of the Association by the Chairman, the Chief Executive Officer, the President, any Vice Chairman, or any Executive Vice President, or the Chairman Credit Policy Committee, or any Senior Vice President, or the Secretary, or the Chief Auditor, or any Vice President, or anyone holding a position equivalent to the foregoing pursuant to provisions of these By-Laws, or, in connection with the exercise of any of the fiduciary powers of the Association, by any of said officers or by any Senior Trust Officer. Any such instruments may also be executed, acknowledged, verified, delivered or accepted in behalf of the Association in such other manner and by such other officers as the Board of Directors may from time to time direct. The provisions of this Section 2 are supplementary to any other provisions of these By-Laws."

I FURTHER CERTIFY that Bharat B. Sarpeshkar is a Vice President of CITIBANK, N.A., duly constituted as such, and the following is a facsimile signature as it appears in the Citibank, N.A. Authorized Signature System.

Sarpeshkar, Bharat B,
Vice President

*B. B. Sarpeshkar*

IN WITNESS WHEREOF, I have hereunto affixed my official signature and seal of the said Bank in the City of New York on this 21st day of February, 2007.

MICHAEL J. TARPLEY

(SEAL)

# CERTIFICATE OF INCUMBENCY

# CITIBANK, N.A.

I, Michael J. Tarpley, Assistant Secretary of Citibank, N.A. having its main office at 8900 Paradise Road, Las Vegas, Nevada and its principal place of business at 399 Park Avenue, New York, NY, DO HEREBY CERTIFY that the following is a true and correct copy of Section 2 of Article X of the existing By-Laws of CITIBANK, N.A. in full force and effect as of the date hereof:

"Execution of Instruments. All agreements, indentures, mortgages, deeds, conveyances, transfers, certificates, declarations, receipts, discharges, releases, satisfactions, settlements, petitions, schedules, accounts, affidavits, bonds, undertakings, proxies and other instruments or documents, may be signed executed, acknowledged, verified, delivered or accepted in behalf of the Association by the Chairman, the Chief Executive Officer, the President, any Vice Chairman, or any Executive Vice President, or the Chairman Credit Policy Committee, or any Senior Vice President, or the Secretary, or the Chief Auditor, or any Vice President, or anyone holding a position equivalent to the foregoing pursuant to provisions of these By-Laws or, if in connection with the exercise of any of the fiduciary powers of the Association, by any of said officers or by any Senior Trust Officer. Any such instruments may also be executed, acknowledged, verified, delivered or accepted in behalf of the Association in such other manner and by such other officers as the Board of Directors may from time to time direct. The provisions of this Section 2 are supplementary to any other provisions of these By-Laws."

I FURTHER CERTIFY that John M. Kohan is a Vice President of CITIBANK, N.A. duly constituted as such and the following is a facsimile signature as it appears in the Citibank, N.A. Authorized Signature System:

Kohan, John M.
Vice President

_John M. Kohan_

In WITNESS WHEREOF, I have hereunto affixed my official signature and seal of the said Bank in the City of New York on this 21st day of February, 2007.

_Michael J. Tarpley_

MICHAEL J. TARPLEY

(SEAL)

### ANNEX A

## U.S. BANK, NATIONAL ASSOCIATION
## MONEY MARKET ACCOUNT
## DESCRIPTION AND TERMS

The U.S. Bank Money Market account is a U.S. Bank, National Association ("U.S. Bank") interest-bearing money market deposit account designed to meet the needs of U.S. Bank's Corporate Trust Services Escrow Group and other Corporate Trust customers of U.S. Bank. Selection of this investment includes authorization to place funds on deposit with U.S. Bank.

U.S. Bank uses the daily balance method to calculate interest on this account (actual/365 or 366). This method applies a daily periodic rate to the principal balance in the account each day. Interest is accrued daily and credited monthly to the account. Interest rates are determined at U.S. Bank's discretion, and may be tiered by customer deposit amount.

The owner of the account is U.S. Bank as Agent for its trust customers. U.S. Bank's trust department performs all account deposits and withdrawals. The deposit account is insured by the Federal Deposit Insurance Corporation up to $100,000.

**Annex B**

# CUSTOMER IDENTIFICATION PROGRAM NOTICE

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT

To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions (which includes the Escrow Agent) to obtain, verify and record information that identifies each person who opens an account.

For a non-individual person such as a business entity, a charity, a trust or other legal entity the Escrow Agent will ask for documentation to verify its formation and existence as a legal entity. Such documentation may include, but is not limited to, Certificates of Good Standing from the appropriate Secretary of State, certified copies of Partnership Agreements, Trust Agreements or other formation agreements or documents. For companies whose equity securities are publicly traded, these requirements can be met with evidence of regulatory filings with the Securities and Exchange Commission as found on their EDGAR database. We may also ask to see financial statements, licenses, identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

In addition, for non-individual entities, the Escrow Agent must be informed if any contractual party is now acting, or has acted in the past 12 months, under a different name, or has changed its name in the last 12 months.

For individuals, a copy of a government–issued identification, such as a driver's license or passport, is required to establish identity for the primary party responsible for the account, such as the Shareholder Representative, as a signing party to the governing documents. Additionally, any individual involved in the transaction will be required to provide a certified Tax Identification Number on IRS Form W-9, or Form W-8 for non-US Persons.

Any capitalized term used without definition in this Annex B is used with the meaning assigned to such term in the Escrow Agreement of which this Annex B is a part.

# Delaware

PAGE  1

### The First State

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF MERGER, WHICH MERGES:

"PENELOPE ACQUISITION SUB, INC.", A DELAWARE CORPORATION,

WITH AND INTO "PAYQUIK.COM, INC." UNDER THE NAME OF "PAYQUIK.COM, INC.", A CORPORATION ORGANIZED AND EXISTING UNDER THE LAWS OF THE STATE OF DELAWARE, AS RECEIVED AND FILED IN THIS OFFICE THE NINTH DAY OF JANUARY, A.D. 2008, AT 1:53 O'CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.

Harriet Smith Windsor
_____
Harriet Smith Windsor, Secretary of State

3240587  8100M

080026442

AUTHENTICATION:  6297560

DATE:  01-09-08

You may verify this certificate online
at corp.delaware.gov/authver.shtml

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 01:53 PM 01/09/2008*
*FILED 01:53 PM 01/09/2008*
*SRV 080026442 - 3240587 FILE*

# CERTIFICATE OF MERGER

## OF

## PENELOPE ACQUISITION SUB, INC.
### (a Delaware corporation)

## WITH AND INTO

## PAYQUIK.COM, INC.
### (a Delaware corporation)

Pursuant to Title 8, Section 251(c) of the Delaware General Corporation Law, the undersigned corporation hereby certifies as follows:

FIRST:    The name and state of incorporation of each of the constituent corporations participating in the merger are as follows:

(i)    PayQuik.com, Inc., a Delaware corporation (the "Corporation"); and

(ii)    Penelope Acquisition Sub, Inc., a Delaware corporation ("Merger Sub").

SECOND:    The Merger Agreement, dated as of October 18, 2007, by and among Citibank, N.A., Merger Sub, the Corporation and Fesnak & Associates, LLP, as Stockholders' Representative (the "Merger Agreement"), has been approved, adopted, certified, executed and acknowledged by each of the constituent corporations.

THIRD:    The surviving corporation is the Corporation and the corporation being merged into this surviving corporation is Merger Sub.    The name of the surviving corporation is PayQuik.com, Inc.

FOURTH:    The First Amended and Restated Certificate of Incorporation of the surviving corporation shall be amended and restated to be the Amended and Restated Certificate of Incorporation set forth in Exhibit A hereto.

FIFTH:    The merger is to become effective upon the filing of this Certificate of Merger with the Secretary of State of the State of Delaware.

SIXTH:    The Merger Agreement is on file at the principal place of business of the surviving corporation.    The address of the principal place of business of the surviving corporation is 150 Monument Road, Suite 207, Bala Cynwyd, PA 19004.

SEVENTH:    A copy of the Merger Agreement will be furnished by the surviving corporation, upon request and without cost, to any stockholder of any of the constituent corporations.

IN WITNESS WHEREOF, PayQuik.com, Inc. has caused this Certificate of Merger to be executed by its President as of this _7th_ day of January, 2008.

PAYQUIK.COM, INC.

By: _____

Name: Bhairav Trivedi

Title:  President

**Exhibit A**

## AMENDED AND RESTATED
## CERTIFICATE OF INCORPORATION
## OF
## PAYQUIK.COM, INC.
a Delaware corporation

FIRST:      The name of the corporation is PayQuik.com, Inc. (hereinafter referred to as the "Corporation").

SECOND:      The registered office of the Corporation is to be located at 2711 Centerville Road, Suite 400, in the City of Wilmington, in the County of New Castle, in the State of Delaware 19808. The name of its registered agent at that address is Corporation Service Company.

THIRD:      The purpose of the Corporation is to engage in any lawful act or activity for which a corporation may be organized under the Delaware General Corporation Law.

FOURTH:      The total number of shares of stock that the Corporation is authorized to issue is one thousand (1,000) shares of stock, all of which shall be designated common stock (the "Common Stock"). Each share of Common Stock shall have a par value of $0.01.

FIFTH:      The following provisions are inserted for the management of the business and for the conduct of the affairs of the Corporation, and for further definition, limitation and regulation of the powers of the Corporation and of its directors and stockholders:

(1)      The number of directors of the Corporation shall be such as from time to time shall be fixed by, or in the manner provided in, the bylaws. Election of directors need not be by ballot unless the bylaws so provide.

(2)      The Board of Directors shall have powers without the assent or vote of the stockholders to make, alter, amend, change, add to or repeal the bylaws of the Corporation; to fix and vary the amount to be reserved for any proper purpose; to authorize and cause to be executed mortgages and liens upon all or any part of the property of the Corporation; to determine the use and disposition of any surplus or net profits; and to fix the times for the declaration and payment of dividends.

(3)     The directors in their discretion may submit any contract or act for approval or ratification at any annual meeting of the stockholders or at any meeting of the stockholders called for the purpose of considering any such act or contract, and any contract or act that shall be approved or be ratified by the vote of the holders of a majority of the stock of the Corporation which is represented in person or by proxy at such meeting and entitled to vote thereat (provided that a lawful quorum of stockholders be there represented in person or by proxy) shall be as valid and as binding upon the Corporation and upon all the stockholders as though it had been approved or ratified by every stockholder of the Corporation, whether or not the contract or act would otherwise be open to legal attack because of directors' interest, or for any other reason.

(4)     In addition to the powers and authorities hereinbefore or by statute expressly conferred upon them, the directors are hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by the Corporation; subject, nevertheless, to the provisions of the statutes of Delaware, of this certificate, and to any bylaws from time to time made by the stockholders; provided, however, that no bylaws so made shall invalidate any prior act of the directors which would have been valid if such bylaw had not been made.

SIXTH:     The Corporation shall, to the full extent permitted by Section 145 of the Delaware General Corporation Law, as amended from time to time, indemnify all persons whom it may indemnify pursuant thereto.

SEVENTH:     The Corporation reserves the rights to amend, alter, change or repeal any provision contained in this certificate of incorporation in the manner now or hereafter prescribed by law, and all rights and powers conferred herein on stockholders, directors and officers are subject to this reserved power.

EIGHTH:     No director shall be personally liable to the Corporation or any of its stockholders for monetary damages for breach of fiduciary duty as a director except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) pursuant to Section 174 of the Delaware General Corporation Law or (iv)

for any transaction from which the director derived an improper personal benefit. Any repeal or modification of this Article Eighth by the stockholders of the Corporation shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification with respect to acts or omissions for or with respect to any acts or omissions of such director occurring prior to such repeal or modification.

NINTH:      Section 203 of the Delaware General Corporation Law shall not apply to the Corporation.

**EXHIBIT 2**

EXECUTION VERSION

MERGER AGREEMENT

dated as of October 18, 2007

by and among

CITIBANK, N.A.,

PENELOPE ACQUISITION SUB, INC.,

PAYQUIK.COM, INC.,

and the

STOCKHOLDERS' REPRESENTATIVE

appointed hereby

# TABLE OF CONTENTS

**Page**

ARTICLE I      DEFINITIONS ................................................................. 1
   1.1    Definitions .................................................................... 1
ARTICLE II    THE MERGER ................................................................. 10
   2.1    The Merger ................................................................... 10
   2.2    Merger Consideration and Conversion of Shares................... 10
   2.3    Retained Key Client Payments......................................... 13
   2.4    Annualized Revenue Target Payment ................................. 14
   2.5    Dissenting Shares .......................................................... 16
   2.6    Options and Warrants ..................................................... 16
   2.7    Pre-Closing Adjustment to Merger Consideration................. 17
   2.8    Post-Closing Adjustment ................................................ 18
   2.9    Certificate of Incorporation and Bylaws............................. 20
   2.10   Closing of Transfer Books; Unclaimed Merger Consideration ............. 20
   2.11   Escrow Funds Merger Consideration Adjustment ................. 20
   2.12   Stockholders' Representative Funds ................................. 21
   2.13   Withholding.................................................................. 21
ARTICLE III   THE CLOSING ................................................................ 21
   3.1    The Closing .................................................................. 21
   3.2    Deliveries .................................................................... 21
ARTICLE IV   REPRESENTATIONS AND WARRANTIES OF THE COMPANY ................................................................... 23
   4.1    Organization and Good Standing ...................................... 23
   4.2    Capitalization ............................................................... 23
   4.3    Subsidiaries of the Company ........................................... 25
   4.4    Authority and Enforceability............................................ 25
   4.5    No Conflicts; Consents ................................................... 26
   4.6    Financial Statements ...................................................... 26
   4.7    Taxes ......................................................................... 27
   4.8    Compliance with Law; Authorizations................................ 29
   4.9    Title to Personal Properties ............................................. 30
   4.10   Real Property ............................................................... 30

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| 4.11 | Intellectual Property | 31 |
| 4.12 | Absence of Certain Changes or Events | 34 |
| 4.13 | Contracts | 36 |
| 4.14 | Litigation | 37 |
| 4.15 | Employee Benefits | 38 |
| 4.16 | Labor and Employment Matters | 41 |
| 4.17 | Environmental | 41 |
| 4.18 | Insurance | 42 |
| 4.19 | Brokers | 42 |
| 4.20 | Banking Relationships | 42 |
| 4.21 | Minutes and Records | 42 |
| 4.22 | Related Party Transactions | 43 |
| 4.23 | Corrupt Practices | 43 |
| 4.24 | Powers of Attorney | 43 |
| ARTICLE V | REPRESENTATIONS AND WARRANTIES OF BUYER AND MERGER SUBSIDIARY | 43 |
| 5.1 | Organization and Good Standing | 44 |
| 5.2 | Authority and Enforceability | 44 |
| 5.3 | No Conflicts; Consents | 44 |
| 5.4 | Litigation | 45 |
| 5.5 | Availability of Funds | 45 |
| ARTICLE VI | COVENANTS OF THE COMPANY | 45 |
| 6.1 | Conduct of Business | 45 |
| 6.2 | Negative Covenants | 45 |
| 6.3 | Employee Benefits | 48 |
| 6.4 | 280G Approval | 48 |
| 6.5 | Access to Information | 48 |
| 6.6 | Resignations | 48 |
| 6.7 | Intercompany Liabilities; Indebtedness; Release of Liens | 49 |
| 6.8 | Notification | 49 |
| 6.9 | Stockholder Approval | 49 |

**TABLE OF CONTENTS**
(continued)

Page

6.10  Exclusive Dealing ................................................................ 49

ARTICLE VII  COVENANTS OF BUYER .......................................... 50

7.1  WARN Act .......................................................................... 50

ARTICLE VIII  COVENANTS OF BUYER AND THE COMPANY .............. 50

8.1  Confidentiality .................................................................... 50

8.2  Fulfillment of Closing Conditions .......................................... 50

8.3  Employee Matters ............................................................... 51

8.4  Public Announcements ........................................................ 51

8.5  Tax Matters ....................................................................... 52

ARTICLE IX  CONDITIONS TO CLOSING ...................................... 54

9.1  Conditions to Obligations of Buyer and the Company ............. 54

9.2  Conditions to Obligation of Buyer and Merger Subsidiary ....... 55

9.3  Conditions to Obligation of the Company .............................. 56

ARTICLE X  TERMINATION ...................................................... 57

10.1  Termination ...................................................................... 57

10.2  Effect of Termination ........................................................ 58

10.3  Remedies ......................................................................... 58

ARTICLE XI  INDEMNIFICATION ............................................... 58

11.1  Survival .......................................................................... 58

11.2  Indemnification by the Stockholder Parties ........................... 58

11.3  Indemnification by Buyer ................................................... 61

11.4  Indemnification Procedure for Third Party Claims .................. 61

11.5  Indemnification Procedures for Non-Third Party Claims .......... 62

11.6  Calculation of Indemnity Payments ..................................... 62

11.7  Characterization of Indemnification Payments ....................... 63

11.8  No Effect of Investigation; No Waiver ................................. 63

11.9  Stockholders' Representative .............................................. 63

ARTICLE XII  MISCELLANEOUS ................................................ 66

12.1  Notices ........................................................................... 66

12.2  Amendments and Waivers .................................................. 67

12.3  Expenses ......................................................................... 67

## TABLE OF CONTENTS
### (continued)

|  |  |  | Page |
|---|---|---|---|
| 12.4 | Successors and Assigns | | 67 |
| 12.5 | Governing Law | | 67 |
| 12.6 | Consent to Jurisdiction | | 67 |
| 12.7 | Counterparts | | 68 |
| 12.8 | No Third Party Beneficiaries | | 68 |
| 12.9 | Entire Agreement | | 68 |
| 12.10 | Captions | | 68 |
| 12.11 | Severability | | 68 |
| 12.12 | Specific Performance | | 69 |
| 12.13 | Interpretation | | 69 |

## MERGER AGREEMENT

This MERGER AGREEMENT (this "Agreement") is made as of October 18, 2007, by and among Citibank, N.A., a national banking association ("Buyer"), Penelope Acquisition Sub, Inc., a Delaware corporation and wholly-owned subsidiary of Buyer ("Merger Subsidiary"), PayQuik.com, Inc., a Delaware corporation (the "Company") and Fesnak & Associates, LLP, solely in the capacity of Stockholders' Representative as defined herein (the Stockholders' Representative and, together with the Company, Buyer and Merger Subsidiary, each a "Party" and collectively, the "Parties").

## BACKGROUND

A.     The Company is in the business of providing global end-to-end money transfer solutions to companies (the "Business").

B.     The respective Boards of Directors of the Company and Merger Subsidiary deem it advisable and in the best interests of the Company, Merger Subsidiary and their respective stockholders that Merger Subsidiary merge with and into the Company (the "Merger") pursuant to this Agreement and the applicable provisions of the laws of the State of Delaware.

C.     Concurrently with the execution of this Agreement and as an inducement to Buyer to enter into this Agreement, each of Bhairav Trivedi, Jeff Slowik, Alex Peterhans, Mike Swink and Mike Luebbert (the "Key Employees") has entered into an Employment Agreement with Buyer, pursuant to which each such employee has agreed to employment with the Surviving Corporation.

D.     Concurrently with the execution of this Agreement and as an inducement to Buyer to enter into this Agreement, each of Bhairav Trivedi and Jeff Slowik has entered into a Non-Competition Agreement with Buyer.

NOW, THEREFORE, in consideration of the foregoing premises and the respective representations and warranties, covenants and agreements contained herein, the Parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

1.1     Definitions. When used in this Agreement, the following terms shall have the meanings assigned to them in this Section 1.1.

"2006 Financial Statements" is defined in Section 4.6(a).

"280G Approval" is defined in Section 6.4.

LEGAL_US_W # 56638659.22

"Action" is defined in Section 4.14.

"Affiliate" means, with respect to any specified Person, any other Person directly or indirectly controlling, controlled by or under common control with such specified Person.

"Aggregate Exercise Price" means an amount equal to the sum of (i) the aggregate amount of the exercise prices per share of all in-the-money Common Options outstanding immediately prior to the Effective Time, plus (ii) the aggregate amount of the exercise prices per share of all in-the-money Common Warrants outstanding immediately prior to the Effective Time.

"Agreement" is defined in the Preamble.

"A.G. Solutions" means the Indian sole proprietary firm and service provider providing infrastructure and systems support, operational and human resource support, customer support functions and accounting support functions to the Company.

"Annualized Revenue Target" means $1,500,000.

"Annualized Revenue Target Determination" is defined in Section 2.4(a).

"Annualized Revenue Target Payment" is defined in Section 2.4(e).

"Authorization" means any authorization, approval, consent, certificate, license, permit or franchise of or from any Governmental Entity or pursuant to any Law.

"Balance Sheet" is defined in Section 4.6(a).

"Balance Sheet Date" is defined in Section 4.6(a).

"Business" is defined in the Background. For the purpose of this Agreement, Business shall be deemed to include any activities, including liaison activities, carried on by the Company in India, the United Kingdom and Canada.

"Business Day" means a day other than a Saturday, Sunday or other day on which banks located in New York City are authorized or required by law to close.

"Buyer" is defined in the Preamble.

"Buyer Disclosure Schedule" is defined in the preamble to Article V.

"Buyer Indemnitee" means the Buyer, the Surviving Corporation, their Affiliates and each of their respective Representatives.

"Buyer Material Adverse Effect" means any change or effect that is materially adverse to the ability of Buyer or Merger Subsidiary to perform their respective obligations under this Agreement or on the ability of Buyer or Merger Subsidiary to

consummate any of the transactions contemplated by this Agreement, other than any such effect or change resulting from or arising in connection with (a) general economic or industry-wide conditions, (b) acts of terrorism or military action or the threat thereof which do not disproportionately affect Buyer and its Subsidiaries, or (c) any condition described in the Buyer Disclosure Schedule.

"Capital Stock" means (a) in the case of a corporation, its shares of capital stock, (b) in the case of a partnership or limited liability company, its partnership or membership interests or units (whether general or limited), and (c) any other interest that confers on a Person the right to receive a share of the profits and losses of, or distribution of assets, of the issuing entity.

"Closing" is defined in Section 3.1.

"Closing Date" is defined in Section 3.1.

"Closing Working Capital" means the Net Working Capital of the Company and its Subsidiaries on a consolidated basis as of the close of business on the Closing Date.

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

"Code" means the Internal Revenue Code of 1986.

"Common Option" means each outstanding stock option or similar rights to purchase shares of Common Stock.

"Common Optionholder" is defined in Section 2.6(a).

"Common Stock" is defined in Section 4.2(a).

"Common Warrantholder" is defined in Section 2.6(b).

"Common Warrants" mean each warrant or other contractual right to purchase or acquire shares of Common Stock; provided, however, that Common Options and shares of Preferred Stock shall not be considered Common Warrants.

"Company" is defined in the Preamble.

"Company Benefit Plan" means any current or former plan, program, Contract or agreement providing for compensation, severance, termination pay, performance awards, stock or stock-related awards, fringe benefits or other benefits or remuneration of any kind, whether written or unwritten, funded or unfunded, which is or has been (within the last 6 years) maintained, contributed to, or required to be contributed to, by the Company or any of its Subsidiaries or any ERISA Affiliate for the benefit of any employee, officer, director, or other service provider or any relative or dependent of any of the foregoing and under which the Company or any of its Subsidiaries or any ERISA Affiliate has or

may have any liability with respect to such employee, relative or dependent, including without limitation, each "employee benefit plan" as defined in ERISA Section 3(3), including any (a) nonqualified deferred compensation or retirement plan or arrangement which is an Employee Pension Benefit Plan (as defined in ERISA Section 3(2)), (b) qualified defined contribution retirement plan or arrangement which is an Employee Pension Benefit Plan, (c) qualified defined benefit retirement plan or arrangement which is an Employee Pension Benefit Plan (including any Multiemployer Plan (as defined in ERISA Section 3(37)) or (d) Employee Welfare Benefit Plan (as defined in ERISA Section 3(1)) or material fringe benefit plan or program.

"Company Disclosure Schedule" is defined in the preamble to Article IV.

"Company Disclosure Schedule Supplement" is defined in Section 6.8.

"Company Material Adverse Effect" means any change, effect, event, violation, inaccuracy, circumstance or other matter that, individually or in the aggregate, is or would reasonably be expected to be materially adverse to (i) the business, financial condition, capitalization, assets, liabilities, operations or financial performance of the Company and its Subsidiaries taken as a whole or (ii) the ability of the Company to consummate the Merger or any of the other transactions contemplated by this Agreement or to perform any of its obligations under this Agreement prior to the Termination Date, in each case other than any such effect or change (a) resulting from or arising in connection with (i) general economic or industry-wide conditions which do not disproportionately affect the Company and its Subsidiaries, (ii) acts of terrorism or military action or the threat thereof which do not disproportionately affect the Company and its Subsidiaries, (iii) the announcement or pendency of the transactions contemplated by this Agreement, (iv) any change in accounting requirements or principles or any change in applicable Law, or (b) attributable to the fact that the prospective owner of the Company and its Subsidiaries is Buyer or any Affiliate of Buyer.

"Company Shares" means shares of Common Stock and Preferred Stock.

"Company Stock Plan" means any stock plan or other stock or equity-related plan of the Company.

"Confidentiality Agreement" is defined in Section 8.1.

"Contract" means any agreement, contract, commitment, arrangement or understanding.

"Controlled Group Liability" means any and all liabilities (i) under Title IV of ERISA, (ii) under Section 302 of ERISA, (iii) under Sections 412 and 4971 of the Code, or (iv) resulting from a failure to comply with the continuation coverage requirements of Section 601 et seq. of ERISA and Section 4980B of the Code.

"Convertible Notes" means those Convertible Notes described on Schedule 4.2(g).

"Deductible" is defined in Section 11.2(d).

"DGCL" is defined in Section 2.1.

"Dissenting Shares" is defined in Section 2.5(a).

"Effective Time" means the time at which the Surviving Corporation files the Certificate of Merger with the Secretary of State of the State of Delaware.

"Employee Agreement" shall mean each material employment, retention, severance, change-of-control, non-competition, consulting and indemnification agreement or Contract between the Company and any employee, officer, director, or service provider.

"Environmental Laws" is defined in Section 4.17.

"Equity Securities" means (a) shares of Capital Stock, and (b) options, warrants or other rights convertible into, or exercisable or exchangeable for, directly or indirectly, or otherwise entitling any Person to acquire, directly or indirectly, shares of Capital Stock.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any entity, trade or business (whether or not incorporated) which is a member of a "controlled group of corporations" with, under "common control" with or a member of an "affiliated services group" with, the Company or any of its Subsidiaries, as defined in Section 414(b), (c), (m) or (o) of the Code or Section 4001(a)(14) or 4001(b)(1) of ERISA.

"Escrow Agent" is defined in Section 2.11(a).

"Escrow Agreement" is defined in Section 2.11(a).

"Escrow Funds" is defined in Section 2.11(a).

"Financial Statements" is defined in Section 4.6(a).

"GAAP" is defined in Section 4.6(a).

"Governmental Entity" means any entity or body exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to United States federal, state or local government or foreign, provincial, international, multinational or other government, including any department, commission, board, agency, bureau, official or other regulatory, administrative or judicial authority thereof.

"Income Statement" is defined in Section 2.4(a).

"Indebtedness" means any of the following: (a) any indebtedness for borrowed money, (b) any obligations evidenced by bonds, debentures, notes or other similar instruments (including outstanding Convertible Notes not converted pursuant to Section 2.2(c)), (c) any obligations to pay the deferred purchase price of property or services, except trade accounts payable and other current Liabilities arising in the ordinary course of business, (d) any obligations as lessee under capitalized leases, (e) any indebtedness created or arising under any conditional sale or other title retention agreement with respect to acquired property, (f) any obligations, contingent or otherwise, under acceptance credit, letters of credit or similar facilities, (g) all obligations arising from cash/book overdrafts, (h) any obligations arising from deferred compensation arrangements to the extent such obligations exceed the restricted cash set aside to pay such obligations, (i) all obligations secured by a Lien, (j) all deferred rent, (k) all long-term deferred revenue, (l) all indebtedness for the deferred purchase price of property or services with respect to which a Person is liable, contingently or otherwise, as obligor or otherwise (other than trade payables incurred in the ordinary course of business which are not past due based on the due date specified in the invoice therefore, or if no due date is specified, then based on past custom and practice), (m) all Liabilities classified as non-current liabilities in accordance with GAAP as of the Closing Date, (n) all accrued interest, prepayment premiums or penalties related to any of the foregoing and (o) any guaranty of any of the foregoing.

"Indemnitee" means any Person that is seeking indemnification from an Indemnitor pursuant to the provisions of this Agreement.

"Indemnitor" means any Party to this Agreement from which any Indemnitee is seeking indemnification pursuant to the provisions of this Agreement.

"Independent Accounting Firm" is defined in Section 2.8(d).

"Indian Income-Tax Act" means the Indian Income-Tax Act, 1961 as amended from time to time.

"Intellectual Property" is defined in Section 4.11(a).

"Interim Balance Sheet" is defined in Section 4.6(a).

"Interim Balance Sheet Date" is defined in Section 4.6(a).

"Interim Financial Statements" is defined in Section 4.6(a).

"Knowledge" (a) an individual will be considered to have "Knowledge" of a fact or matter if the individual is actually aware of the fact or matter or a prudent individual in similar circumstances could be reasonably expected to discover or otherwise become aware of the fact or matter in the course of conducting a reasonable investigation concerning the existence of the fact or matter, and (b) an entity will be considered to have "Knowledge" of a fact or matter if any individual who is serving, or who has at any time

served, as a director, manager or executive officer of that entity (or in similar capacity) has, or at any time had, Knowledge of the fact or matter.

"Law" means any federal, state, provincial, local or municipal law, statute, constitution, ordinance, code, decree, rule, regulation, ruling, requirement, policy or guideline issued, enacted, adopted or promulgated by or under the authority of any Governmental Entity.

"Leased Real Property" is defined in Section 4.10(b).

"Leases" is defined in Section 4.10(b).

"Liability" means any direct or indirect liability, indebtedness, obligation, expense, claim, loss, damage, deficiency, guaranty or endorsement of or by any Person, absolute or contingent, accrued or unaccrued, due or to become due, liquidated or unliquidated, secured or unsecured, disputed or undisputed, vested or unvested.

"Lien" means, with respect to any property or asset, any mortgage, lien, pledge, charge, security interest, covenant, easement, right of way, encroachment, restriction on transfer or other encumbrance in respect of such property or asset.

"Losses" is defined in Section 11.2(a).

"Material Contracts" is defined in Section 4.13(c).

"Merger" is defined in the Background.

"Merger Consideration" is defined in Section 2.2.

"Merger Subsidiary" is defined in the Preamble.

"Multiemployer Plan" means any "Pension Plan (as defined below) which is a "multiemployer plan," as defined in Section 3(37) of ERISA.

"Net Working Capital" means, as of any specific date, the excess of the current assets (excluding deferred income taxes) of the Company over the current liabilities, determined in accordance with GAAP. Current liabilities of the Company shall exclude Indebtedness, payables arising from Transaction Costs and deferred revenue.

"Non-Option Amount" means the amount of the Merger Consideration minus the aggregate amount of all Option Cancellation Payments.

"Non-Preference Amount" is defined in Section 2.2(b).

"Notice of Claim" is defined in Section 11.4(a).

"Option Cancellation Payment" is defined in Section 2.6(a).

"Order" means any award, injunction, judgment, decree, order, ruling, subpoena or verdict or other decision issued, promulgated or entered by or with any Governmental Entity of competent jurisdiction.

"Organizational Documents" means, with respect to any entity, the certificate of incorporation, the articles of incorporation, bylaws, articles of organization, partnership agreement, limited liability company agreement, formation agreement, joint venture agreement or other similar organizational documents of such entity (in each case, as amended through the date of this Agreement).

"Outstanding Shares" means outstanding shares of Common Stock and Preferred Stock, as set forth on Schedule 4.2(a).

"Owned Intellectual Property" is defined in Section 4.11(b).

"Party" and "Parties" is defined in the Preamble.

"Payment Agent" is defined in Section 2.2(a).

"Pension Plan" means each Company Benefit Plan that is an "employee pension benefit plan," within the meaning of Section 3(2) of ERISA.

"Permitted Liens" means (a) Liens for current real or personal property taxes that are not yet due and payable or that may hereafter be paid without material penalty and (b) workers', carriers' and mechanics' or other like Liens incurred in the ordinary course of business.

"Person" means an individual, a corporation, a partnership, a limited liability company, a trust, an unincorporated association, a Governmental Entity or any agency, instrumentality or political subdivision of a Governmental Entity, or any other entity or body.

"Policies" is defined in Section 4.18.

"Preferred Stock" is defined in Section 4.2(a).

"Representatives" shall mean officers, directors, employees, agents, attorneys, accountants, advisors and representatives.

"Required Consents" is defined in Section 9.2(g).

"Requisite Stockholder Approval" means the adoption of this Agreement and the approval of the Merger by (a) a majority of the votes represented by the holders of Company Shares and (b) holders of a majority of the outstanding shares of Series B Preferred Stock.

"Retained Key Client" is defined in Section 2.3(a).

"Retained Key Client Payment" is defined in Section 2.3(a).

"Series A Preference Amount" is defined in Section 2.2(a)(ii).

"Series A Preferred Stock" is defined in Section 4.2(a).

"Series B Preference Amount" is defined in Section 2.2(a)(i).

"Series B Preferred Stock" is defined in Section 4.2(a).

"Stockholder Parties" means the holders of Company Shares, the Common Optionholders and the Common Warrantholders.

"Stockholders' Representative" is defined in Section 11.9(a).

"Stockholders' Representative Funds" is defined in Section 2.12.

"Subsidiary" or "Subsidiaries" means, with respect to any Party to this Agreement, any corporation or other organization, of which (a) such Party or any other Subsidiary of such Party is a general partner (excluding partnerships, the general partnership interests of which held by such Party or any Subsidiary of such Party do not have a majority of the voting interest in such partnership) or (b) such Party or any other Subsidiary of such Party directly or indirectly owns or controls at least a majority of the Capital Stock or other interests having by their terms ordinary voting power to elect a majority of the board of directors or other persons performing similar functions.

"Subsidiary Shares" is defined in Section 4.3(b).

"Survival Period" is defined in Section 11.1(a).

"Surviving Corporation" means the Company, as the surviving corporation in the Merger.

"Tax" or "Taxes" means (i) any and all federal, state, provincial, local, or foreign net or gross income, gross receipts, net proceeds, sales, use, ad valorem, value added, franchise, bank shares, withholding, payroll, employment, excise, property, deed, stamp, alternative or add-on minimum, environmental, profits, windfall profits, transaction, license, lease, service, service use, occupation, severance, energy, unemployment, social security, workers' compensation, capital, branch, employee health, premium, and other taxes, assessments, customs, duties, fees, levies, or other governmental charges (including Canada pension plan and provincial pension plan contributions, and employment insurance premiums), (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any Governmental Entity in connection with any item described in clause (i) or for failure to file any Tax Return, (iii) any successor or transferee liability in respect of any items described in clauses (i) and/or (ii) and (iv) any amounts payable under any tax sharing agreement or Contract entered into by the Company or any of its Subsidiaries.

"Tax Returns" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Third Party Claim" is defined in Section 11.4(a).

"Third Party Defense" is defined in Section 11.4(b).

"Transaction Bonuses" means the transaction bonus payments set forth on Schedule 6.2(m).

"Transaction Costs" means (i) all fees, costs and expenses of any brokers, financial advisors, consultants, accountants, attorneys or other professionals engaged by the Company or its Subsidiaries in connection with the structuring, negotiation or consummation of the transactions contemplated by this Agreement and the other Transaction Documents, and (ii) Transaction Bonuses, and any other bonuses or similar compensation payable by the Company or its Subsidiaries in connection with the Closing.

"Transaction Documents" means this Agreement, the Escrow Agreement and the Unsecured Promissory Note issued concurrently with the execution of this Agreement by the Company to Buyer in the principal amount of $1,200,000.

"Transfer Taxes" means sales, use, transfer, real property transfer, recording, documentary, stamp, registration and stock transfer taxes and fees.

"Updated Schedule" is defined in Section 2.2.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988.

## ARTICLE II

## THE MERGER

2.1     The Merger.   Upon and subject to the terms and conditions of this Agreement, Merger Subsidiary shall merge with and into the Company at the Effective Time. From and after the Effective Time, the separate corporate existence of Merger Subsidiary shall cease and the Company shall continue as the Surviving Corporation. The Merger shall have the effects set forth in Section 259 of the Delaware General Corporation Law (the "DGCL").

2.2     Merger Consideration and Conversion of Shares.   The aggregate amount to be paid by Buyer on the Closing Date with respect to the outstanding shares of Capital Stock of the Company calculated on a fully-diluted basis (including holders of Common Stock, Preferred Stock, Common Options, Common Warrants and Convertible Notes)

shall equal: Ten Million Dollars ($10,000,000), plus or minus the adjustments set forth in Section 2.7 and minus (A) the Indebtedness of the Company and its Subsidiaries not satisfied on or prior to the Closing by the Company or Buyer on behalf of the Company, (B) the unpaid amount of any Transaction Costs not satisfied on or prior to the Closing by the Company or Buyer on behalf of the Company, (C) the Escrow Funds and (D) the Stockholders' Representative Funds (such amount remaining after such subtractions, the "Merger Consideration"). The Merger Consideration is subject to further adjustment after the Closing pursuant to Section 2.3, Section 2.4, Section 2.8, Section 2.11 and Section 2.12. Schedule 2.2 sets forth (i) the names of all Stockholder Parties and their respective addresses, (ii) the number and kind of shares of Capital Stock of the Company held by, or subject to Common Options or Common Warrants by, such Persons, (iii) the estimated amount of the Merger Consideration calculated in accordance with this Section 2.2, and (iv) the estimated amount of Merger Consideration payable to each Stockholder Party at Closing, assuming the estimated Merger Consideration and other assumptions set forth therein, and includes the percentage interest of each Stockholder Party in the Escrow Funds and the Stockholders' Representative Funds. The Company shall deliver to Buyer at the Closing an updated Schedule 2.2 (the "Updated Schedule") as of the Closing Date.

(a)     At and upon the Effective Time, Buyer shall remit the Non-Option Amount, after subtraction of the portion thereof otherwise allocable in accordance with Section 2.5 to Dissenting Shares, in cash to U.S. Bank, National Association (the "Payment Agent") and the aggregate amount of all Option Cancellation Payments (minus amounts withheld for Escrow Funds) and Transaction Bonuses to the Company, by wire transfer of immediately available funds to the account or accounts designated by the Payment Agent or the Company, as applicable, (which accounts shall be designated at least two Business Days prior to the Closing Date). Immediately after the Effective Time, Buyer shall cause the Company to allocate and distribute the Option Cancellation Payments and Transaction Bonuses in accordance with Section 2.6(a) and the Updated Schedule. Promptly after the Effective Time, the Parties shall cause the Payment Agent to allocate and, subject to receipt by the Payment Agent of, if applicable, duly executed letters of transmittal and certificates contemplated by Section 2.2(f), distribute the remaining Merger Consideration (after payment of the Option Cancellation Payments and subtraction of the portion thereof otherwise allocable in accordance with Section 2.5 to Dissenting Shares) in accordance with Section 2.6(b) and the Updated Schedule, and as follows:

(i)     each share of Series B Preferred Stock issued and outstanding immediately prior to the Effective Time shall be automatically converted into the right to receive at the Effective Time, an amount in cash, without interest, equal to the sum of (A) $1.346 plus the amount payable at the Effective Time on a share of Series B Preferred Stock pursuant to the Company's First Amended and Restated Certificate of Incorporation (the "Series B Preference Amount") plus (B) the Non-Preference Amount multiplied by 0.2;

(ii)    each share of Series A Preferred Stock issued and outstanding immediately prior to the Effective Time shall be automatically converted into the right to receive at the Effective Time an amount in cash, without interest, equal to $20.92 (the "Series A Preference Amount") plus the Non-Preference Amount; and

(iii)    each share of Common Stock issued and outstanding immediately prior to the Effective Time shall be automatically converted into the right to receive at the Effective Time an amount in cash, without interest, equal to the Non-Preference Amount.

(b)    The "Non-Preference Amount" means an amount per share equal to the quotient of (i) (A) the Merger Consideration plus (B) the Aggregate Exercise Price, minus (C) the Series B Preference Amount multiplied by the number of shares of Series B Preferred Stock outstanding immediately prior to the Effective Time, minus (D) the Series A Preference Amount multiplied by the number of shares of Series A Preferred Stock outstanding immediately prior to the Effective Time, divided by (ii) the number of shares of Common Stock outstanding immediately prior to the Effective Time (assuming for purposes of this calculation only that all outstanding Common Options and Common Warrants have been exercised and have not been cancelled and that all shares of Series B Preferred Stock and Series A Preferred Stock have been converted into shares of Common Stock).

(c)    Promptly following the date of this Agreement, the Company shall send to each holder of a Convertible Note, a notice regarding the Merger and an election form pursuant to which such holder may elect conversion of the relevant Convertible Notes upon consummation of the Merger. Immediately prior to the Effective Time, all principal and interest outstanding under each Convertible Note for which the relevant holder has elected conversion shall convert, pursuant to the terms of such Convertible Note, into Common Stock of the Company, and such Common Stock shall be issued and outstanding for the purposes of entitling the holders thereof to receive the Merger Consideration set forth in Section 2.2(a)(iii) in respect of such Common Stock. The Company shall not issue stock certificates in respect of any such Convertible Note. The Company and Buyer shall cause the Payment Agent to pay the holders of Convertible Notes the Merger Consideration set forth in Section 2.2(a)(iii) in respect of such Common Stock in accordance with the Updated Schedule upon proper submission to the Payment Agent of a Letter of Transmittal and such holder's Convertible Note(s) for cancellation.

(d)    At the Effective Time, by virtue of the Merger and without any action on the part of any Party or the holder of any of the following securities, (A) each of the Company Shares held in the Company's treasury immediately prior to the Effective Time shall be cancelled and retired without payment of any consideration in respect thereof, (B) all Company Shares shall no longer be outstanding and shall automatically be cancelled and shall cease to exist, and each holder of a certificate representing any such share of Common Stock or Preferred Stock shall cease to have any rights with respect thereto, except the right to receive such holder's share of the Merger

Consideration pursuant to this Section 2.2 upon the surrender of such certificate in accordance with this Agreement (and any other rights given such holder by law), without interest, and (C) each share of common stock, $0.01 par value per share, of Merger Subsidiary issued and outstanding immediately prior to the Effective Time shall be converted into and thereafter evidence one share of common stock, $0.01 par value per share, of the Surviving Corporation.

(e)     At the Effective Time, Buyer shall cause the Company to pay the unpaid amount of any Transaction Costs payable in connection with the transactions contemplated by this Agreement not satisfied on or prior to the Closing.

(f)     As soon as practicable after the Effective Time, the Payment Agent shall mail to each holder of record of Company Shares (including the holders of Convertible Notes that have converted into Company Shares pursuant to Section 2.2(c)): (i) a notice of the effectiveness of the Merger, (ii) a letter of transmittal in the form attached hereto as **Exhibit B** (the "Letter of Transmittal"), and (iii) instructions for use in surrendering the certificates representing the former Company Shares and the Convertible Notes (collectively, the "Certificates"), and for receiving the applicable merger consideration in respect thereof.  Upon surrender to the Payment Agent of a Certificate, together with such Letter of Transmittal duly executed and completed in accordance with the instructions thereto (x) the holder of such Certificate shall be entitled to receive in exchange therefor the Merger Consideration payable to such holder of Company Shares pursuant to Section 2.2(a) and (y) the Certificate so surrendered shall forthwith be cancelled.

(g)     If any Certificate shall have been lost, stolen or destroyed, the Person who is the record owner of such Certificate shall deliver to the Surviving Corporation an affidavit with respect to such loss, theft or destruction.  The Surviving Corporation may, in its discretion and as a condition precedent to the delivery of any merger consideration to such owner, require such Person to indemnify Buyer and the Surviving Corporation against any claim that may be made against Buyer or the Surviving Corporation with respect to the Certificate alleged to have been lost, stolen or destroyed.  The Payment Agent shall not deliver to such Person any merger consideration attributable to any such lost, stolen or destroyed Certificate until such Person shall have complied with this Section 2.2(g).

2.3     Retained Key Client Payments.

(a)     For each Company client set forth on Schedule 2.3 (each, a "Retained Key Client"), if at the close of business on April 1, 2008, (i) there shall exist a valid and legally binding Contract relating to the Business between such Retained Key Client and the Company, any of its Subsidiaries or any Affiliate of Buyer to whom such Contract is transferred pursuant to clause (iii) of Section 2.3(c), and (ii) no written notice of termination which materially complies with the termination provisions of such Contract shall have been given by such client pursuant to the terms of such Contract, Buyer shall pay to the Stockholders' Representative the amount set forth opposite such

Retained Key Client's name on Schedule 2.3 (each, a "Retained Key Client Payment"). Any Retained Key Client Payments shall be subject to the withholding of Escrow Funds pursuant to Section 2.3(b), and shall be paid by Buyer on April 30, 2008 in cash by wire transfer of immediately available funds to an account designated in writing by the Stockholders' Representative or to the Company in accordance with Section 2.3(d). The Stockholders' Representative shall distribute all Retained Key Client Payments promptly upon receipt to the Stockholder Parties in accordance with the Updated Schedule. Each Retained Key Client Payment shall be deemed an adjustment to the Merger Consideration paid at Closing.

(b)     Buyer shall deposit 10% of each Retained Key Client Payment with the Escrow Agent in accordance with the provisions of Section 2.11(b) to be held by the Escrow Agent pursuant to the terms of the Escrow Agreement. All such deposited amounts shall be deemed Escrow Funds for the purposes of this Agreement and the Escrow Agreement.

(c)     From and after the Closing until April 1, 2008, Buyer shall use commercially reasonable efforts not to, and shall cause the Company and its Affiliates not to, take any actions that materially affect the ability of the Company to maintain its contractual relationship with any Retained Key Client, perform its obligations, satisfy its liabilities or enforce its rights under any Contract with any Retained Key Client, and Buyer shall use commercially reasonable efforts to ensure that the Company conducts the Business in compliance with all Contracts with Retained Key Clients. Without limiting the generality of the foregoing, from and after the Closing until April 1, 2008, Buyer shall not, and shall cause the Company and its Affiliates not to, (i) terminate any Contract between the Company or any of its Subsidiaries and any Retained Key Client, (ii) transfer or terminate without cause the employment of any of the Company's or its Subsidiaries' employees without the express prior written consent of Bhairav Trivedi; or (iii) transfer (by operation of law or otherwise) any Contract with a Retained Key Client to any other Person (including any other business of Buyer or its Affiliates) unless required by applicable Laws. For the purposes of this Section 2.3(c), any determination as to whether any act or omission is "commercially reasonable" shall be made without regard to the existence of Buyer's obligation to make the Retained Key Client Payment.

(d)     To the extent Buyer makes any Retained Key Client Payment pursuant to this Agreement, and subject to the withholding of Escrow Funds in accordance with Section 2.3(b), Buyer shall pay the portions of such Retained Key Client Payment set forth on the Updated Schedule to the Company as deferred Option Cancellation Payments and deferred Transaction Bonuses. Buyer shall cause the Company to allocate and distribute such deferred Option Cancellation Payments and deferred Transaction Bonuses in accordance with Section 2.6(a) and the Updated Schedule.

2.4     Annualized Revenue Target Payment.

(a)     Not later than April 24, 2008, Buyer will prepare and deliver to the Stockholders' Representative (i) an income statement setting forth the revenues of the Company and its Subsidiaries for the 90-day period ending April 15, 2008 (the "Income Statement") and (ii) Buyer's determination as to whether the revenues set forth on the Income Statement exceed the Annualized Revenue Target (the "Annualized Revenue Target Determination"). The Income Statement will be prepared in accordance with GAAP applied on a basis that is consistent with the Financial Statements, but in all instances in accordance with GAAP.

(b)     Within five days after delivery of the Income Statement, the Stockholders' Representative will deliver to Buyer a written response in which the Stockholders' Representative will either:

(i)     agree in writing with the Annualized Revenue Target Determination; or

(ii)     dispute the Annualized Revenue Target Determination by delivering to Buyer a Dispute Notice.

(c)     If the Stockholders' Representative fails to take either of the foregoing actions within 10 Business Days after delivery of the Income Statement, then the Stockholder Parties will be deemed to have irrevocably accepted the Annualized Revenue Target Determination, in which case, the Annualized Revenue Target Determination will be final and binding on the Parties.

(d)     If the Stockholders' Representative timely delivers a Dispute Notice to Buyer, then Buyer and the Stockholders' Representative will attempt in good faith, for a period of 10 Business Days, to agree on the Income Statement and the Annualized Revenue Target Determination. Any resolution by Buyer and the Stockholders' Representative during such 10-Business-Day period as to any disputed items will be final and binding on the Parties. If Buyer and the Stockholders' Representative do not resolve all disputed items by the end of 10 Business Days after the date of delivery of the Dispute Notice, then Buyer and the Stockholders' Representative will submit the remaining items in dispute to the Independent Accounting Firm. Buyer and the Stockholders' Representative will instruct the Independent Accounting Firm to render its determination with respect to the items in dispute in a written report that specifies the conclusions of the Independent Accounting Firm as to each item in dispute and the resulting Annualized Revenue Target Determination. Buyer and the Stockholders' Representative will each use commercially reasonable efforts to cause the Independent Accounting Firm to render its determination within 30 days after referral of the items to such firm or as soon thereafter as reasonably practicable. The Independent Accounting Firm's determination of the Annualized Revenue Target Determination as set forth in its report will be final and binding on the Parties. The fees and expenses of the Independent Accounting Firm will be shared equally by Buyer and the Stockholders' Representative.

(e)     In the event revenues of the Company and its Subsidiaries for the 90-day period ending April 15, 2008 equal or exceed the product of (i) .25 multiplied by (ii) the Annualized Revenue Target, Buyer shall pay to the Stockholders' Representative $10,000,000 (the "Annualized Revenue Target Payment"). The Annualized Revenue Target Payment, if any, shall be subject to the withholding of Escrow Funds pursuant to Section 2.4(f), and shall be paid by Buyer on the later of (x) April 30, 2008 and (y) the final Annualized Revenue Target Determination pursuant to Section 2.4(d) in cash by wire transfer of immediately available funds to an account designated in writing by the Stockholders' Representative or to the Company in accordance with Section 2.4(f)  The Stockholders' Representative shall distribute the Annualized Revenue Target Payment promptly upon receipt to the Stockholder Parties in accordance with the Updated Schedule.  The Annualized Revenue Target Payment, if any, shall be deemed an adjustment to the Merger Consideration paid at Closing.

(f)     Buyer shall deposit 10% of the Annualized Revenue Target Payment, if any, with the Escrow Agent in accordance with the provisions of Section 2.11(b) to be held by the Escrow Agent pursuant to the terms of the Escrow Agreement. All such deposited amounts shall be deemed Escrow Funds for the purposes of this Agreement and the Escrow Agreement.

2.5    <u>Dissenting Shares.</u>

(a)     Notwithstanding anything in this Agreement to the contrary, any Company Shares that are issued and outstanding as of the Effective Time and that are held by a holder who has not voted in favor of the Merger or consented thereto in writing and who has properly exercised such holder's appraisal rights (the "<u>Dissenting Shares</u>") under the DGCL, shall not be converted into the right to receive the respective portion of the Merger Consideration determined pursuant to this Agreement, unless and until such holder shall have failed to perfect, or shall have effectively withdrawn or lost, such holder's appraisal rights in connection with the Merger under the DGCL and to receive such consideration as may be determined to be due with respect to such Dissenting Shares pursuant to and subject to the requirements of the DGCL.  If, after the Effective Time, any such holder shall have failed to perfect or shall have effectively withdrawn or lost such right, each of such holder's Company Shares shall thereupon be deemed to have been converted into and to have become, as of the Effective Time, the right to receive, without interest or dividends thereon, the respective portion of the Merger Consideration determined pursuant to this Agreement.

(b)     The Company shall give Buyer (i) prompt notice of any written demands for appraisal of any Company Shares, withdrawals of such demands, and any other instruments that relate to such demands received by the Company and (ii) the opportunity to direct all negotiations and proceedings with respect to demands for appraisal under the DGCL. The Company shall not, except with the prior written consent of Buyer, make any payment with respect to any demands for appraisal of Company Shares or settle or offer to settle any such demands.

2.6     Options and Warrants.

(a)     Common Stock Options.  In connection with the Merger, effective at the Effective Time, except as otherwise provided in this Section 2.6(a), each Common Option (whether vested or unvested) shall be cancelled in accordance with its terms without any payment therefor, and, prior to the Effective Time, the Board of Directors of the Company shall adopt appropriate resolutions and take all other actions necessary to terminate the Company Stock Plans and all individual option agreements outside of the Company Stock Plans as of the Effective Time.  Each Common Option, to the extent unexercised as of the Effective Time, shall thereafter no longer be exercisable but shall entitle the holder of such Common Option whether vested or unvested ("Common Optionholder"), in cancellation and settlement therefor, to a payment in cash equal to the product of (i) the excess, if any, of (x) Non-Preference Amount over (y) the exercise price per share of Common Stock subject to such Common Option, multiplied by (ii) the total number of shares of Common Stock subject to such Common Option immediately prior to the Effective Time (each such payment, net of the withholding of Taxes, and without interest, an "Option Cancellation Payment").  Such payments to all Common Optionholders shall be subject to the same conditions (including the withholding of Escrow Funds) under which holders of Company Shares receive the Merger Consideration, provided that the Company shall use commercially reasonable efforts to ensure that such payments are made in accordance with the requirements of Section 409A of the Code and its corresponding regulations.

(b)     Common Warrants.  In connection with the Merger, effective at the Effective Time, the Company shall cause each holder of a Common Warrant (each, a "Common Warrantholder") without any payment therefor except as otherwise provided in this Section 2.6(b), to cancel such Common Warrant in accordance with its terms, and, prior to the Effective Time, the Board of Directors of the Company shall adopt appropriate resolutions and take all other actions necessary relating to the cancellation of the Common Warrants.  In consideration for the cancellation of the Common Warrant, each Common Warrantholder shall be entitled to receive a payment equal to the product of (i) the excess, if any, of (x) the Non-Preference Amount over (y) the exercise price per share of Common Stock subject to such Common Warrant, multiplied by (ii) the total number of shares of Common Stock subject to such Common Warrant immediately prior to its cancellation (such payment to be net of withholding Taxes and without interest).  Such payment shall be made by the Payment Agent at the same time, in the same manner and subject to the same conditions (including the withholding of Escrow Funds) under which the holders of Company Shares receive the Merger Consideration, and each Common Warrantholder shall deliver to the Payment Agent, prior to the Effective Time and as a condition to any payment under this Section 2.6(b), documents evidencing the surrender of such Common Warrants and release of claims related thereto in form and substance reasonably satisfactory to the Company and Buyer.

2.7     Pre-Closing Adjustment to Merger Consideration.

(a)     Estimated Working Capital Statement.  No later than three Business Days prior to the Closing Date, the Company will prepare and deliver to Buyer an officer's certificate of the Company that contains a good faith estimate of the Closing Working Capital (the "Estimated Working Capital Statement").  The Estimated Working Capital Statement will be prepared in accordance with GAAP applied on a basis that is consistent with the Interim Balance Sheet, but in all instances in accordance with GAAP.

(b)     Adjustment.  If the Closing Working Capital stated in the Estimated Working Capital Statement (the "Estimated Closing Working Capital") is less than $-100,000 (the "Working Capital Target"), the Merger Consideration payable as of the Closing will be reduced by an amount equal to the difference between the Estimated Closing Working Capital and the Working Capital Target.  If the Estimated Closing Working Capital exceeds the Working Capital Target, the Merger Consideration payable as of the Closing will be increased by an amount equal to the amount by which the Estimated Net Closing Working Capital exceeds the Working Capital Target.

2.8     Post-Closing Adjustment.

(a)     As soon as commercially practicable but no later than 60 days after the Closing Date, Buyer will prepare and deliver to the Stockholders' Representative written notice (the "Adjustment Notice") containing (i) an unaudited consolidated balance sheet of the Company and its Subsidiaries as of the close of business on the Closing Date (the "Closing Balance Sheet"), (ii) Buyer's calculation of Closing Working Capital (the "Final Closing Working Capital") based on the Closing Balance Sheet, and (iii) Buyer's calculation of the amount of any payment required pursuant to Section 2.8(f) (the "Adjustment Calculation").  The Closing Balance Sheet will be prepared in accordance with GAAP applied on a basis that is consistent with the Interim Balance Sheet, but in all instances in accordance with GAAP.

(b)     Within 30 days after delivery of the Adjustment Notice, the Stockholders' Representative will deliver to Buyer a written response in which the Stockholders' Representative will either:

(i)     agree in writing with the Adjustment Calculation, in which case such calculation will be final and binding on the Parties for purposes of Section 2.8(f); or

(ii)     dispute the Adjustment Calculation by delivering to Buyer a written notice (a "Dispute Notice") setting forth in reasonable detail the basis for each such disputed item and certifying that all such disputed items are being disputed in good faith.

(c)     If the Stockholders' Representative fails to take either of the foregoing actions within 30 days after delivery of the Adjustment Notice, then the Stockholder Parties will be deemed to have irrevocably accepted the Adjustment

Calculation, in which case, the Adjustment Calculation will be final and binding on the Parties for purposes of Section 2.8(f).

(d)     If the Stockholders' Representative timely delivers a Dispute Notice to Buyer, then Buyer and the Stockholders' Representative will attempt in good faith, for a period of 30 days, to agree on the Adjustment Calculation for purposes of Section 2.8(f). Any resolution by Buyer and the Stockholders' Representative during such 30-day period as to any disputed items will be final and binding on the Parties for purposes of Section 2.8(f). If Buyer and the Stockholders' Representative do not resolve all disputed items by the end of 30 days after the date of delivery of the Dispute Notice, then Buyer and the Stockholders' Representative will submit the remaining items in dispute to a mutually agreeable independent accounting firm, which firm is not the regular auditing firm of Buyer, the Company or any of their Affiliates (such selected independent accounting firm, the "Independent Accounting Firm"). Buyer and the Stockholders' Representative will instruct the Independent Accounting Firm to render its determination with respect to the items in dispute in a written report that specifies the conclusions of the Independent Accounting Firm as to each item in dispute and the resulting Adjustment Calculation. Buyer and the Stockholders' Representative will each use commercially reasonable efforts to cause the Independent Accounting Firm to render its determination within 30 days after referral of the items to such firm or as soon thereafter as reasonably practicable. The Independent Accounting Firm's determination of the Adjustment Calculation as set forth in its report will be final and binding on the Parties for purposes of Section 2.8(f). Buyer will revise the Closing Balance Sheet and the calculation of Final Closing Working Capital as appropriate to reflect the resolution of the issues in dispute pursuant to this Section 2.8(d). The fees and expenses of the Independent Accounting Firm will be shared equally by Buyer and the Stockholders' Representative.

(e)     For purposes of complying with Section 2.4 and this Section 2.8, Buyer and the Stockholders' Representative will furnish to each other and to the Independent Accounting Firm such work papers and other documents and information relating to the disputed issues as the Independent Accounting Firm may reasonably request and are available to that Party (or its independent public accountants) and will be afforded the opportunity to present to the Independent Accounting Firm any material related to the disputed items and to discuss the items with the Independent Accounting Firm.

(f)     Following a final determination of the Final Closing Working Capital:

(i)     If the Final Closing Working Capital as finally determined pursuant to this Section 2.8 is less than the Estimated Closing Working Capital, then Buyer will be entitled to recover the deficiency from the Escrow Fund in accordance with the provisions of the Escrow Agreement.

(ii)    If the Final Closing Working Capital as finally determined pursuant to this Section 2.8 is greater than the Estimated Closing Working Capital, then Buyer shall pay to the Stockholders' Representative on behalf of the Stockholder Parties the amount of such excess.

2.9    Certificate of Incorporation and Bylaws.

(a)    At the Effective Time, the Certificate of Incorporation of the Company shall be amended to be the same as the Certificate of Incorporation of Merger Subsidiary immediately prior to the Effective Time, except that the name of the corporation set forth therein shall be changed to the name of the Company, until thereafter amended in accordance with the provisions thereof and as provided by applicable law.

(b)    The bylaws of the Surviving Corporation immediately following the Effective Time shall be amended to be the same as the bylaws of Merger Subsidiary immediately prior to the Effective Time, except that the name of the corporation set forth therein shall be changed to the name of the Company.

2.10    Closing of Transfer Books; Unclaimed Merger Consideration.    At the Effective Time, the stock transfer books of the Company shall be closed and no transfer of Company Shares shall thereafter be made. If any portion of the Merger Consideration deposited with the Payment Agent remains unclaimed twelve (12) months after the Effective Time, such unclaimed amounts shall be remitted, upon demand, to Buyer or the Surviving Corporation and, thereafter, the holders of certificates formerly representing Company Shares and the Common Warrantholders shall look only to Buyer or the Surviving Corporation for payment of the applicable portion of the Merger Consideration.  None of Buyer, the Surviving Corporation or the Paying Agent shall be liable to any holder of Company Shares or Common Warrants for any amount properly paid to a public official under any applicable property, escheat or similar Laws.

2.11    Escrow Funds Merger Consideration Adjustment.

(a)    At and upon the Effective Time, Buyer shall deposit with the Escrow Agent out of the Merger Consideration an amount equal to One Million Dollars ($1,000,000) (such cash, plus any funds deposited with the Escrow Agent pursuant to Section 2.3 and Section 2.4 and all investment proceeds thereon, the "Escrow Funds") to be held pursuant to the terms of the Escrow Agreement substantially in the form of Exhibit A (the "Escrow Agreement") to be entered into at the Closing by Buyer, the Stockholders' Representative and U.S. Bank, National Association (the "Escrow Agent").

(b)    Buyer shall remit the Escrow Funds to the Escrow Agent by wire transfer of immediately available funds, to such account designated by the Escrow Agent in a written notice to Buyer prior to the Closing Date.  Any amount of the Escrow Funds that is distributed to the Stockholders' Representative shall be Merger Consideration that shall be distributed to the Stockholder Parties (on a fully-diluted basis) by the

Stockholders' Representative pursuant to the percentage interest of each Stockholder Party as set forth on the Updated Schedule.

2.12   Stockholders' Representative Funds.  At and upon the Effective Time, Buyer shall pay to the Stockholders' Representative an amount equal to $250,000 to be held by the Stockholders' Representative as the Stockholders' Representative Funds (the "Stockholders' Representative Funds").

2.13   Withholding.  Each of the Company and Buyer, as applicable, shall be entitled to deduct and withhold or cause to be deducted and withheld from amounts otherwise payable to any person pursuant to this Agreement such amounts as it is required to deduct and withhold with respect to such payments under any provision of federal, state, provincial, local or foreign Tax Law.  Any amounts so deducted and withheld will be treated for all purposes of this Agreement as having been paid to the person in respect of which such deduction and withholding was made.

## ARTICLE III

## THE CLOSING

3.1   The Closing.  The closing for the transactions contemplated by this Agreement (the "Closing") shall be held at the offices of Morgan, Lewis & Bockius LLP, 1701 Market Street, Philadelphia, PA at 10:00 a.m. (local time) as promptly as practicable (but no sooner than January 1, 2008) after the date on which there has been a satisfaction or waiver of the conditions to the consummation of the transactions contemplated by this Agreement set forth in Article IX, unless the Parties agree in writing to another date or place.  The date on which the Closing occurs is referred to herein as the "Closing Date."

3.2   Deliveries.  At the Closing, subject to the terms and conditions contained herein:

(a)   The Company shall deliver the following items:

(i)   Duly executed counterparts to each of the Transaction Documents to which the Company or the Stockholders' Representative is party;

(ii)   A certificate of the Secretary of State of Delaware as to the good standing as of the most recent practicable date of the Company in such jurisdiction;

(iii)   The certificate of incorporation of the Company certified as of the most recent practicable date by the Secretary of State of Delaware;

(iv)   A certificate of the Secretary of the Company, given by him on behalf of the Company and not in his individual capacity, certifying as to the certificate of incorporation and the bylaws of the Company and as to the resolutions of

the Company's Board of Directors authorizing the Transaction Documents and the transactions contemplated hereby;

> (v)     The Updated Schedule;

> (vi)    The resignations referenced in Section 6.6; and

> (vii)   The additional deliverables referenced in Section 9.2.

(b)     Buyer shall deliver the following items at the Closing, except as otherwise provided below:

> (i)     Duly executed counterparts to the Transaction Documents to which it is a party;

> (ii)    A certificate of the Secretary or Assistant Secretary of Buyer, given by him on behalf of Buyer and not in his individual capacity, certifying as to the due authorization by Buyer of the Transaction Documents and the transactions contemplated hereby;

> (iii)   The certificate of incorporation of Merger Subsidiary certified as of the most recent practicable date by the Secretary of State of Delaware;

> (iv)    A certificate of the Secretary of State of Delaware as to the good standing as of the most recent practicable date of Merger Subsidiary in such jurisdiction;

> (v)     A certificate of the Secretary of Merger Subsidiary, given by him on behalf of Merger Subsidiary and not in his individual capacity, certifying as to the certificate of incorporation and the bylaws of Merger Subsidiary and as to the resolutions of the Board of Directors and stockholder of Merger Subsidiary authorizing the Transaction Documents and the transactions contemplated hereby;

> (vi)    Promptly following the Effective Time, to the Payment Agent, on behalf of the holders of Company Shares and the Common Warrantholders of record immediately prior to the Effective Time, the portion of the Non-Option Amount required to be paid to it pursuant to Section 2.2;

> (vii)   Promptly following the Effective Time, to the Company, on behalf of the Common Optionholders of record immediately prior to the Effective Time, the portion of the aggregate Option Cancellation Payments required to be paid to it pursuant to Section 2.6(a);

> (viii)  To the Company's applicable creditors, the unpaid amount of any Transaction Costs not satisfied prior to the Closing by the Company;

> (ix)    To the Escrow Agent, the Escrow Funds; and

(x)     To an account designated by the Stockholders' Representative, the Stockholders' Representative Funds.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company represents and warrants to Buyer that each statement contained in this Article IV is true and correct as of the date hereof and as of the Closing Date, except as set forth in the Disclosure Schedules accompanying this Agreement (collectively, the "Company Disclosure Schedule"). For the purposes of Article IV, the expression "business", unless the context otherwise requires, shall include the Business. The Company Disclosure Schedule has been organized in sections corresponding to the numbering of this Article IV with disclosures in each such section specifically corresponding to a particular Section of this Article IV.

4.1     Organization and Good Standing.

(a)     The Company is a corporation duly incorporated, validly existing and in good standing under the Laws of the jurisdiction of its incorporation, has all requisite corporate power and authority to own, lease and operate its properties and assets and to carry on its business as now being conducted, and is duly licensed and qualified to do business and is in good standing as a foreign corporation in each jurisdiction in which the character of the properties it owns, operates or leases property or conducts any business so as to require such qualification, except where the failure to be so qualified would not reasonably be expected to have a Company Material Adverse Effect.

(b)     Schedule 4.1 contains a true and complete list of the jurisdictions in which the Company conducts business.

4.2     Capitalization.

(a)     The authorized Capital Stock of the Company consists of 1,300,000 shares of Common Stock, par value $0.001 per share (the "Common Stock"), and 700,000 of Preferred Stock, par value $0.001 per share (the "Preferred Stock"), of which 40,000 shares have been designated Series A Convertible Preferred Stock (the "Series A Preferred Stock"), and 400,000 shares have been designated Series B Convertible Preferred Stock (the "Series B Preferred Stock"). All of the Outstanding Shares are, and all shares of Capital Stock that may be issued upon exercise of Common Options or Common Warrants will be (upon issuance in accordance with their terms), duly authorized, validly issued, fully paid and nonassessable and are not subject to preemptive rights created by statute or the Company's Organizational Documents. The Outstanding Shares are owned of record and beneficially by the holders of Company Shares in the amount set forth on Schedule 4.2(a).

(b)     Schedule 4.2(b) sets forth the following information with respect to each Common Option outstanding on the date of this Agreement: (i) the name of the holder of such Common Option; (ii) the number of shares of Common Stock subject to such Common Option and the number of shares with respect to which such Common Option is immediately exercisable; (iii) the exercise price per share of Common Stock purchasable under such Common Option; and (iv) the Company Stock Plan pursuant to which such Common Option was granted.

(c)     Schedule 4.2(c) sets forth the following information with respect to each Common Warrant outstanding on the date of this Agreement: (i) the name of the holder; (ii) the number (as of October 15, 2007) and type of shares of Common Stock subject to such Common Warrant; and (iii) the exercise price per share under such Common Warrant. The Company has delivered to Buyer accurate and complete copies of all Common Warrants.

(d)     All securities of the Company have been issued and granted in compliance with (i) all applicable securities Laws and (ii) all requirements set forth in the Company's Organizational Documents and applicable Contracts.

(e)      The Company and its Subsidiaries do not have outstanding stock appreciation rights, phantom stock, performance based rights or other similar rights or obligations. Except as set forth on Schedule 4.2(e), there are no agreements to which the Company is a party or by which it is bound with respect to the voting (including voting trusts or proxies), registration under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder, or any foreign securities law, or sale or transfer (including agreements relating to preemptive rights, rights of first refusal, co-sale rights or "drag-along" rights) of any securities of the Company.

(f)     Except as otherwise provided pursuant to Section 2.5, no Stockholder Party is entitled to receive any amount in connection with the Merger with respect to any of the Equity Securities of the Company held by it that is different from or additional to the amounts of the Merger Consideration to be received by it as set forth in the Updated Schedule. No Person other than the Stockholder Parties listed in the Updated Schedule and the Stockholders' Representative, is entitled to receive any payment or property in connection with the Merger in respect of any Company Share or other Equity Security of the Company. Schedule 2.2 is as of the date hereof, and the Updated Schedule shall be as of the Closing Date, accurate and complete and the calculations performed to compute the information contained therein comply with the applicable provisions of this Agreement, subject to the Stockholder Parties' rights under Section 262 of the DGCL.

(g)     Except as set forth on Schedule 4.2(g), other than the Outstanding Shares, the Common Options and the Common Warrants set forth on Schedule 4.2(a)-(c), the Company does not have outstanding any shares of Capital Stock or any other Equity Securities.

4.3     Subsidiaries of the Company.

(a)     Each Subsidiary of the Company is validly existing and in good standing under the Laws of the jurisdiction of its formation, has all requisite power to own, lease and operate its properties and to carry on its business as now being conducted, and is duly qualified to do business and is in good standing in each jurisdiction in which it owns or leases property or conducts any business so as to require such qualification, except where the failure to be so qualified would not reasonably be expected to have a Company Material Adverse Effect.

(b)     Schedule 4.3 contains a true and complete list of the Subsidiaries of the Company and sets forth, with respect to each such Subsidiary, the jurisdiction of formation, the authorized and outstanding Capital Stock of such Subsidiary and the owner(s) of record of such outstanding Capital Stock, which holds such Capital Stock free and clear of all Liens.   All of the outstanding shares of Capital Stock of the Subsidiaries of the Company (collectively, the "Subsidiary Shares") are duly authorized, validly issued, fully paid and nonassessable and were not issued in violation of any applicable preemptive or similar right or federal or state securities law.

(c)     Other than the Subsidiary Shares set forth on Schedule 4.3, no Subsidiary of the Company has outstanding any shares of Capital Stock or any other Equity Securities.

4.4     Authority and Enforceability.  The Company has the requisite power and authority to enter into this Agreement and any Transaction Document to which it is a party, and to consummate the Merger, assuming the receipt of the Requisite Stockholder Approval.   The execution and delivery of this Agreement, any of the Transaction Documents to which the Company is a party and the consummation of the Merger have been duly authorized by all necessary corporate action on the part of the Company, assuming the receipt of the Requisite Stockholder Approval.  The Board of Directors of the Company has unanimously approved this Agreement and the other Transaction Documents and declared the advisability of this Agreement and the other Transaction Documents and the Merger and recommended that the stockholders of the Company adopt this Agreement and approve the Merger.  The Requisite Stockholder Approval is sufficient for the Company's stockholders to approve this Agreement and the Merger, and no other vote of the Company's stockholders is required in connection with the consummation of the transactions contemplated hereby.   This Agreement and any Transaction Document to which the Company is a party have been duly executed and delivered by the Company and, assuming due authorization, execution and delivery by the other parties hereto and thereto, constitute the valid and binding obligation of the Company, enforceable against it in accordance with its terms, except as such enforceability may be limited by (i) bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting or relating to creditors' rights generally, and (ii) the availability of injunctive relief and other equitable remedies.

4.5     No Conflicts; Consents.

(a)     Except for any notices, filings, consents or approvals set forth in Schedule 4.5, the execution and delivery of this Agreement by the Company do not, and the consummation of the Merger or any of the other transactions contemplated by this Agreement or any of the Transaction Documents by the Company will not, assuming the receipt of the Requisite Stockholder Approval, directly or indirectly (i) violate, conflict with or result in a violation of any of the provisions of any of the Organizational Documents of the Company or any of its Subsidiaries, (ii) violate, conflict with or result in a violation or breach of, or result in a default under, any Material Contract to which the Company or any of its Subsidiaries is a party, (iii) violate, conflict with or result in a violation of any of the terms or requirements of any Order or Law applicable to the Company, its Subsidiaries or any of the properties or assets owned, used or controlled by the Company or any of its Subsidiaries, or (iv) result in the creation of any material Liens upon any of the assets owned or used by the Company or any of its Subsidiaries.

(b)     No material Authorization or Order of, registration, declaration or filing with, or notice to any Governmental Entity is required by the Company or any of its Subsidiaries in connection with the execution and delivery of this Agreement or any of the Transaction Documents or the consummation of the Merger or any of the other transactions contemplated by this Agreement or any of the Transaction Documents, except for the filing of the Certificate of Merger with the Secretary of State of the State of Delaware and the filing with the Reserve Bank of India and the Indian Registrar of Companies, inter alia, in respect of the Certificate of Incorporation of the Surviving Corporation and bylaws of the Surviving Corporation.

4.6     Financial Statements.

(a)     Except as set forth in Schedule 4.6, the audited balance sheet of the Company and its Subsidiaries and the related unaudited statements of income for the year ended December 31, 2006 (collectively, the "2006 Financial Statements") and unaudited balance sheet of the Company and its Subsidiaries and the related unaudited statements of income as of, for the nine-month period ended, September 30, 2007 (collectively, the "Interim Financial Statements" and together with the 2006 Financial Statements, the "Financial Statements"), (i) are correct and complete in all material respects, (ii) are consistent with the books and records of the Company and its Subsidiaries, as applicable, (iii) have been prepared in accordance with United States generally accepted accounting principles ("GAAP") applied on a consistent basis throughout the periods involved (except as may be indicated in the notes to such Financial Statements) and (iv) fairly present in all material respects the financial condition and results of operations of the Company as of the respective dates thereof and for the respective periods indicated, subject, in the case of the Interim Financial Statements, to normal year-end adjustments and the absence of notes. The consolidated balance sheet of the Company as of December 31, 2006 is referred to herein as the "Balance Sheet" and the date thereof as the "Balance Sheet Date" and the consolidated balance sheet of the Company as of

September 30, 2007 is referred to herein as the "Interim Balance Sheet" and the date thereof as the "Interim Balance Sheet Date."

(b)     No financial statements of any Person other than the Company or its Subsidiaries are required by GAAP to be included in the financial statements of the Company.  The Company has no Liabilities except for (i) Liabilities reflected on the Interim Balance Sheet, (ii) Liabilities incurred after the date of the Interim Balance Sheet in the ordinary course of business, (iii) Liabilities set forth in the Company Disclosure Schedule, (iv) Liabilities under the Material Contracts, to the extent the nature and magnitude of such Liabilities can be ascertained by reference to the text of such Material Contract, and (v) Liabilities not required to be reflected on the Interim Balance Sheet under GAAP.  Neither the Company nor any of its Subsidiaries have extended or maintained credit, arranged for the extension of credit, or renewed an extension of credit, in the form of a personal loan to or for any of its respective directors or executive officers (or equivalent thereof).  Neither the Company nor any of its Subsidiaries are a party to any off-balance sheet arrangements that could have a current or future material effect upon the Company's consolidated financial condition or results of operations.

4.7     Taxes.

(a)     All Tax Returns required to have been filed by the Company and its Subsidiaries have been filed, and each such Tax Return was correct and complete in all respects.  Schedule 4.7(a) contains a list of all jurisdictions (whether foreign or domestic) in which the Company and its Subsidiaries file Tax Returns.  No written claim has ever been made by a taxing authority in a jurisdiction where the Company or any of its Subsidiaries does not file Tax Returns that it is or may be subject to Tax or to a requirement to file Tax Returns in that jurisdiction.

(b)     All Taxes due and owing by the Company and its Subsidiaries (whether or not shown on any Tax Return) have been paid or will be paid prior to Closing.  Neither the Company nor any of its Subsidiaries is currently delinquent with respect to the payment of any Tax.  The Interim Balance Sheet reflects adequate reserves in accordance with GAAP for all liabilities for Taxes accrued by the Company and its Subsidiaries but not yet paid.

(c)     To the Company's Knowledge, there is no audit currently pending against the Company or any of its Subsidiaries in respect of any Taxes nor, to the Company's Knowledge, is any such activity or assessment or reassessment contemplated by any Governmental Entity.  There are no Liens on any of the assets of the Company or any of its Subsidiaries that arose in connection with any failure (or alleged failure) to pay any Tax, other than Liens for Taxes not yet due and payable.

(d)     Each of the Company and its Subsidiaries has withheld and paid all material Taxes required to have been withheld and paid in connection with amounts paid or owing to any third party.

(e)    To the Company's Knowledge, A.G. Solutions has filed all Tax Returns and each such Tax Return was correct and complete in all respects.  To the Company's Knowledge, no claim has ever been made by a taxing authority in a jurisdiction where A.G. Solutions does not file Tax Returns that it is or may be subject to taxation or to a requirement to file Tax Returns in that jurisdiction.  To the Company's Knowledge, all Taxes due and owing by A.G. Solutions have been paid or will be paid prior to Closing, and A.G. Solutions is not currently delinquent with respect to the payment of any Tax.  To the Company's Knowledge, there is no audit currently pending against A.G. Solutions in respect of any Taxes nor is any such activity contemplated by any Governmental Entity.  To the Company's Knowledge, there are no Liens on any of the assets of A.G. Solutions that arose in connection with any failure (or alleged failure) to pay any Tax, other than Liens for Taxes not yet due and payable.  To the Company's Knowledge, A.G. Solutions has withheld and paid all Taxes required to have been withheld and paid in connection with the amounts paid or owing to any third party.

(f)    Neither the Company nor any of its Subsidiaries has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to the filing of a Tax Return or a Tax assessment or reassessment or deficiency.

(g)    Neither the Company nor any of its Subsidiaries (x) has been a member of any affiliated, consolidated, combined or unitary group filing a consolidated or combined Tax Return (other than a group the common parent of which was the Company) or (y) has any liability for the Taxes of any Person (other than the Company or any of its Subsidiaries) under Reg. §1:1502-6 (or any similar provision of state, local, or foreign law), as a transferee or successor, by Contract, or otherwise.  Neither the Company nor any of its Subsidiaries is a party to any Tax allocation or sharing agreement.

(h)    Neither the Company nor any of its Subsidiaries will be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any:

(i)    change in method of accounting for a taxable period ending on or prior to the Closing Date;

(ii)    "closing agreement" as described in Code §7121 (or any corresponding or similar provision of state, local or foreign income Tax law) executed on or prior to the Closing Date;

(iii)    intercompany transactions or any excess loss account described in Treasury Regulations under Code §1502 (or any corresponding or similar provision of state, local or foreign income Tax law);

(iv)    installment sale or open transaction disposition made on or prior to the Closing Date; or

(v)    prepaid amount received on or prior to the Closing Date.

(i)    Neither the Company nor any of its Subsidiaries is a party to any agreement, Contract, arrangement, or plan that has resulted or would result, separately or in the aggregate, in the payment of any "excess parachute payment" within the meaning of Code §280G (or any corresponding provision of state, local, or foreign Tax law).

(j)    Neither the Company nor any of its Subsidiaries has distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Code §355 or Code §361.

(k)    Neither the Company nor any of its Subsidiaries is or has ever been a United States Real Property Holding Corporation (as defined in Section 897(c)(2) of the Code).

(l)    Neither the Company nor any of its Subsidiaries is a party to any "listed transaction" within the meaning of Section 1.6011-4 of the Treasury Regulations or any reportable transaction within the meaning of Section 6011, Section 6111 and Section 6112 of the Code.

(m)    Except as set forth on <u>Schedule 4.7(m)</u>, neither the Company nor any of its Subsidiaries has a permanent establishment or carries on business in any jurisdiction outside the United States.

(n)    Neither the Company Shares, Common Options nor Common Warrants is "taxable Canadian property" for purposes of the Income Tax Act (Canada) or "taxable Quebec property" for purposes of the Taxation Act (Quebec).

4.8    <u>Compliance with Law; Authorizations</u>.

(a)    This Section 4.8 does not relate to real property or interests in real property, such items being the subject of Section 4.10, employee benefit matters, such items being the subject of Section 4.15, nor to environmental matters, such items being the subject of Section 4.17.

(b)    Except as set forth on <u>Schedule 4.8(b)</u>, each of the Company and its Subsidiaries is, and has at all times been, in compliance in all material respects with all Laws to which the Business is subject, no investigation or review by any Governmental Entity is pending or to the Company's Knowledge threatened against the Company or its Subsidiaries, except for regular inspections in the ordinary course of business. There is no Order binding upon the Company or any of its Subsidiaries which has or could reasonably be expected to result in a Company Material Adverse Effect. Neither the Company nor any of its Subsidiaries has received in writing any assertion that any of them have failed to comply with any Law, in each case to which any of their respective assets, properties and businesses, including the Business, are subject.

(c)    Except as set forth on <u>Schedule 4.8(c)</u>, each of the Company and its Subsidiaries owns, holds, possesses or lawfully uses in the operation of the Business

all material Authorizations necessary for it to conduct the Business. The Company and each of its Subsidiaries are and have been in material compliance with the terms of all Authorizations necessary for the Company and its Subsidiaries to conduct the Business and all such Authorizations are valid and in full force and effect. Schedule 4.8(c) contains a correct and complete list of all material Authorizations held by the Company or its Subsidiaries.

(d)     The Company and its Subsidiaries have made all requisite material filings with a Governmental Entity that are necessary for the purpose of conducting the Business.

4.9     Title to Personal Properties. Except as set forth on Schedule 4.9, the Company and its Subsidiaries have good and valid title to all properties and assets purported to be owned by them, or have a valid leasehold interests or right to use all of their properties or assets purported to be leased or licensed by them free and clear of all Liens, except for Permitted Liens. Such properties and assets are sufficient for the Company and its Subsidiaries to conduct the Business as conducted prior to the date hereof, and represent all of the properties and assets used by the Company and its Subsidiaries in the conduct of the Business, as presently conducted.

4.10    Real Property.

(a)     Owned Real Property.   Neither the Company nor any of its Subsidiaries owns, or has ever owned, any real property.

(b)     Leased Real Property. Schedule 4.10(b) contains a list of all real property leases, subleases and licenses, and each amendment thereto, under which the Company or any of its Subsidiaries is lessor, lessee or licensee (the "Leased Real Property"). The Company has made available to Buyer or its counsel a true and complete copy of every lease and sublease with respect to the Leased Real Property (the "Leases"). Each Lease is valid and enforceable in accordance with its terms and there is not, under any of such leases, any existing default or event of default (or event which with notice or lapse of time, or both, would constitute a default) that would result in a Company Material Adverse Effect.

(c)     Eminent Domain. To the Company's Knowledge, none of the Leased Real Property is the subject of any material condemnation or eminent domain proceeding.

(d)     Utilities. The Leased Real Property is served by all water, electric, gas, telephone, sewer and other utilities reasonably necessary for the conduct of business of the Company and its Subsidiaries as currently conducted.

(e)     Damage. No damage or destruction has occurred with respect to any of the Leased Real Property for which the Company or any of its Subsidiaries may be liable and which is not covered by insurance adequate to repair or replace such property in the condition prior to such damage or destruction.

(f)    The current use and occupancy of the Owned Real Property and the Leased Real Property and the operation of the Business as currently conducted or as currently proposed to be conducted thereon do not and will not violate any easement, covenant, condition, restriction or similar provision in Law or any instrument or other agreement to which the Company or its Subsidiaries is a party in respect of such Owned Real Property or the Leased Real Property. Neither the Company nor any of its Subsidiaries has received any notice of any such violation and, to the Company's Knowledge, there is no basis for the issuance of any such notice or the taking of any action for such violation.

4.11    Intellectual Property.

(a)    "Intellectual Property" means (i) patents and patent applications, (ii) registered, unregistered and applications to register trademarks, service marks, trade names, trade dress, and logos, including all goodwill associated with the foregoing, (iii) registered, unregistered and applications to register copyrights, together with translations, adaptations, derivations and combinations thereof, (iv) trade secrets, know-how, and proprietary information, and (v) algorithms and Software, domain names, web sites, inventions (whether patentable or unpatentable and whether or not reduced to practice) and all improvements thereto, and all other similar intellectual property rights. "Software" means all (i) computer programs, whether in source code or object code form, (ii) data, database specifications, designs and compilations, and (iii) all documentation relating to any of the foregoing.

(b)    Schedule 4.11(b)(i) sets forth a list of all Intellectual Property that is presently used in the business of the Company or any of the Subsidiaries as presently conducted, except for Intellectual Property owned by a third party and licensed to the Company or a Subsidiary pursuant to a written agreement or off-the shelf software ("Owned Intellectual Property"), that is registered or subject to an application for registration (including the jurisdictions where such Owned Intellectual Property is registered or where applications have been filed, and all registration numbers) ("Registered IP"). Schedule 4.11(b)(ii) sets forth a list of all Owned Intellectual Property, other than Registered IP identified on Schedule 4.11(b)(ii), that is material to the business of the Company or any of the Subsidiaries as presently conducted. The Company and the Subsidiaries, as applicable, have sole title and ownership of all Owned Intellectual Property, free and clear of all Liens (other than Permitted Liens), and have licenses to or other valid rights to use all other Intellectual Property used in the business as presently conducted. The Company and the Subsidiaries are the sole and exclusive owners of the Owned Intellectual Property, and there are no outstanding options, claims, encumbrances or shared ownership of interests of any kind relating to any Owned Intellectual Property.

(c)    Neither the Company nor any of its Subsidiaries is in material default in the performance, observance or fulfillment of any obligation, covenant or condition contained in any material Contract pursuant to which any third party is authorized to use any Owned Intellectual Property ("Company Licenses") or pursuant to

which the Company or any of its Subsidiaries is licensed to use Intellectual Property owned by a third party ("Third Party Licenses"). Schedule 4.11(c)(i) sets forth a list of all Company Licenses, except those pursuant to which non-exclusive licenses to Owned Intellectual Property are granted to customers in the ordinary course of business pursuant to standard customer agreements of Company or its Subsidiaries, copies of which have been provided to Buyer or its counsel. Schedule 4.11(c)(ii) sets forth a list of all Third Party Licenses material to the business of the Company or any of the Subsidiaries as presently conducted, copies of which have been provided to Buyer or its counsel.

(d)     The conduct of the business of the Company and the Subsidiaries has never infringed, misappropriated or otherwise violated any Intellectual Property of any third party. The conduct of the business of the Company and the Subsidiaries as presently conducted does not infringe, misappropriate or otherwise violate any Intellectual Property of any third party. Neither the Company nor any of the Subsidiaries has received any written claim or demand, and no action is pending or to the Knowledge of the Company threatened against the Company or any of the Subsidiaries, (i) alleging that the Company or any of the Subsidiaries has infringed, misappropriated or otherwise violated any Intellectual Property owned by a third party or (ii) challenging the validity, registrability, enforceability or ownership of, or the right of the Company or the Subsidiaries to use, any Owned Intellectual Property.

(e)     To the Company's Knowledge, no third party is infringing, misappropriating or otherwise violating any Owned Intellectual Property. Neither the Company nor any Subsidiary has brought or threatened a claim against any third party (i) alleging that such third party is infringing, misappropriating or otherwise violating any Owned Intellectual Property or (ii) challenging such third party's ownership or use, or the validity, registrability, or enforceability, of such third party's Intellectual Property.

(f)     All Software included in the Owned Intellectual Property and material to the business of the Company and its Subsidiaries as such Software is currently used and as such business is currently conducted performs in material conformance with its documentation. The Company has made back-ups of all such Software and has maintained such back-ups at a secure off-site location. Except as set forth in Schedule 4.11(f)(i), no person has gained unauthorized access to such Software. Except as set forth in Schedule 4.11(f)(ii), no source code for such Software has been disclosed or licensed to any escrow agent or other Person, nor is the Company or its Subsidiaries under any obligation to disclose or license such source code to any Person.

(g)     Except as set forth in Schedule 4.11(g), (i) the Company and each Subsidiary do not use and have not used any "freeware", "shareware" or other Software obtained pursuant to any open source, community source, copy left or similar arrangement ("Open Source Software") and (ii) none of the Software included in the Owned Intellectual Property incorporates, contains or requires use of any Open Source Software that does or may require disclosure or licensing of any such Software or any other Owned Intellectual Property.

(h)   The current operation of the business of the Company and the Subsidiaries does not, and to the Company's Knowledge will not, result in any requirement that the Company or any of the Subsidiaries publish, disclose, license or otherwise make available the source code for their (or any of their respective licensors', if any) respective proprietary Software, libraries, firmware or other computer programs.

(i)   The Company and each of the Subsidiaries maintain policies, procedures and security measures with respect to the physical and electronic security and privacy of the data, trade secrets and other confidential or proprietary information owned or used by the Company and the Subsidiaries that would reasonably be expected to be maintained by a technology company reasonably comparable to that of the Company, copies of which have been provided to Buyer. The Company and the Subsidiaries have, at all times, been in material compliance with such policies and procedures, and to the Company's Knowledge, such policies and procedures comply in all material respects with all applicable Laws. Except as set forth on Schedule 4.11(i), to the Company's Knowledge, there have been no material breaches or violations of any such security measures, or any unauthorized access of any data, trade secrets or other confidential or proprietary information owned or used by the Company and the Subsidiaries. No claim is pending or to the Company's Knowledge threatened against the Company or any Subsidiary relating to any such policy, procedure or measure, or any breach or alleged breach thereof.

(j)   Except as set forth in Schedule 4.11(f), there are no settlements, forbearances to sue, consents, judgments, or orders or similar obligations which (i) materially restrict the Company's or any of the Subsidiaries' rights to use any Intellectual Property or (ii) permit any third party to use any Owned Intellectual Property.

(k)   Except as set forth in Schedule 4.11(k), the execution of this Agreement (including the consummation of the transactions contemplated hereby) shall not (i) result in the loss or impairment of the Company's or any of the Subsidiaries' rights to or under any of the Owned Intellectual Property, (ii) give rise to a right to terminate any agreement under the express terms of such agreement pursuant to which the Company or any of the Subsidiaries obtains the rights to use any third party Intellectual Property used in the business of the Company or any of the Subsidiaries as presently conducted, (iii) result in the release, disclosure or delivery of any Owned Intellectual Property by or to any escrow agent or other Person, or (iv) result in payment obligations under any Intellectual Property-related agreements which are in excess of the amounts payable prior to the Closing Date.

(l)   Each Person who is or was an employee or contractor of the Company or any of its Subsidiaries and who is or was involved in the creation or development of any material Owned Intellectual Property has signed an agreement containing an assignment of Intellectual Property to the Company or one of its Subsidiaries. Each Person who is or was an employee or contractor of the Company or any of its Subsidiaries and who has access to any material confidential information of the Company or one of its Subsidiaries or any material confidential information their

customers has signed a valid, enforceable agreement containing confidentiality provisions protecting such confidential information.

(m)     The Company has provided to the Buyer or its counsel a complete and accurate copy of each Contract relating to assignment or licensing of Company Intellectual Property or Intellectual Property of a third party used by the Company or any of its Subsidiaries (other than off-the-shelf software generally available to the public at a cost of not less than $10,000).

4.12   Absence of Certain Changes or Events.

(a)     Since the Interim Balance Sheet Date to the date of this Agreement, except as set forth on Schedule 4.12(a):

(i)     no event has occurred that has had a Company Material Adverse Effect nor has there occurred any event, development or state of circumstances which could reasonably be foreseen to result in such a Company Material Adverse Effect in the future;

(ii)    neither the Company nor any of its Subsidiaries has declared, set aside or paid any dividend or other distribution (whether in cash, stock or property) with respect to any Equity Security, or repurchased, redeemed or otherwise reacquired any Equity Securities;

(iii)   neither the Company nor any of its Subsidiaries have sold, issued or authorized the issuance of any Equity Securities (except for Common Stock issued upon the exercise of outstanding Common Options);

(iv)    the Company has not amended or waived any of its rights under, or permitted the acceleration of vesting under, (i) any provision of any Company Stock Plan, (ii) any provision of any Contract evidencing any outstanding Common Option, or (iii) any restricted stock purchase agreement;

(v)     neither the Company nor any of its Subsidiaries has (i) increased or modified the compensation or benefits payable or to become payable by the Company or any of its Subsidiaries to any of its current or former directors, employees, contractors or consultants, (ii) increased or modified any bonus, severance, termination, pension, insurance or other employee benefit plan, payment or arrangement made to, for or with any current or former directors, employees, contractors or consultants of the Company or any of its Subsidiaries, or (iii) entered into any employment, severance or termination agreement, in each case except as required by the terms of any Company Benefit Plan as in effect on the date of this Agreement, or in the ordinary course of business, consistent with past practice or as required to comply with applicable law;

(vi)    no party to any Contract to which the Company or any of its Subsidiaries is a party has given written notice to the Company or its Subsidiaries of

any intention not to renew, not to extend, to cancel or otherwise terminate or materially modify its business relationship with the Company or its Subsidiaries;

(vii)    other than the sale of inventory and obsolete assets in the ordinary course of business, neither the Company nor any of its Subsidiaries has sold, leased, transferred or assigned any property or assets of the Company or any such Subsidiary;

(viii)    neither the Company nor any of its Subsidiaries has (i) lent money to any Person (other than pursuant to routine travel advances made to any employee of the Company or its Subsidiaries in the ordinary course of business and consistent with past practice) or (ii) incurred, assumed or guaranteed any material Indebtedness;

(ix)    neither the Company nor any of its Subsidiaries has created or assumed any Lien on any asset, except for Liens arising under lease financing arrangements existing as of the Balance Sheet Date and Liens for Taxes not yet due and payable with respect to which the Company and its Subsidiaries maintain adequate reserves;

(x)    there has not been any material damage, destruction or loss with respect to the property and assets of the Company or any of its Subsidiaries, whether or not covered by insurance;

(xi)    neither the Company or any of its Subsidiaries has made any Tax election, changed its method of Tax accounting or settled any claim for Taxes;

(xii)    there has been no amendment to the Company's Organizational Documents, and the Company has not effected or been a party to any merger, consolidation, share exchange, business combination, recapitalization, reclassification of shares, stock split, reverse stock split or similar transaction;

(xiii)    the Company has not formed any Subsidiary or acquired any equity interest or other interest in any other entity;

(xiv)    neither the Company nor any of its Subsidiaries have made any capital expenditure which exceeds $5,000 individually or $10,000 in the aggregate;

(xv)    neither the Company nor any of its Subsidiaries has amended or prematurely terminated, or waived any right or remedy under, any Material Contract;

(xvi)    the Company has not written off as uncollectible, or established any extraordinary reserve with respect to, any account receivable or other indebtedness;

LEGAL_US_W # 56638659.22

35

(xvii)   neither the Company nor any of its Subsidiaries have changed any of its methods of accounting or accounting practices in any respect;

(xviii)   neither the Company nor any of its Subsidiaries have threatened, commenced or settled any Action;

(xix)   neither the Company nor any of its Subsidiaries has entered into any transaction or taken any other action outside the ordinary course of business other than entering into this Agreement and the agreements and transactions contemplated hereby; and

(xx)   neither the Company nor any of its Subsidiaries has agreed, whether in writing or otherwise, to do any of the foregoing.

4.13   Contracts.

(a)   This Section 4.13 does not relate to Leases, such items being the subject of Section 4.10, or Company Licenses or Third Party Licenses, such items being the subject of Section 4.11.

(b)   Schedule 4.13 sets forth an accurate and complete list of each Contract to which either the Company or any of its Subsidiaries is party or by which any of them or their respective assets is bound:

(i)   for the purchase of materials, supplies, goods, services, equipment or other assets (other than purchase orders for inventory or Contracts for services in the ordinary course of business) which (A) involves or is expected to involve annual payments by the Company or any of its Subsidiaries of $100,000 or more in any 12 month period, or (B) (x) has a residual term as of the date of this Agreement of more than six months and (y) is not terminable by the Company or any of its Subsidiaries by notice of not more than 60 days for a cost of less than $100,000;

(ii)   for the sale or license by the Company or any of its Subsidiaries of materials, supplies, goods, services, equipment or other assets, which (A) involves or is expected to involve a specified annual minimum dollar sales or license amount by the Company or any of its Subsidiaries of $100,000 or more in any 12 month period, or (B) (x) has a residual term as of the date of this Agreement of more than twelve months and (y) is not terminable by the Company or any of its Subsidiaries by notice of not more than 60 days for a cost of less than $100,000;

(iii)   that requires the Company or any of its Subsidiaries to purchase its total requirements of any product or service from a third party or that contains "take or pay" provisions;

(iv)   that is for the sale of materials, supplies, goods, services, equipment or other assets by the Company or any of its Subsidiaries for an aggregate sale price of $100,000 or more in any 12 month period and contains any most-favored-nation

or other provision obligating the Company or any of its Subsidiaries to grant any other Person preferential pricing terms;

(v)     that is a note, debenture, bond, equipment trust, letter of credit, capital lease obligation, loan or other Contract for the borrowing or lending of money (other than to employees for travel expenses in the ordinary course of business) or otherwise pertaining to Indebtedness or that is a Contract for a line of credit or guarantee, pledge or undertaking of the Indebtedness of any other Person; in any such case which, individually, is in excess of $100,000;

(vi)    that restrains the ability of the Company or any of its Subsidiaries to engage or compete in any manner or in any business, or, to the Company's Knowledge, that restrains the ability of any employee of the Company or any of its Subsidiaries to work or do business in any industry, at or with a competitor or in any geographic region other than any agreements between such employee and the Company or any of its Subsidiaries;

(vii)   that relates to the acquisition or disposition of any business or material assets or properties (whether by merger, sale of stock, sale of assets or otherwise);

(viii)  that relates to the compromise or settlement of any litigation or arbitration or other proceeding; and

(ix)    that is a collective bargaining Contract or other Contract with any labor organization, union or association.

(c)     Neither the Company nor any of its Subsidiaries, nor to the Knowledge of the Company, any counterparty, is in default in the performance, observance or fulfillment of any material obligation, covenant or condition contained in any of the Contracts required to be listed in Schedule 4.13 (collectively, the "Material Contracts").

(d)     All amounts due and owing by the Company to A.G. Solutions have been paid or will be paid prior to Closing. The Interim Balance Sheet reflects adequate reserves in accordance with GAAP for all liabilities to A.G. Solutions accrued by the Company but not paid as of the date of such balance sheet.

4.14    Litigation. Except as set forth on Schedule 4.14, there is no action, suit or proceeding, claim, arbitration, litigation or formal investigation by or before any Governmental Entity (each, an "Action") pending against the Company or any of its Subsidiaries or any of their directors and officers or, to the Company's Knowledge, threatened against the Company or any of its Subsidiaries or any of their directors and officers. To the Company's Knowledge, no event has occurred, and no claim, dispute or other condition or circumstance exists, that will, or that could reasonably be expected to, give rise to or serve as a basis for the commencement of any such Action. There is no material unsatisfied judgment, penalty or award against the Company or any of its

Subsidiaries or any of its directors and officers.   Each of the Company and its Subsidiaries is in material compliance with each Order entered, issued or rendered by any Governmental Entity to which the Company or any of its Subsidiaries is subject.   There is no other scheme of arrangement, amalgamation or reconstruction of the Company or any of its Subsidiaries or arrangement or composition with or assignment for the benefit of, all or a class of the Company's or any of its Subsidiaries' creditors, pending or proposed. Neither the Company nor any of its Subsidiaries is subject to any insolvency proceedings under any Law whatsoever nor is the Company aware of any facts which would lead to such proceedings.

4.15    Employee Benefits.

(a)    Schedule 4.15(a) contains a true and complete list of all material Company Benefit Plans. Schedule 4.15(a) contains a complete and accurate list, as of the date hereof, of all of the employees of the Company and the Company's Subsidiaries, showing for each such employee: (1) such employee's name, job title, and location; (2) such employee's annualized compensation and base salary as of the date of this Agreement, separately identifying any bonus payments; (3) remaining accrued vacation and other leave hours (including the dollar value of such hours) as of the date hereof (to be updated to state accrued available hours as of the Closing Date); (4) leave status (including type of leave), expected date of return for non-disability related leaves and expiration dates for disability-related leaves; (5) whether such employee is classified as exempt from overtime requirements; and (6) such employee's date of hire. The Company has made available or delivered to the Buyer true and complete copies of all Employee Agreements, disclosure materials, policy statements, employee handbooks or manuals, and other materials relating to the employment of the current and former employees of the Company and its Subsidiaries.

(b)    For each Company Benefit Plan, as applicable, the Company has provided to Buyer: (i) true and complete copies of such Company Benefit Plan, including all amendments thereto and all related trust documents; (ii) a true and complete copy of the most recent summary plan description, together with each summary of material modifications; (iii) all material written employee communications relating to such Company Benefit Plan; (iv) the most recent determination or opinion letter received from the Internal Revenue Service with respect to each Company Benefit Plan intended to be qualified under Section 401(a) of the Code; (v) the annual report (Form 5500, with all applicable attachments) for the last three years; (vi) all material written Contracts relating to each Company Benefit Plan, including administrative service agreements and group insurance Contracts and other funding arrangements that implement each Company Benefit Plan; and (vii) all correspondence to or from any Governmental Entity relating to any Company Benefit Plan.

(c)    The Company and its ERISA Affiliates do not maintain any Company Benefit Plan subject to Laws other than those of the United States.

(d)     Except as set forth on <u>Schedule 4.15(d)</u>, neither the Company nor any of its ERISA Affiliates maintains, sponsors, or contributes to, has any obligation to contribute to, or has maintained, sponsored or contributed to or been required to contribute to, or has any liability (contingent or otherwise) under or with respect to any Pension Plan which is or was at any time (i) intended to qualify under Section 401(a) of the Code; or (ii) subject to Section 302 of ERISA, Title IV of ERISA, or Section 412 of the Code.

(e)     Neither the Company nor any of its ERISA Affiliates maintains, sponsors, or contributes to, has any obligation to contribute to, or has maintained, sponsored or contributed to or been required to contribute to, or has any liability (including withdrawal liability as defined in ERISA § 4201) under or with respect to any Multiemployer Plan within the meaning of Section 3(37) of ERISA, any plan sponsored by more than one employer within the meaning of Section 4063 or 4064 of ERISA or Section 413(c) of the Code, or a single employer plan within the meaning of Section 4001(a)(15) of ERISA. There does not now exist, nor do any circumstances exist that could reasonably be expected to result in, any Controlled Group Liability. Neither the Company nor any of its ERISA Affiliates has ever maintained, established, sponsored, participated in or contributed to, any employee pension benefit plan in which stock of the Company or its ERISA Affiliates is or was held as a plan asset.

(f)     Each Company Benefit Plan is and at all times has been maintained, funded and administered in all respects in accordance with its terms and with all applicable Laws (including ERISA and the Code). No "prohibited transaction," within the meaning of Section 4975 of the Code or Sections 406 and 407 of ERISA, and not otherwise exempt under Section 408 of ERISA, has occurred with respect to any Company Benefit Plan and to the Knowledge of the Company no fiduciary (within the meaning of Section 3(21) of ERISA) of any Company Benefit Plan subject to Part 4 of Title I of ERISA has committed a breach of fiduciary duty that could subject the Company or any of its Subsidiaries to material liability taken as a whole. Each Company Benefit Plan can be amended, terminated or otherwise discontinued after the Closing in accordance with its terms, without liability to the Buyer or the Company or any of its Subsidiaries (other than ordinary administration expenses). There are no actions pending, or, to the Company's Knowledge, threatened (other than routine claims for benefits) against any Company Benefit Plan. All contributions due from the Company with respect to any of the Company Benefit Plans have been made as required under any applicable Laws and the terms of such Company Benefit Plan, and all premiums due or payable with respect to insurance policies funding any Company Benefit Plan for any period through the Closing Date, have been timely made or paid in full, or in each such case have been fully reflected on the Company balance sheet. Neither the Company nor any ERISA Affiliate has ever incurred any penalty or tax with respect to any Company Benefit Plan under Section 502(i) of ERISA or Sections 4975 through 4980 of the Code.

(g)     No Company Benefit Plan or Employee Agreement provides retiree life insurance, retiree health or other retiree employee welfare benefits to any employee (or relative or dependent of any Employee), except (i) as may be required by

COBRA or other applicable federal, state, or local statute, (ii) disability benefits that have been fully provided for by insurance under one or more Company Benefit Plans set forth on Schedule 4.15(g), and (iii) benefits in the nature of severance pay with respect to one or more Employee Agreements set forth on Schedule 4.15(g).

(h)     With respect to each welfare plan, all claims incurred by the Company and its ERISA Affiliates are (i) insured pursuant to a Contract of insurance (that does not provide for any retrospective premium adjustments) whereby the insurance company bears any risk of loss with respect to such claims, (ii) covered under a Contract with a health maintenance organization (an "HMO") pursuant to which the HMO bears the liability for claims or (iii) reflected as a liability or accrued for on the financial statements of the Company.

(i)     The Company and its ERISA Affiliates have never been party to any arrangement that is or was a "non-qualified deferred compensation plan" within the meaning of Section 409A of the Code.  All stock options or share appreciation rights granted by the Company were granted using an exercise price or a base price, as the case may be, of not less than the fair market value of the underlying shares in accordance with applicable guidance under Section 409A of the Code, and are not otherwise subject to the requirements of Section 409A of the Code.

(j)     Except as set forth on Schedule 4.15(j), (i) neither the Company nor any of its Subsidiaries has made any payments, is obligated to make any payments, or is a party to any Contract, plan or arrangement that obligates it to make any payments of compensation (A) that will be "excess parachute payments" under Section 280G of the Code  and the regulations and guidance promulgated thereunder (as in effect on the date hereof) and (B) will not be fully deductible as a result of Section 162(m) of the Code and the regulations and guidance promulgated thereunder (as in effect on the date hereof); and (ii) neither the Company nor any of its Subsidiaries are a party to any Contract, nor do any of them have any liability (current or contingent), to compensate any individual for excise taxes paid pursuant to Section 4999 of the Code; and (iii) the execution of this Agreement and the consummation of the transactions contemplated hereby will not (either alone or upon the occurrence of any additional or subsequent events) constitute an event under any Company Benefit Plan, Employee Agreement, trust or loan that will or may result in any payment (whether of severance pay or otherwise), acceleration of vesting, forgiveness of indebtedness, loss of rights, distribution of funds, increase in benefits or obligation to fund benefits with respect to any employee, nor will the execution of this Agreement and the consummation of the transactions contemplated hereby result in any liability to Buyer.

(k)     Prior to the Closing Date, each of Bhairav Trivedi, Alex Peterhans and any other Person listed or required to be listed on Schedule 4.15(j) in order to make the representation in Section 4.15(j) true and correct shall have waived their respective rights to receive from the Company a portion of the payments identified in Schedule 4.15(k) in an amount sufficient to ensure that no payment (whether or not identified on Schedule 4.15(k)) to such individual will fail to be deductible by the Company under

Section 280G of the Code or result in the imposition of excise taxes under Section 4999 of the Code.

4.16    Labor and Employment Matters.

(a)    Schedule 4.16 sets forth a list of any written Employee Agreements to which the Company or any of its Subsidiaries is a party.

(b)    Neither the Company nor the Company's Subsidiaries are engaged, or have ever been engaged, in any unfair labor practice of any nature. The Company has not implemented any employee layoffs that could implicate the WARN Act or any similar state law, such as California Labor Code Section 1400, et. seq.

(c)    The Company does not have any unsatisfied obligations to any employee or qualified beneficiary pursuant to COBRA, HIPAA, or any state law governing health care coverage extension or continuation other than the payment of benefits in the ordinary course of business. Neither the Company nor any of its Subsidiaries is a party or subject to any labor union or collective bargaining Contract, nor is any such Contract being negotiated. To Company's Knowledge, there are not pending any labor disputes, work stoppages, requests for representation, pickets, work slow-downs due to labor disagreements or any actions or arbitrations which involve the labor or employment relations of the Company or any of its Subsidiaries. There is no union, works council, employee representative or other labor organization, which, pursuant to applicable Law, must be notified, consulted or with which negotiations need to be conducted in connection with the transactions contemplated by this Agreement.

(d)    Schedule 4.16(d) contains a true and complete list of each former employee, officer, director, or other service provider of the Company or its Subsidiaries who is receiving or is scheduled to receive (or whose spouse or other dependent is receiving or is scheduled to receive) any benefits (whether from the Company or otherwise) relating to such former employee's employment with the Company; and Schedule 4.16(d) contains a true and complete description of such benefits.

(e)    The Company and its Subsidiaries have maintained worker's compensation coverage as required by applicable state law through the purchase of insurance and not by self-insurance or otherwise.

(f)    Except as set forth on Schedule 4.16(f), none of the current or former independent contractors of the Company or its Subsidiaries could be reclassified as an employee and no current or former employees classified as "exempt" from overtime requirements could be reclassified as non-exempt. No independent contractor of the Company or its Subsidiaries is eligible to participate in any Company Benefit Plans.

4.17    Environmental. To Company's Knowledge, (a) each of the Company and its Subsidiaries is in material compliance with all applicable Laws relating to protection of human health, safety, or the environment ("Environmental Laws"), (b) each of the Company and its Subsidiaries possesses and is in material compliance with all

Authorizations required under Environmental Laws for the conduct of their respective operations and (c) there are no actions pending, nor have there been any claims asserted, against the Company or any of its Subsidiaries alleging a violation of, or liability under, Environmental Laws.

4.18    Insurance.    Schedule 4.18 (as such Schedule shall be updated by the Company prior to Closing to reflect additions and deletions thereto made in accordance with Section 6.8) sets forth an accurate and complete list of all material insurance policies and fidelity bonds which cover any of the Company or its Subsidiaries or their respective businesses, properties, assets, directors or employees (the "Policies"). Such Policies are in full force and effect in all material respects and neither the Company nor any of its Subsidiaries is in default with respect to its obligations under any such Policy in a manner that would permit the termination of such Policy or the limitation of any coverage thereunder.

4.19    Brokers.    Except as set forth on Schedule 4.19, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Company.

4.20    Banking Relationships.

(a)    Set forth on Schedule 4.20(a) are the names and locations of all banks and trust companies in which the Company and its Subsidiaries has accounts or lines of credit and with respect to each account or line of credit, the names of all persons authorized to draw thereon or to have access thereto.

(b)    All notes receivable and accounts receivable outstanding as of the Interim Balance Sheet Date are reflected properly on the Interim Balance Sheet and represent valid obligations arising from sales actually made or services actually performed in the ordinary course of business. Such notes and accounts receivable will as of the date of the Effective Time be collectible, net of the respective reserve shown in the corresponding line items on the Interim Balance Sheet, provided, however, that this representation shall not be deemed to be a guarantee of collection. There is no contest, claim, defense or right of setoff, other than returns in the ordinary course of business, relating to the amount or validity of such note or account receivable. Schedule 4.20(b) sets forth an accurate and complete list and the aging of all notes and accounts receivable as of the date of the Interim Balance Sheet.

4.21    Minutes and Records.    The minute books of the Company and each of its Subsidiaries contain records that are accurate in all material respects of all meetings and consents in lieu of meetings of their respective Board of Directors and any committees thereof (whether permanent or temporary), and of their respective stockholders, since inception, and are accurate in all material respects, and such minutes accurately reflect all transactions referred to in such minutes and consents. The stock books of the Company and each of its Subsidiaries accurately reflect the ownership of the capital stock of the

entity referenced therein. The Company and its Subsidiaries are currently maintaining all material statutory registers, records and books required to be kept by the Company and its Subsidiaries under any applicable Law.

4.22 <u>Related Party Transactions</u>. Except as set forth on <u>Schedule 4.22,</u> to the Company's Knowledge, (a) no Related Party has, and no Related Party has at any time within the last 12 months had, any direct or indirect interest in any material asset used in or otherwise relating to the business of the Company or any of its Subsidiaries; (b) no Related Party is, or has been within the last two years, indebted to the Company or any of its Subsidiaries; (c) within the last 12 months, no Related Party has entered into, or has had any direct or indirect financial interest in, any Contract, transaction or business dealing involving the Company or any of its Subsidiaries; (d) no officer or director of the Company or any of its Subsidiaries is competing, or has at any time within the last 12 months competed, directly or indirectly, with the Company or any of its Subsidiaries; and (e) no Related Party has any claim or right against the Company (other than rights as a securityholder and rights to receive compensation for services performed and benefits as an employee of the Company or any of its Subsidiaries). For purposes of this Section 4.22 each of the following shall be deemed to be a "<u>Related Party</u>": (a) each individual who is an officer or director of the Company or any of its Subsidiaries; (b) each holder of Company Shares who owns of record in excess of five percent of the outstanding Common Stock on a fully diluted basis; (c) each member of the immediate family of each of the individuals referred to in clauses (a) and (b) above; and (d) any trust or other entity (other than the Company) in which any one of the individuals referred to in clauses (a), (b) and (c) above holds (or in which more than one of such individuals collectively hold), beneficially or otherwise, a material voting, proprietary, equity or other financial interest.

4.23 <u>Corrupt Practices</u>. Neither the Company nor any of its Subsidiaries have made, directly or indirectly, any payment or promise to pay, or gift or promise to give, or authorized such a promise or gift, of any money or anything of value, directly or indirectly to any Person for the purpose of improperly influencing any such Person or improperly inducing him or her to use his or her influence to affect any act or decision of any third party in order to assist the Company or any of its Subsidiaries to obtain or retain business for, or direct business to, the Company or any of its Subsidiaries or in relation to obtaining or preventing termination of an Authorization.

4.24 <u>Powers of Attorney</u>. There are no outstanding powers of attorney executed on behalf of the Company or any of its Subsidiaries to any Person.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF BUYER AND MERGER SUBSIDIARY

Each of Buyer and Merger Subsidiary represents and warrants to the Stockholder Parties that each statement contained in this Article V is true and correct as of the date

hereof, except as set forth in the Schedules accompanying this Agreement (collectively, the "Buyer Disclosure Schedule"). The Buyer Disclosure Schedule has been arranged for purposes of convenience only, in sections corresponding to the Sections of this Article V. Each section of the Buyer Disclosure Schedule shall be deemed to incorporate by reference all information disclosed in any other section of the Buyer Disclosure Schedule.

5.1    Organization and Good Standing.  Each of Buyer and Merger Subsidiary is a corporation duly organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation, has all requisite corporate power to own, lease and operate its properties and to carry on its business as now being conducted, and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction in which it owns or leases property or conducts any business so as to require such qualification, except where the failure to be so qualified would not reasonably be expected to have a Buyer Material Adverse Effect.

5.2    Authority and Enforceability.  Each of Buyer and Merger Subsidiary has the requisite power and authority to enter into this Agreement and to consummate the Merger.  The execution and delivery of this Agreement and the consummation of the Merger have been duly authorized by all necessary corporate action on the part of Buyer and Merger Subsidiary.  This Agreement has been duly executed and delivered by each of Buyer and Merger Subsidiary and, assuming due authorization, execution and delivery by the Company and the Stockholders' Representative, constitutes the valid and binding obligation of each of Buyer and Merger Subsidiary, enforceable against each of them in accordance with its terms, except as such enforceability may be limited by (i) bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting or relating to creditors' rights generally, and (ii) the availability of injunctive relief and other equitable remedies.

5.3    No Conflicts; Consents.

(a)    Except for any notices, filings, consents or approvals set forth in Schedule 5.3, the execution and delivery of this Agreement by Buyer and Merger Subsidiary do not, and the consummation of the Merger by Buyer and Merger Subsidiary will not, (i) violate the provisions of any Organizational Document of Buyer or Merger Subsidiary, (ii) violate any Contract to which Buyer or Merger Subsidiary is a party, (iii) violate any Order or Law applicable to Buyer or Merger Subsidiary on the date hereof, or (iv) result in the creation of any Liens upon any of the assets owned or used by Buyer or Merger Subsidiary, except in each such case where such violation or Lien would not reasonably be expected to have a Buyer Material Adverse Effect or impair or delay in any material respect the ability of Buyer or Merger Subsidiary to perform its obligations under this Agreement.

(b)    No Authorization, Order of, registration, declaration or filing with, or notice to  any Governmental Entity is required by Buyer or Merger Subsidiary in connection with the execution and delivery of this Agreement and the consummation of the Merger, except for such Authorizations, Orders, registrations, declarations, filings and

notices the failure to obtain which would not reasonably be expected to (i) have a Buyer Material Adverse Effect or (ii) materially impair or delay the ability of Buyer or Merger Subsidiary to perform its obligations under this Agreement or consummate the Merger.

5.4     Litigation.  There is no Action pending or, to the Knowledge of Buyer, threatened, against Buyer or Merger Subsidiary which (a) challenges or seeks to enjoin, alter or materially delay the consummation of the Merger or (b) would reasonably be expected to have a Buyer Material Adverse Effect.

5.5     Availability of Funds.  Buyer has cash available sufficient to enable it to consummate the Merger.

ARTICLE VI

COVENANTS OF THE COMPANY

6.1     Conduct of Business.  During the period from the date of this Agreement and continuing until the earlier of the termination of this Agreement or the Closing Date, the Company and its Subsidiaries shall operate in the ordinary course of business consistent with past practice, pay its debts and Taxes when due (subject to good faith disputes over such debts or Taxes) and otherwise pay or perform other material obligations when due and comply with all applicable Laws in all material respects.

6.2     Negative Covenants.  Without limiting the generality of the foregoing, except as expressly provided in this Agreement, during the period from the date hereof and continuing until the earlier of the termination of this Agreement pursuant to its terms or the Effective Time, the Company shall not do, cause or permit any of the following (except to the extent contemplated in this Agreement, disclosed in the Company Disclosure Schedule, required by applicable Law, or as consented to in writing by Buyer, which consent will not be unreasonably withheld):

(a)     sell, assign, transfer, convey, lease, license or otherwise dispose of or encumber any property or assets having a value individually exceeding $100,000 or an aggregate value exceeding $100,000, other than sales of products in the ordinary course of business consistent with its past practice;

(b)     except in the ordinary course of business, enter into any Contract that would be required to be listed as a Material Contract if such Contract were in effect on the date hereof, materially amend, terminate or fail to use its commercially reasonable efforts to renew any Material Contract;

(c)     materially amend, modify or terminate any of the Leases or enter into any new leases of real property;

(d)     make any capital expenditure or commit to make any capital expenditure which in any one case exceeds $100,000 or capital expenditures which in the

aggregate exceed $100,000; provided that this restriction shall not apply to capital expenditures that are undertaken in order to replace or repair capital goods of the Company or any of its Subsidiaries in the ordinary course of business;

(e)      fail to use commercially reasonable efforts to maintain the material tangible assets of the Company and its Subsidiaries in their current physical condition, except for ordinary wear and tear;

(f)      enter into or amend any agreement pursuant to which any other party is granted exclusive marketing or other exclusive rights of any type or scope with respect to any material product or Intellectual Property of the Company or its Subsidiaries;

(g)      incur any Indebtedness for borrowed money in excess of $500,000 or guarantee any such Indebtedness or issue or sell any debt securities or guarantee any debt securities of others;

(h)      mortgage, pledge or subject to Liens, other than Permitted Liens, any properties or assets of the Company or any of its Subsidiaries except pursuant to existing Contracts;

(i)      cause or permit any amendments to the Company's Organizational Documents;

(j)      issue, amend the terms of, or declare or pay any dividend or make any other payment or distribution (whether in cash, stock or property) with respect to, its Equity Securities or split, combine, reclassify, redeem or repurchase Equity Securities;

(k)      make any loans or advances, other than routine advances to employees consistent with past practice or forgive or discharge in whole or in part any outstanding loans or advances;

(l)      (i) transfer or license to any Person any rights to any Intellectual Property other than in the ordinary course of business consistent with past practice (other than any expiration or nonrenewal in accordance with its terms), (ii) grant, extend, amend (except as required in the diligent prosecution of the material Intellectual Property), waive or modify any rights in or to any Intellectual Property, (iii) fail to diligently prosecute any material patent applications or (iv) fail to exercise a right of renewal or extension under any Intellectual Property;

(m)      except as set forth on Schedule 6.2, (i) increase the wages, salaries, compensation, severance, pension or other benefits payable to any employee, consultant, independent contractor or director, (ii) pay any bonus or other amount to any employee, consultant, independent contractor or director, (iii) modify in any material respect, or enter into any new, employment, deferred compensation, severance, retirement or other agreement or arrangement providing for additional or different benefits with any employee than those payable on the date hereof, or (iv) make any change in the key

management structure of the Company, including the hiring of additional officers or the termination of existing officers, in each case other than pursuant to existing Contracts or Company Benefit Plans;

(n)     adopt or amend in any material respect any Company Benefit Plan, except as required by applicable Law;

(o)     make any change (or file any such change) in any method of Tax accounting, make, change or rescind any material Tax election, or settle or compromise any material Tax liability;

(p)     make any material change in any of the Company's accounting methods, principles or practices, except for changes made in compliance with GAAP or in the ordinary course of business;

(q)     collect accounts receivable on an accelerated basis or pay accounts payable on a delayed basis, in each case, as compared to the Company's historic practice;

(r)     cancel or write-off any material claims or Indebtedness, establish an extraordinary reserve with respect to any material account receivable or Indebtedness or waive or relinquish any material rights;

(s)     sell, issue or authorize the issuance of any Equity Securities or other securities of the Company;

(t)     acquire, lease, or license any material right or other material asset from any Person;

(u)     commence or settle any Action;

(v)     enter into a material transaction or take any other material action outside the ordinary course of business consistent with past practice;

(w)     enter into any operating lease in excess of $250,000 in the aggregate;

(x)     enter into any collective bargaining agreement;

(y)     adopt a plan of complete or partial liquidation or dissolution or resolutions providing for or authorizing such a liquidation or a dissolution;

(z)     agree, whether in writing or otherwise, to do any of the foregoing.

(aa)    dismiss any employee except for cause or hire any new employee having an annual salary in excess of $100,000;

(bb)    materially reduce the amount of any insurance coverage provided by existing insurance policies;

(cc)    acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof, or otherwise acquire or agree to acquire any assets which are material, individually or in the aggregate, to its and its subsidiaries' business, taken as a whole; or

(dd)    take or agree to take, whether in writing or otherwise, any of the foregoing actions.

6.3    <u>Employee Benefits</u>.

(a)    Prior to the Closing Date, the Company shall make, or cause to be made, all contributions and pay all premiums under each Company Benefit Plan other than a pension benefit plan within the meaning of Section 3(2) of ERISA, with respect to periods ending on or prior to the Closing Date.

(b)    Neither the Company nor any ERISA Affiliate has any intention or commitment to create any additional Company Benefit Plan, or to modify or change any existing Company Benefit Plan (other than as provided herein or to comply with applicable law) in a manner that would materially adversely affect any employee of the Company or any Subsidiary.

6.4    <u>280G Approval</u>.  Prior to the Closing Date, the Company shall seek the necessary stockholder approval of any payments or benefits under any Company Benefit Plan or other agreement which would be an "excess parachute payment" under Section 280G of the Code as a result of the transactions contemplated by this Agreement.  The Company shall deliver to Buyer prior to the Closing reasonable evidence either (a) that the stockholder approval was solicited in conformance with Section 280G and the regulations promulgated thereunder and the necessary stockholder approval was obtained with respect to any payments and/or benefits that were subject to the stockholder vote (the "<u>280G Approval</u>"), or (b) that the 280G Approval was not obtained and, as a consequence, that such "excess parachute payments" shall not be made or provided, as authorized under the waivers of those payments and/or benefits which were executed by all of the affected individuals.

6.5    <u>Access to Information</u>.  The Company and its Subsidiaries shall afford to Buyer and its Representatives reasonable access, upon reasonable notice during normal business hours prior to the Closing, to the personnel, properties, books, Contracts and records of the Company and its Subsidiaries; <u>provided that</u> Buyer shall not have access to individual performance or evaluation records, medical histories or other information if such access would violate applicable Law.

6.6    <u>Resignations</u>.  On the Closing Date, the Company shall cause to be delivered to Buyer duly signed resignations, effective immediately upon the Closing, of

all directors of their position as a director and all officers of their position as an officer of the Company as defined in the bylaws and each Subsidiary of the Company as Buyer has requested in writing at least 10 Business Days prior to Closing; provided that no such resignation by any individual shall be a resignation from employment with the Company or such Subsidiary if such individual is so employed.

6.7    Intercompany Liabilities; Indebtedness; Release of Liens.

(a)    On or prior to the Closing Date, except as set forth on Schedule 6.7(a), the Company and its Subsidiaries shall settle all intercompany accounts between the Company or any of its Subsidiaries.

(b)    On or prior to the Closing Date, the Company shall extinguish or cause to be extinguished (i) all of its and its Subsidiaries' Indebtedness and (ii) all guarantees by the Company and its Subsidiaries of any Indebtedness of any Person, and the Company shall deliver to Buyer the corresponding release of any Lien such Person may have with respect to the Company, any Subsidiary or any of their respective assets.

6.8    Notification.    The Company shall notify Buyer in writing of (a) the existence or happening of any fact, event or occurrence which should be included in the Company Disclosure Schedule in order to make the representations and warranties set forth in Article IV true and correct in all material respects as of the Closing Date (each such additional written disclosure, a "Company Disclosure Schedule Supplement") and (b) the failure of the Company to comply with or satisfy in any material respect any covenant to be complied with by it hereunder, it being understood and agreed that the delivery of such information shall not in any manner constitute a waiver by Buyer of any of the conditions precedent to the Closing hereunder or affect Buyer's rights to indemnification pursuant to Article XI.

6.9    Stockholder Approval.    The Company shall obtain, on or before the second Business Day after the date of this Agreement, the Requisite Stockholder Approval for the transactions contemplated by this Agreement, pursuant to a written consent of the holders of Company Shares in accordance with the applicable requirements of the DGCL. The Company shall send, pursuant to Sections 228 and 262(d) of the DGCL, a written notice to all holders of Company Shares that did not execute such written consent informing them that this Agreement and the Merger were adopted and approved by the holders of Company Shares and that appraisal rights are available for their Company Shares pursuant to Section 262 of the DGCL (which notice shall include a copy of such Section 262), and shall promptly inform Buyer of the date on which such notice was sent.

6.10    Exclusive Dealing.    During the period from the date of this Agreement and continuing until the earlier of the termination of this Agreement or the Closing Date, the Company and its Subsidiaries shall not take or permit any other Person (including their directors, officers, employees, counsel, accountants, agents and advisors) on their behalf to take, any action to solicit, encourage, initiate or engage in discussions or negotiations

with, or provide any information or documentation to, or assist, any Person (other than Buyer or its representatives) concerning any purchase of any Equity Securities of the Company or any of its Subsidiaries, any merger involving the Company, any sale of all or substantially all of the assets of the Business or similar transaction involving the Company or the Business (other than assets sold in the ordinary course of business).

## ARTICLE VII

## COVENANTS OF BUYER

7.1    WARN Act.  Buyer shall be liable for any liabilities under the WARN Act or any other Law respecting reductions in force or the impact on employees of plant closings or sales of businesses for any actions taken by Buyer or any of its Affiliates on or after the Closing Date.

## ARTICLE VIII

## COVENANTS OF BUYER AND THE COMPANY

8.1    Confidentiality.  The Parties acknowledge that the Company and Buyer have previously executed a confidentiality agreement dated March 30, 2007 (the "Confidentiality Agreement"), the terms of which are incorporated herein by reference. Effective upon, and only upon, the Closing, the Confidentiality Agreement shall terminate with respect to information relating solely to the Company and its Subsidiaries.

8.2    Fulfillment of Closing Conditions.  At and prior to the Closing, each Party shall use commercially reasonable efforts to fulfill, and to cause each other to fulfill, as soon as practicable the conditions specified in Article IX to the extent that the fulfillment of such conditions is within its or his control. In connection with the foregoing, each Party will (i) refrain from any actions that would cause any of its representations and warranties to be inaccurate as of the Closing, and take any reasonable actions within its control that would be necessary to prevent its representations and warranties from being inaccurate as of the Closing, (ii) execute and deliver the applicable agreements and other documents referred to in Article IX, (iii) comply with all applicable Laws in connection with its execution, delivery and performance of this Agreement and the transactions contemplated hereby, (iv) use commercially reasonable efforts to obtain in a timely manner all necessary waivers, consents and approvals required under any Laws, Contracts or otherwise, including any Required Consents and (v) use commercially reasonable efforts to take, or cause to be taken, all other actions and to do, or cause to be done, all other things reasonably necessary, proper or advisable to consummate and make effective as promptly as practicable the transactions contemplated hereby.

8.3     Employee Matters.

(a)     Employee Communications.  No officer, director, employee, agent or representative of the Company or any of its Subsidiaries shall make any communication to employees of the Company or any of its Subsidiaries regarding any compensation or benefits to be provided after the Closing Date without the advance written approval of Buyer (which approval shall not be unreasonably withheld).

(b)     No Third Party Beneficiaries.  Notwithstanding anything to the contrary in this Agreement, the parties expressly acknowledge and agree that (i) this Agreement is not intended to create a Contract between Buyer, the Surviving Corporation, the Company, any of the Company's Subsidiaries, or the Company's ERISA Affiliates on the one hand and any employee of the Surviving Corporation, the Company, any of the Company's Subsidiaries, or the Company's ERISA Affiliates, on the other hand, and no employee of the Surviving Corporation, the Company, any of the Company's Subsidiaries, or the Company's ERISA Affiliates may rely on this Agreement as the basis for any breach of contract claim against Buyer, the Surviving Corporation, the Company, any of the Company's Subsidiaries, or the Company's ERISA Affiliates; (ii) any employee of the Company or any of its Subsidiaries who is employed by the Surviving Corporation, the Company, any of the Company's Subsidiaries, or the Company's ERISA Affiliates on or after the Closing Date shall be an at-will employee, who shall be subject to the Buyer's, the Surviving Corporation's, or the Company's policies and procedures, including those that apply to applicants and new hires; (iii) nothing in this Agreement shall be deemed or construed to require Buyer, the Surviving Corporation, the Company, any of the Company's Subsidiaries, or the Company's ERISA Affiliates to continue to employ any particular employee of the Surviving Corporation, the Company, any of the Company's Subsidiaries, or the Company's ERISA Affiliates for any period either prior to or after Closing; (iv) nothing in this Agreement shall be deemed or construed to limit Buyer's or the Surviving Corporation's right to terminate the employment of any employee of the Surviving Corporation, the Company, any of the Company's Subsidiaries, or the Company's ERISA Affiliates during any period after Closing; and (v) nothing in this Agreement shall modify or amend any Company Benefit Plan or other agreement, plan, program, or document unless this agreement explicitly states that the provision "amends" such Company Benefit Plan or other agreement, plan, program, or document.  Notwithstanding anything contained in this Section 8.3(b), nothing shall restrict, limit or otherwise alter the rights of the Key Employees under any employment agreement with Buyer or the Surviving Corporation.

8.4     Public Announcements.  Neither the Company nor Buyer shall, nor shall any of their respective Affiliates, without the approval of the other party, issue any press releases or otherwise make any public statements with respect to the transactions contemplated by this Agreement, except as may be required by applicable Law or by obligations pursuant to any listing agreement with any national securities exchange or stock market, in which case the Party required to make the release or announcement shall allow the other Party reasonable time to comment on such release or announcement in advance of such issuance.

8.5    Tax Matters.  The following provisions shall govern the allocation of responsibility as between Buyer and the Stockholders' Representative for certain Tax matters following the Closing Date:

(a)    Tax Returns for Periods Ending on or Before the Closing Date. The Stockholders' Representative shall prepare or cause to be prepared (in a manner consistent with prior practice) and timely file or cause to be timely filed all Tax Returns for the Company for all periods ending on or prior to the Closing Date which are filed after the Closing Date.  The Stockholders' Representative shall permit Buyer to review and comment on such Tax Returns prior to filing and shall not file such Tax Returns without the Buyer's consent, which consent shall not be unreasonably withheld or delayed.  If the parties are unable to agree, they will utilize the dispute resolution mechanism set forth in Section 8.5(c)(ii).  The Stockholder Parties shall be responsible for and indemnify, defend, and hold harmless Buyer from any Taxes of the Company for any pre-Closing periods (including the pre-Closing period related to any portion of any Straddle Period) except to the extent such Taxes have been taken into account in the computation of Net Working Capital.

(b)    Tax Returns for Periods Beginning Before and Ending After the Closing Date.

(i)    Buyer shall prepare or cause to be prepared and file or cause to be filed any Tax Returns of the Company for Tax periods that begin before the Closing Date and end after the Closing Date (a "Straddle Period"); provided that with respect to any such Tax Return, Buyer shall deduct from the Escrow Funds, no later than two (2) business days before the due date (giving effect to any validly obtained extension thereof) for such Tax Return, any amount allocable to the portion of such Straddle Period ending on the Closing Date pursuant to clause (ii) of this Section 8.5(b) with respect to the taxable periods covered by such Tax Returns to the extent such amounts were not specifically identified and taken into account in the computation of Net Working Capital. Buyer shall permit the Stockholders' Representative to review and comment on such Tax Returns prior to filing, and shall not file such Tax Returns without the Stockholders' Representative's consent, which cannot be unreasonably withheld or delayed.  If the parties are unable to agree, they will utilize the dispute resolution mechanism set forth in Section 8.5(c)(ii).

(ii)    In the case of any Straddle Period, the amount of Taxes allocable to the portion of the Straddle Period ending on the Closing Date shall be deemed to be:

(A)    In the case of Taxes imposed on a periodic basis (such as real or personal property Taxes), the amount of such Taxes for the entire period (or, in the case of such Taxes determined on an arrears basis, the amount of such Taxes for the immediately preceding period) multiplied by a fraction, the numerator of which is the number of calendar days in the Straddle Period ending

on and including the Closing Date and the denominator of which is the number of calendar days in the entire relevant Straddle Period; and

(B)    In the case of Taxes not described in (A) above (such as franchise, branch and capital Taxes, Taxes that are based upon or related to income or receipts, based upon occupancy or imposed in connection with any sale or other transfer or assignment of property (real or personal, tangible or intangible)), the amount of any such Taxes shall be determined as if such taxable period ended as of the close of business on the Closing Date.

(c)    Cooperation on Tax Matters.

(i)    Buyer, the Company and the Stockholders' Representative shall cooperate fully, as and to the extent reasonably requested by the other party, in connection with the filing of Tax Returns and any audit, litigation or other proceeding with respect to Taxes. Such cooperation shall include the retention and (upon another party's request) the provision of records and information which are reasonably relevant to any such Tax Return, audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. The Company and the Stockholders' Representative agree (A) to retain all books and records with respect to Tax matters pertinent to the Company relating to any taxable period beginning before the Closing Date until the expiration of the statute of limitations (and any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any taxing authority, and (B) to give the other party reasonable written notice prior to transferring, destroying or discarding any such books and records and, if the other party so requests, to allow the other party to take possession of such books and records.

(ii)    Buyer and the Stockholders' Representative agree to consult and resolve in good faith any objection that is the basis of any party's withholding of any necessary consent under this Section 8.5. If Buyer and the Stockholders' Representative are unable to resolve in good faith any objection, Buyer and the Stockholders' Representative jointly shall engage the Independent Accounting Firm to resolve such dispute. To the extent the Buyer or the Stockholders' Representative are unable to timely resolve any objection prior to the due date of the filing of any Tax Returns, the responsible party shall sign and timely file such Tax Return. After the resolution of such objection, if any, such Tax Return shall be revised to reflect such resolution.

(d)    Transfer Taxes. All Transfer Taxes (including any penalties and interest) incurred in connection with this Agreement shall be paid one-half by Buyer and one-half by the Stockholder Parties. Buyer will file all necessary Tax Returns and other documentation with respect to all such transfer (including real property transfer and stock transfer), documentary, sales, use, stamp, registration and other Taxes and fees, and, if required by applicable law, will cause its Affiliates to, join in the execution of any such Tax Returns and other documentation.

(e)   Litigation.  From and after the Closing Date, the parties shall give prompt notice of any proposed adjustment by any Governmental Entity with respect to Taxes allocable to any pre-Closing Tax period.  The Stockholders' Representative shall be entitled to manage, conduct and control any audit or litigation relating to a period covered by the Tax Returns filed by the Stockholders' Representative pursuant to Section 8.5(a) hereof that is subject to the indemnity obligation of the Stockholder Parties set forth in Section 8.5, provided, however, that the Buyer shall have the right to participate in, and consult with the Stockholders' Representative regarding, any such audit or litigation that may affect the Company for any periods ending after the Closing Date at the Buyer's own expense and provided, further, that any settlement or other disposition of any such audit or litigation may only be with the written consent of the Buyer, which consent will not be unreasonably withheld or delayed.  Buyer shall be entitled to manage, conduct and control any and all other audit or litigation, provided, however, that if such audit or litigation relates to a period covered by a Tax Return for a period ending on or before the Closing Date but filed after the Closing Date or the portion of any Straddle Period ending on the Closing Date (a portion of which is subject to the indemnity obligation of the Stockholder Parties set forth in Section 8.5), then the Stockholders' Representative shall have the right to participate in, and consult with the Buyer regarding, such audit or litigation at the Stockholders' Representative's own expense and provided, further, that any settlement or other disposition of any such audit or litigation may only be with the written consent of the Stockholders' Representative, which consent will not be unreasonably withheld or delayed.   In the event of any conflict between the indemnification procedures in Article XI and the provisions of this Section 8.5, the provisions of this Section 8.5 shall control.  Except as provided in Section 11.2(h), in no event shall the Stockholder Parties be obligated to indemnify Buyer under this Section 8.5 or Article XI for any amounts in excess of, or with any funds other than, the Escrow Funds.

## ARTICLE IX

## CONDITIONS TO CLOSING

9.1   Conditions to Obligations of Buyer and the Company.  The obligations of Buyer and the Company to consummate the Merger is subject to the satisfaction of the following conditions:

(a)   Acceptance for filing of the Certificate of Merger by the Secretary of State of the State of Delaware.

(b)   All Authorizations and Orders of, declarations and filings with, and notices to any Governmental Entity required to permit the consummation of the Merger shall have been obtained or made.

(c)   No Governmental Entity shall have enacted, issued, promulgated, enforced or entered any Law or Order (whether temporary, preliminary or permanent)

which is in effect and which has the effect of making the Merger illegal or otherwise prohibiting consummation of the Merger.

      (d)     The Requisite Stockholder Approval shall have been obtained.

    9.2    Conditions to Obligation of Buyer and Merger Subsidiary. The obligation of Buyer and Merger Subsidiary to consummate the Merger is subject to the satisfaction (or waiver by Buyer in its sole discretion) of the following further conditions:

      (a)     Each of the representations and warranties of the Company set forth in this Agreement that is qualified by materiality, including the terms "material," "in all material respects" and "Material Adverse Effect" or words of similar effect, shall be true and correct as of the date of this Agreement and at and as of the Closing Date as if made at and as of the Closing Date (without giving effect to any Company Disclosure Schedule Supplement) and each of such representations and warranties that is not so qualified shall be true and correct in all material respects as of the date of this Agreement and at and as of the Closing Date as if made at and as of the Closing Date (without giving effect to any Company Disclosure Schedule Supplement), except to the extent that such representations and warranties refer specifically to an earlier date, in which case such representations and warranties shall have been true and correct as of such earlier date; provided, that the representations and warranties set forth in Section 4.2 shall in any event be true and correct in all respects.

      (b)     The Company shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with at or prior to the Closing Date.

      (c)     Buyer shall have received a certificate signed on behalf of the Company by the Chief Executive Officer of the Company (the "Company Compliance Certificate") that the conditions relating to the Company set forth in Section 9.2(a) and (b) have been satisfied.

      (d)     There shall not have occurred a Company Material Adverse Effect, and no event shall have occurred or circumstance exist that, in combination with any other events or circumstances, would reasonably be expected to have a Company Material Adverse Effect.

      (e)     Since the date of this Agreement, there shall not have been commenced or threatened against Buyer or the Company any Action involving any challenge to, or seeking damages or other relief in connection with, the consummation of the transactions contemplated by this Agreement or that may have the effect of making illegal or prohibiting consummation of such transactions.

      (f)     Each Common Warrant shall have been exercised, cancelled or terminated effective immediately prior to the Effective Time, and Buyer shall have received evidence reasonably satisfactory to it of such cancellation or termination.

(g)     The approvals, consents or waivers of the Persons identified on Schedule 9.2(g) of the Company Disclosure Schedule (the "Required Consents") shall have been obtained, in form and substance reasonably satisfactory to Buyer.

(h)     The Escrow Agent and the Stockholders' Representative shall have duly executed and delivered the Escrow Agreement.

(i)     On or before the Closing Date, the Company shall have delivered to Buyer a certification in the form reasonably agreed to by Buyer and the Company for purposes of satisfying Buyer's obligations under Treasury Regulation Section 1.1445 2(c)(3).

(j)     The number of Company Shares which, as of the Closing, have become Dissenting Shares will not exceed twenty percent (20%) of the aggregate number of Company Shares (on a fully-diluted basis) as of the Effective Time.

(k)     Each Key Employee shall have confirmed on the Closing Date his willingness and ability to provide services to the Company in accordance with the employment agreement applicable to him, other than as a result of his death or disability.

(l)     All Common Optionholders shall have signed Option Cancellation Acknowledgments in the form of **Exhibit C.**

(m)     The Company shall have terminated its contractual relationship with A.G. Solutions.

(n)     Buyer shall have received the additional closing deliverables referenced in Section 3.2(a).

9.3     Conditions to Obligation of the Company.  The obligation of the Company to consummate the Merger is subject to the satisfaction (or waiver by the Company in its sole discretion) of the following further conditions:

(a)     Each of the representations and warranties of Buyer and Merger Subsidiary set forth in this Agreement that is qualified by materiality shall be true and correct at and as of the Closing Date as if made at and as of the Closing Date and each of such representations and warranties that is not so qualified shall be true and correct in all material respects at and as of the Closing Date as if made at and as of the Closing Date, except to the extent that such representations and warranties refer specifically to an earlier date, in which case such representations and warranties shall have been true and correct as of such earlier date.

(b)     Buyer and Merger Subsidiary shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with at or prior to the Closing Date.

(c)    The Company shall have received certificates signed on behalf of each of Buyer (by the President of Buyer) and Merger Subsidiary (by the President of Merger Subsidiary) to that the respective conditions relating to them set forth in Section 9.3(a) and (b) have been satisfied.

## ARTICLE X

## TERMINATION

10.1   Termination.

(a)    This Agreement may be terminated and the Merger abandoned at any time prior to the Closing:

(i)    by mutual written consent of Buyer and the Company;

(ii)    by Buyer or the Company if the Closing does not occur on or before January 31, 2008 (the "Termination Date"); provided that the right to terminate this Agreement under this clause (ii) shall not be available to any Party whose breach of a representation, warranty, covenant or agreement under this Agreement has been the cause of or resulted in the failure of the Closing to occur on or before such date;

(iii)    by Buyer if (A) there has been a breach by the Company of any representation, warranty, covenant or agreement contained in this Agreement or the Company Disclosure Schedule or if any representation or warranty of the Company shall have become untrue, in either case without giving effect to any Company Disclosure Schedule Supplement and such that the conditions set forth in Sections 9.2(a) or (b) would not be satisfied, and (B) such breach is not curable, or, if curable, is not cured within fifteen (15) Business Days after written notice of such breach is given to the Company by Buyer;

(iv)    by the Company if (A) there has been a breach by Buyer of any representation, warranty, covenant or agreement contained in this Agreement or the Buyer Disclosure Schedule or if any representation or warranty of Buyer shall have become untrue and such that the conditions set forth in Sections 9.3(a) or (b) would not be satisfied, and (B) such breach is not curable, or, if curable, is not cured within fifteen (15) Business Days after written notice of such breach is given to Buyer by the Company;

(v)    by Buyer or the Company if a Governmental Entity shall have issued an Order or taken any other action, in any case having the effect of permanently restraining, enjoining or otherwise prohibiting the Merger, which Order or other action is final and non-appealable; or

(vi)    by Buyer if the Company shall not have obtained the Requisite Stockholder Approval on or before the second Business Day after the date of this Agreement.

(b)     The Party desiring to terminate this Agreement pursuant to clause (ii), (iii), (iv) or (v) shall give written notice of such termination to the other Parties hereto.

10.2    Effect of Termination.  In the event of termination of this Agreement as provided in Section 10.1, this Agreement shall immediately become void and there shall be no liability or obligation on the part of Buyer, Merger Subsidiary or the Company or their respective officers, directors, stockholders or Affiliates, except as set forth in Section 10.3; provided that the provisions of Sections 8.1 (Confidentiality), 8.3 (Public Announcements), 10.3 (Remedies) and Article XII of this Agreement shall remain in full force and effect and survive any termination of this Agreement.

10.3    Remedies. Any Party terminating this Agreement pursuant to Section 10.1 shall have the right to recover damages sustained by such Party as a result of any willful breach by the other Party of any representation, warranty, covenant or agreement contained in this Agreement or fraud or willful misrepresentation; provided, however, that the Party seeking relief is not in breach of any representation, warranty, covenant or agreement contained in this Agreement under circumstances which would have permitted the other Party to terminate the Agreement under Section 10.1.

## ARTICLE XI

## INDEMNIFICATION

11.1    Survival.

(a)     All representations and warranties contained in this Agreement or in any Schedule, Exhibit or certificate delivered pursuant to this Agreement, and the rights and obligations of the Parties under this Article XI with respect to breaches of such representations and warranties, shall survive the Closing for a period from the Closing Date until 11:59 pm New York time on the eighteen month anniversary of the Closing Date, except that any claims for indemnification with respect to any breaches of representations and warranties made on or before such expiration date shall survive the Closing until final resolution thereof. No claims for indemnification for breaches of representations and warranties shall be made under this Article XI after the expiration of the applicable period of survival (each such time period, a "Survival Period").

(b)     The covenants and agreements which by their terms do not contemplate performance after the Closing shall terminate as of the Closing.  The covenants and agreements which by their terms contemplate performance after the Closing Date shall survive until the first anniversary of the Closing Date.

11.2    Indemnification by the Stockholder Parties.

(a)     Subject to the limitations set forth herein, the Stockholder Parties agree, by virtue of the Requisite Stockholder Approval, to indemnify the Buyer, from and

after the Closing, against, and shall hold the Buyer Indemnitees harmless from, any loss, Liability, claim, demand, settlement, judgment, award, fine, charge, action, suit, proceeding, assessed interest, penalty, damage, Tax or expense of any nature (collectively, "Losses") directly or indirectly resulting from, arising out of, or incurred by the Buyer Indemnitees in connection with, or otherwise with respect to:

(i)      any breach of any representation or warranty of the Company contained in this Agreement or in the Company Compliance Certificate;

(ii)      any breach of any covenant or agreement of the Company contained in this Agreement;

(iii)      any failure to comply in all respects with any Law to which the operations of the Company and its Subsidiaries in India, the United Kingdom and Canada are subject;

(iv)      the amount of any Transaction Costs not deducted from the Merger Consideration;

(v)      the amount of any Indebtedness of the Company and its Subsidiaries outstanding at Closing and not deducted from the Merger Consideration;

(vi)      any assertion or recovery by any holder of Company Shares of fair value, interest and expenses or other amounts pursuant to dissenters' rights exercised or purportedly exercised pursuant to the DGCL (it being understood that any such Losses will not include the pro rata share of the Merger Consideration such asserting or recovering stockholder would have received pursuant to this Agreement);

(vii)      the misclassification of any Person who should have been classified as an employee of the Company or its Affiliates (and who was not) or the misclassification of an employee as exempt or non-exempt;

(viii)      any finding or conclusion by any Governmental Authority that the Company and A.G. Solutions are "associated enterprises" pursuant to Section 92A(2)(g) of the Indian Income-Tax Act; and

(ix)      any Actions, demands or assessments incidental to any of the matters set forth in clauses (i) through (viii) above (including any proceeding commenced by Buyer for the purpose of enforcing its rights under this Article XI).

(b)      Notwithstanding anything herein to the contrary, the representations and warranties of the Company contained in this Agreement or the Company Compliance Certificate shall, for purposes of the Stockholder Parties' obligations pursuant to this Article XI, be deemed to be made as of the date hereof and as of the Closing Date (except to the extent any such representation or warranty expressly speaks of an earlier date) without regard to the exceptions set forth in any Company Disclosure Schedule Supplement or the Company Compliance Certificate.

(c)     In the event the Surviving Corporation suffers, incurs, or otherwise becomes subject to any Losses as a result of or in connection with any inaccuracy in or breach or alleged breach of any representation, warranty, covenant or obligation, then (without limiting any of the rights of any of the Surviving Corporation as a Buyer Indemnitee) Buyer shall also be deemed, by virtue of its ownership of the stock of the Surviving Corporation, to have incurred Losses as a result of and in connection with such inaccuracy or breach.

(d)     The Stockholder Parties shall not be liable for any Loss or Losses under Section 11.2(a)(i) (i) unless the claim for such Loss or Losses is brought within the Survival Period, and (ii) unless and until the aggregate amount of all Losses incurred by Buyer exceeds $250,000 (the "Deductible"), whereupon the Stockholder Parties shall only be liable for the amount of Losses in excess of the Deductible; provided that the limitations in this Section 11.2(d) shall not apply to claims under Section 11.2(a)(i) relating to a breach of the representations set forth in Sections 4.2 (*Capitalization*), 4.7 (*Taxes*), 4.15 (*Employee Benefits*) or 4.16 (*Labor and Employment Matters*).

(e)     Except as provided in Section 11.2(h), in no event shall the Stockholder Parties be obligated to indemnify Buyer under Section 8.5 or this Article XI for any amounts in excess of, or with any funds other than, the Escrow Funds.

(f)     In addition to the limitations set forth in Sections 11.2(d) and (e), the Stockholder Parties shall not be obligated to indemnify Buyer with respect to any indirect, special, incidental, consequential or punitive damages claimed by Buyer resulting from the Company's breach of any representation or warranty, covenant or agreement (other than any such amount payable by a Buyer Indemnitee to a third party).

(g)     BUYER ACKNOWLEDGES THAT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, THERE ARE NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, (I) WITH RESPECT TO THE COMPANY AND ITS SUBSIDIARIES; THEIR RESPECTIVE ASSETS AND LIABILITIES, THE TRANSACTIONS CONTEMPLATED HEREBY OR (II) AS TO THE ACCURACY OR COMPLETENESS OF ANY INFORMATION REGARDING THE COMPANY AND ITS SUBSIDIARIES FURNISHED OR MADE AVAILABLE TO BUYER AND ITS REPRESENTATIVES.   WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, THERE ARE NO EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

(h)     Nothing in this Article XI shall limit any remedy Buyer may have against any Person for fraud or intentional misrepresentation.

(i)     The Parties acknowledge and agree that, from and after the Closing, their sole and exclusive remedy with respect to any and all matters arising out of, relating to or connected with this Agreement, the Company and its Subsidiaries and their respective assets and liabilities and the Merger shall be pursuant to the

indemnification and adjustment provisions set forth in Section 2.8, Section 8.5 and this Article XI (except in the event of fraud or intentional misrepresentation).

11.3    Indemnification by Buyer.   From and after the Closing, Buyer shall indemnify the Stockholder Parties against, and shall hold the Stockholder Parties harmless from, any Loss resulting from, arising out of, or incurred by the Stockholder Parties in connection with, or otherwise with respect to:

(a)    any breach of any representation and warranty of Buyer or Merger Subsidiary contained in this Agreement or in the certificate delivered pursuant to Section 9.3(c);

(b)    any breach of any covenant or agreement of Buyer or Merger Subsidiary contained in this Agreement; and

(c)    any Actions, demands or assessments incidental to any of the matters set forth in clauses (a) or (b) above (including any proceeding commenced by or on behalf of the Stockholder Parties for the purpose of enforcing their rights under Article XI).

11.4    Indemnification Procedure for Third Party Claims.

(a)    In the event that any claim or demand, or other circumstance or state of facts which could give rise to any claim or demand, for which an Indemnitor may be liable to an Indemnitee hereunder is asserted or sought to be collected by a third party ("Third Party Claim"), the Indemnitee shall as soon as practicable notify the Indemnitor in writing of such Third Party Claim ("Notice of Claim"). The Notice of Claim shall (i) specify in reasonable detail the basis for such claim and (ii) to the extent known by the Indemnitee, set forth a reasonable estimate of the amount to which such Indemnitee claims to be entitled hereunder. The Indemnitee shall enclose with the Notice of Claim a copy of all papers served with respect to such Third Party Claim, if any, and any other documents evidencing such Third Party Claim.  Notwithstanding the foregoing, no delay or deficiency on the part of an Indemnitee in so notifying the Indemnitor will limit any Indemnitee's right to indemnification under this Article XI (except to the extent such failure materially prejudices the defense of such proceeding).

(b)    The Indemnitor will have thirty (30) days from the date on which the Indemnitor received the Notice of Claim to notify the Indemnitee that the Indemnitor desires to assume the defense or prosecution of such Third Party Claim and any litigation resulting therefrom with counsel of its choice and at its sole cost and expense (a "Third Party Defense"). If the Indemnitor assumes the Third Party Defense in accordance herewith, (i) the Indemnitee may retain separate co-counsel at its sole cost and expense and participate in the defense of the Third Party Claim but the Indemnitor shall control the investigation, defense and settlement thereof, (ii) the Indemnitee will not file any papers or consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnitor and (iii) the

Indemnitor will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnitee. The Parties will act in good faith in responding to, defending against, settling or otherwise dealing with such claims. The Parties will also cooperate in any such defense and give each other reasonable access to all information relevant thereto to the extent permitted by applicable Law or applicable contractual restrictions, subject to entering into appropriate confidentiality agreements. Whether or not the Indemnitor has assumed the Third Party Defense, the Indemnitee will not consent to the entry of any judgment or enter into any settlement without the prior written consent of the Stockholders' Representative, which consent will not be unreasonably withheld or delayed.

(c)     If the Indemnitor does not assume the Third Party Defense within forty-five (45) days of receipt of the Notice of Claim, the Indemnitee will be entitled to assume the Third Party Defense, at its sole cost and expense (or, if the Indemnitee incurs a Loss with respect to the matter in question for which the Indemnitee is entitled to indemnification pursuant to Section 11.2 or 11.3, as applicable, at the expense of the Indemnitor) upon delivery of notice to such effect to the Indemnitor; provided that the Indemnitor shall have the right to participate in the Third Party Defense at its sole cost and expense, but the Indemnitee shall control the investigation, defense and settlement thereof.

(d)     Notwithstanding the foregoing, in no event may any Indemnitor assume, maintain control of, or participate in, the defense of any proceeding (i) involving Losses in excess of the amount remaining in the Escrow Funds, (ii) involving criminal liability, (iii) involving claims relating to any Intellectual Property or Taxes, or (iv) in which any relief other than monetary damages is sought against an Indemnitee.

11.5    Indemnification Procedures for Non-Third Party Claims. The Indemnitee will notify the Indemnitor in writing promptly of its discovery of any matter that does not involve a Third Party Claim. The Notice of Claim shall (a) specify in reasonable detail the basis for such claim and (b) to the extent known by the Indemnitee, a reasonable estimate of the amount to which such Indemnitee claims to be entitled hereunder. In the event that the Indemnitor does not notify the Indemnitee that it disputes such claim within thirty (30) days from receipt of such Notice of Claim, the Indemnitor will be deemed to have rejected such claim, in which event the Indemnitee will be free to pursue such remedies as may be available to it under this Agreement. The Indemnitee will reasonably cooperate and assist the Indemnitor in determining the validity of any claim for indemnity by the Indemnitee and in otherwise resolving such matters.

11.6    Calculation of Indemnity Payments.

(a)     The Indemnitee agrees to use its commercially reasonable efforts to pursue and collect on any recovery available under any insurance policies. The Indemnitor agrees that the Indemnitee shall have no obligation to maintain insurance or be required to threaten or commence litigation against any insurer. The amount of Losses payable under this Article XI by the Indemnitor shall be reduced by any and all net

amounts actually recovered by the Indemnitee under applicable insurance policies, less any premiums paid under such insurance policies or any verifiable increase in such premiums. If the Indemnitee receives any amounts under applicable insurance policies or from any other Person alleged to be responsible for any Losses, subsequent to an indemnification payment by the Indemnitor, then such Indemnitee shall promptly reimburse the Indemnitor for any payment made or expense incurred by such Indemnitor in connection with providing such indemnification up to the amount received by the Indemnitee, net of any expenses incurred by such Indemnitee in collecting such amount.

(b)      No Losses shall be determined or increased based on any multiple of any financial measure (including earnings, sales or other benchmarks) that might have been used by Buyer in the valuation of the Company and its Subsidiaries or their respective business and operations.

11.7   Characterization of Indemnification Payments.   Except as otherwise required by applicable law, the Parties shall treat any indemnification payment made hereunder as an adjustment to Merger Consideration.

11.8   No Effect of Investigation; No Waiver.  The representations, warranties, covenants and obligations of the Parties, and the rights and remedies that may be exercised by the Buyer Indemnitees, shall not be limited or otherwise affected by or as a result of any information furnished to, or any investigation made by or Knowledge of, any of the Buyer Indemnitees or any of their Representatives, it being understood that Buyer has the right to rely fully on the representations, warranties, covenants and agreements of the Company and the Stockholders' Representative contained in this Agreement.

11.9   Stockholders' Representative.

(a).      As of the date of this Agreement, each Stockholder Party, by virtue of the Requisite Stockholder Approval, will be deemed to have irrevocably appointed Fesnak & Associates, LLP, as its, his or her true and lawful attorney-in-fact and agent (the "Stockholders' Representative"), each with full power of substitution or resubstitution, to act solely and exclusively on behalf of such Stockholder Party with respect to the transactions contemplated by this Agreement, including the Merger, and to act on behalf of such Stockholder Party in any litigation or arbitration involving this Agreement, to do or refrain from doing all such further acts and things, and to execute all such documents (including the Escrow Agreement) as the Stockholders' Representative shall deem necessary or appropriate in connection with the transactions contemplated hereby, including the power:

(i)      to act for such Stockholder Party with regard to matters pertaining to indemnification referred to in this Agreement, including the power to compromise any indemnity claim on behalf of such Stockholder Party;

(ii)     to act for such Stockholder Party with regard to matters pertaining to litigation;

(iii)     to execute and deliver all documents in connection with the transactions contemplated hereby or amendments thereto that the Stockholders' Representative deems necessary or appropriate;

(iv)     to receive funds, make payments of funds, and give receipts for funds on behalf of any Stockholder Party;

(v)     to receive funds for the payment of expenses of such Stockholder Party and apply such funds in payment for such expenses;

(vi)     to do or refrain from doing any further act or deed on behalf of such Stockholder Party that the Stockholders' Representative deems necessary or appropriate in his sole discretion relating to the subject matter of this Agreement as fully and completely as such Stockholder Party could do if personally present; and

(vii)     to receive service of process in connection with any claims under this Agreement.

(b)     The appointment of the Stockholders' Representative shall be deemed coupled with an interest and shall be irrevocable, and Buyer, Merger Subsidiary and any other Person may conclusively and absolutely rely, without inquiry, upon any action of the Stockholders' Representative in all matters referred to herein. Any action taken by the Stockholders' Representative must be in writing and must be signed by the Stockholders' Representative. All notices required to be made or delivered by Buyer or Merger Subsidiary to the Company described above shall be made to the Stockholders' Representative for the benefit of such Stockholder Party and shall discharge in full all notice requirements of Buyer, any Buyer Indemnitee or Merger Subsidiary, as applicable, to such Stockholder Party with respect thereto. By their appointment of the Stockholders' Representative, the Stockholder Parties thereby confirm all that the Stockholders' Representative shall do or cause to be done by virtue of his appointment as the representative of the Stockholder Parties hereunder. The Stockholders' Representative shall act for the Stockholder Parties on all of the matters set forth in this Agreement in the manner the Stockholders' Representative reasonably believes to be in the best interest of the Stockholder Parties and consistent with the obligations of the Stockholder Parties under this Agreement, but none of the Stockholders' Representative, Buyer, Merger Subsidiary, the Surviving Corporation or the Buyer Indemnitees shall be responsible to any Stockholder Party for any damages which the Stockholder Parties may suffer by the performance of the Stockholders' Representative's duties under this Agreement, except that the Stockholders' Representative shall be solely responsible for all damages arising from willful violation of applicable Law by it or gross negligence in the performance of his duties under this Agreement. The Stockholders' Representative shall not have any duties or responsibilities except those expressly set forth in this Agreement, and no implied covenants, functions, responsibilities, duties or liabilities

shall be read into this Agreement or shall otherwise exist against the Stockholders' Representative. The Stockholders' Representative Funds shall be used to pay expenses incurred by the Stockholders' Representative. By virtue of the Requisite Stockholder Approval, the Stockholder Parties agree that the Stockholders' Representative is authorized to replenish the Stockholders' Representative Funds with funds that would otherwise be distributed from the Escrow Funds to the Stockholders' Representative for distribution to the Stockholder Parties, if at that time there have been expenditures from the Stockholders' Representative Funds or if the Stockholders' Representative in his discretion believes it necessary to maintain or increase the Stockholders' Representative Funds at that time. Any portion of the Stockholders' Representative Funds not expended at the end of the Escrow Period shall be distributed promptly by the Stockholders' Representative to the Stockholder Parties on a proportionate basis in accordance with the Updated Schedule (but shall be subject to any applicable withholding requirements). By the Requisite Stockholder Approval of the Merger, the Stockholder Parties hereby agree (a) to reimburse the Stockholders' Representative for all out-of-pocket costs and expenses incurred by the Stockholders' Representative under this Agreement, including fees for any attorneys or other representative he may employ, and (b) to severally (without, for the avoidance of doubt, any right of contribution from any of the Surviving Corporation or the Buyer Indemnitees) indemnify and hold harmless and defend the Stockholders' Representative, his agents and assigns against all liabilities, claims, actions, damages, losses and expenses (including legal and other professional fees and expenses, amounts payable to the Stockholders' Representative as agreed by the Company prior to the Effective Time and litigation costs) of any kind (whether known or unknown, fixed or contingent) arising out of or in connection with (a) the Stockholders' Representative's omissions to act, or actions taken, resulting from, arising out of, or incurred in connection with, or otherwise with respect to this Agreement, or (b) actions taken with respect to this Agreement or reasonably believed to be in the scope of the Stockholders' Representative's authority, provided that he or his agent or assign has not acted with intentional misconduct or fraud in taking such action.

(c)     In the event that the Stockholders' Representative dies, becomes legally incapacitated or resigns from his position as Stockholders' Representative, Chip Nichols shall select a replacement Stockholders' Representative, which replacement Stockholders' Representative shall be deemed to be the Stockholders' Representative for all purposes of this Agreement.

(d)     The Stockholders' Representative shall be entitled to rely, and shall be fully protected in relying, upon any statements furnished to it by the Company, any Stockholder Party, Buyer, Merger Subsidiary, or any other evidence deemed by the Stockholders' Representative to be reliable, and the Stockholders' Representative shall be entitled to act on the advice of counsel selected by it.

ARTICLE XII

MISCELLANEOUS

12.1    Notices.  Any notice, request, demand, waiver, consent, approval or other communication which is required or permitted hereunder shall be in writing and shall be deemed given: (a) on the date established by the sender as having been delivered personally, (b) on the date delivered by a private courier as established by the sender by evidence obtained from the courier, (c) on the date sent by facsimile, with confirmation of transmission, if sent during normal business hours of the recipient, if not, then on the next Business Day, or (d) on the fifth Business Day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such communications, to be valid, must be addressed as follows:

If to Buyer, to:

Citigroup Inc.
153 East 53rd Street, 25th Floor
New York, NY  10022
Attn: Deputy General Counsel – M&A Legal
Facsimile: (212) 793-2402

With a required copy to:

Paul, Hastings, Janofsky & Walker LLP
3579 Valley Centre Drive
San Diego, CA  92130
Attn:  Carl R. Sanchez
Facsimile:  (858) 720-2555

If to Stockholders' Representative, to:

Fesnak and Associates, LLP
1777 Sentry Parkway, Gwynedd Hall, Suite 400
Blue Bell, PA 19422
Attn: Robert Fesnak
Facsimile: (267) 419-2222

With a required copy to:

Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA  19103
Attn:  Barbara J. Shander
Facsimile:  (215) 963-5001

or to such other address or to the attention of such Person or Persons as the recipient party has specified by prior written notice in accordance with this Section 12.1 to the sending party (or in the case of counsel, to such other readily ascertainable business address as such counsel may hereafter maintain). If more than one method for sending notice as set forth above is used, the earliest notice date established as set forth above shall control.

> 12.2   Amendments and Waivers.

> > (a)     Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each Party to this Agreement, or in the case of a waiver, by the Party against whom the waiver is to be effective.

> > (b)     No failure or delay by any Party in exercising any right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

> 12.3   Expenses.   Each of the Parties shall bear its own costs and expenses in connection with this Agreement and the transactions contemplated hereby, including all legal, accounting, financial advisory, consulting and all other fees and expenses of third parties, whether or not the Merger is consummated.

> 12.4   Successors and Assigns.   This Agreement may not be assigned by any Party hereto without the prior written consent of each of Buyer and the Company, and any assignment in contravention of this Agreement shall be null and void; provided, that Buyer may, without the prior written consent of the Company, assign all or any portion of its rights hereunder to one or more of its Affiliates, which assignment shall not relieve Buyer from its obligations hereunder.   Subject to the foregoing, all of the terms and provisions of this Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective successors and assigns.

> 12.5   Governing Law.   This Agreement and the exhibits and schedules hereto shall be governed by and interpreted and enforced in accordance with the Laws of the State of Delaware, without giving effect to any choice of Law or conflict of Laws rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware.

> 12.6   Consent to Jurisdiction.   Each of the Parties irrevocably submits to the exclusive jurisdiction of (a) Delaware, and (b) the United States District Court for the District of Delaware, for the purposes of any suit, action or other proceeding arising out of this Agreement or any transaction contemplated hereby. Each of the Parties agrees to commence any such action, suit or proceeding either in the United States District Court for the District of Delaware or if such suit, action or other proceeding may not be brought in such court for jurisdictional reasons, in any state court located in the City of

Wilmington, Delaware. Each of the Parties further agrees that service of any process, summons, notice or document by U.S. registered mail to such Party's respective address set forth above shall be effective service of process for any action, suit or proceeding in Delaware with respect to any matters to which it has submitted to jurisdiction in this Section 12.6. Each of the Parties irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in (a) the United States District Court for the District of Delaware, or (b) any state court located in Wilmington, Delaware, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.   EACH PARTY HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF SUCH PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT HEREOF.

12.7    Counterparts. This Agreement may be executed in counterparts, and any Party hereto may execute such counterpart, each of which when executed and delivered shall be deemed to be an original and both of which counterparts taken together shall constitute but one and the same instrument. This Agreement shall become effective when all Parties hereto shall have received a counterpart hereof signed by the other Parties hereto. The Parties agree that the delivery of this Agreement may be effected by means of an exchange of facsimile signatures with original copies to follow by mail or courier service.

12.8    No Third Party Beneficiaries. No provision of this Agreement is intended to confer upon any Person other than the Parties hereto and the Buyer Indemnitees any rights or remedies hereunder.

12.9    Entire Agreement. This Agreement and the documents, instruments and other agreements specifically referred to herein or delivered pursuant hereto, including the Exhibits and Schedules and the Escrow Agreement, set forth the entire understanding of the Parties hereto with respect to the Merger and the other matters set forth herein. All Exhibits and Schedules referred to herein are intended to be and hereby are specifically made a part of this Agreement. Any and all previous agreements and understandings between or among the Parties regarding the subject matter hereof, whether written or oral, are superseded by this Agreement, except for the Confidentiality Agreement which shall continue in full force and effect in accordance with its terms.

12.10   Captions. All captions contained in this Agreement are for convenience of reference only, do not form a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.

12.11   Severability.   Any provision of this Agreement which is invalid or unenforceable in any jurisdiction shall be ineffective to the extent of such invalidity or

unenforceability without invalidating or rendering unenforceable the remaining provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

12.12  Specific Performance.  Buyer and the Company each agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by them in accordance with the terms hereof and that each party shall be entitled to specific performance of the terms hereof, in addition to any other remedy at law or equity. Each Party expressly waives any requirement that any other Party obtain any bond or provide any indemnity in connection with any action seeking injunctive relief or specific enforcement of the provisions of this Agreement.

12.13  Interpretation.

(a)  The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term and vice versa, and words denoting either gender shall include both genders as the context requires. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(b)  The terms "hereof", "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement.

(c)  When a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article, Section, Exhibit or Schedule of this Agreement unless otherwise specified.

(d)  The words "include", "includes", and "including" when used in this Agreement shall be deemed to be followed by the words "without limitation", unless otherwise specified.

(e)  A reference to any Party to this Agreement or any other agreement or document shall include such Party's predecessors, successors and permitted assigns.

(f)  Reference to any Law means such Law as amended, modified, codified, replaced or reenacted, and all rules and regulations promulgated thereunder.

(g)  The Parties have participated jointly in the negotiation and drafting of this Agreement. Any rule of construction or interpretation otherwise requiring this Agreement to be construed or interpreted against any Party by virtue of the authorship of this Agreement shall not apply to the construction and interpretation hereof.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

CITIBANK, N.A.

By: _____
Name:  Bharat Sarpeshkar
Title:  Vice President


PENELOPE ACQUISITION SUB, INC.

By: _____
Name: Bharat Sarpeshkar
Title: President


PAYQUIK.COM, INC.

By: _____
Name: Bhairav Trivedi
Title: Chief Executive Officer


STOCKHOLDERS' REPRESENTATIVE

Fesnak and Associates, LLP


By: _____
Name:
Title:


**[Signature Page to the Merger Agreement]**

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

CITIBANK, N.A.

By: _____
Name:  Bharat Sarpeshkar
Title:

PENELOPE ACQUISITION SUB, INC.

By: _____
Name: Bharat Sarpeshkar
Title: President

PAYQUIK.COM, INC.

By: _____
Name: Bhairav Trivedi
Title: Chief Executive Officer

STOCKHOLDERS' REPRESENTATIVE

Fesnak and Associates, LLP

By: _____
Name:
Title:

[Signature Page to the Merger Agreement]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

CITIBANK, N.A.

By: _____
Name:  Bharat Sarpeshkar
Title:

PENELOPE ACQUISITION SUB, INC.

By: _____
Name: Bharat Sarpeshkar
Title: President

PAYQUIK.COM, INC.

By: _____
Name: Bhairav Trivedi
Title: Chief Executive Officer

STOCKHOLDERS' REPRESENTATIVE

Fesnak and Associates, LLP

By: _____
Name: Sam Vinovich
Title: Manager

**[Signature Page to the Merger Agreement]**

**EXHIBIT 3**

Schedule 2.2

**Closing Date (Estimated):**                    January 9, 2008

**Calculation of Merger Consideration**

| | | Closing Payment | Deferred Payment | Total* | Return of Escrow & Rep Funds | Total including Escrow & Rep Funds |
|---|---|---|---|---|---|---|
| Total Proceeds | (+) | $10,000,000.00 | $30,000,000.00 | $40,000,000.00 | | $40,000,000.00 |
| Working Capital Adjustment (Section 2.6) | +/- | $150,000.00 | $0.00 | $150,000.00 | | $150,000.00 |
| 2007 Deferred Conversion Indebtedness | | $606,107.53 | $0.00 | 606,107.53 $ | | 606,107.53 $ |
| 2007 Bridge Indebtedness | | $0.00 | $0.00 | $0.00 | | $0.00 |
| 2007 Convertible Notes Indebtedness | | $0.00 | $0.00 | $0.00 | | $0.00 |
| 2008/6 Convertible Notes Indebtedness | | $0.00 | $0.00 | $0.00 | | $0.00 |
| Acquiror Promissory Note | | $1,213,643.84 | $0.00 | $1,213,643.84 | | $1,213,643.84 |
| BFTP | | $344,007.10 | | $344,007.10 | | $344,007.10 |
| AG Solutions | | $35,412.61 | | $35,412.61 | | $35,412.61 |
| Henry R. Nichols | | $3,708.40 | | $3,708.40 | | $3,708.40 |
| Samuel K. Jones | | $14,499.05 | | $14,499.05 | | $14,499.05 |
| David F. Noteware | | $49,157.68 | | $49,157.68 | | $49,157.68 |
| George Sprankle | | $20,000.00 | | $20,000.00 | | $20,000.00 |
| Fees and expenses | | $1,135,555.63 | $1,350,767.37 | $2,486,333.00 | | $2,486,333.00 |
| Stockholder Representative Fund | | $250,000.00 | $0.00 | $250,000.00 | $250,000.00 | $0.00 |
| Escrow Funds | | $1,000,000.00  10% | $3,000,000.00  10% | $4,000,000.00 | $4,000,000.00 | $0.00 |
| | = | $5,477,808.17 | $25,549,232.63 | $31,127,130.80 | $4,250,000.00 | $35,377,130.80 |
| Merger Consideration for distribution to Stockholder Parties | | | | | | |

**Calculation of Non-Preference Amount**

| | | Closing Payment | Deferred Payment | Total* | Return of Escrow & Rep Funds | Total including Escrow & Rep Funds |
|---|---|---|---|---|---|---|
| Merger Consideration | | $5,477,898.17 | $25,549,232.63 | $31,127,130.80 | $4,250,000.00 | $35,377,130.80 |
| Aggregate Exercise Price | | | | | | |
| Common Warrants | | $66,809.89 | $49,661.94 | $116,471.83 | | $116,471.83 |
| Options | | $359,794.09 | $168,311.89 | $528,105.98 | | $528,105.98 |
| **Total Agg. Ex. Price** | + | $426,603.97 | $217,973.84 | $644,577.81 | | $644,577.81 |
| Series A Preference Amount | | $329,992.08 | $0.00 | $329,992.08 | | $329,992.08 |
| Series B Preference Amount | | $729,205.25 | $0.00 | $729,205.25 | | $729,205.25 |
| Consideration Available after Exercise and Preferences | | $4,945,303.81 | $25,887,205.46 | $30,712,510.28 | $4,250,000.00 | $34,962,510.28 |
| Total outstanding Company Shares (on a fully-diluted basis) | + | 869,805.4562 | 869,805.4562 | 869,805.4562 | 869,805.4562 | 869,805.4562 |
| **"Non-Preference Amount"** | | $5.67056 | $29.73997 | $35.30993 | $4.88615 | $40.18678 |
| | | 13.9% | 74.0% | 87.8% | 12.2% | 100.0% |

* Total before release of Escrow Funds and Stockholder Representative Funds.

**Schedule 4.2(a) & (b)**
**Capitalization Table**

| Stockholder | Common Stock | Common Stock on Conversion of Notes | Total Options | Total Common Warrants | Total Common Stock (Including Notes, Options and Warrants) | Series A Preferred Stock | Series A CSE | Series B Preferred Stock | Series B CSE | Total Preferred Stock | Total Preferred Stock on CSE Basis | Total Company Shares (on a fully diluted basis) | Percentage Ownership Interest (on a fully diluted basis) of Escrow Funds |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bhalav Trivedi | 104,188 | | | | 112,270.0000 | | 0 | | | | | 112,270.0000 | 12.970783% |
| David F. Noteware | 97,844 | | | 3,750.0000 | 101,594.0000 | | 0 | | | | | 101,594.0000 | 11.690008% |
| Shankar Trivedi | 2,000 | 4,112.8694 | | 3,750.0000 | 7,441.8230 | | 0 | | | | | 8,538.6220 | 0.862949% |
| David R. Noteware | 5,000 | 12,334.8081 | | 1,328.8596 | 21,292.6810 | | 0 | | | | | 23,882.9910 | 2.722275% |
| Sailesh G Joshi | 5,000 | | | 3,978.1750 | 5,000.0000 | | 0 | | | | | 5,000.0000 | 0.574044% |
| Anand Basavabsverasyam | 4,000 | | | | 4,000.0000 | | 0 | | | | | 4,000.0000 | 0.458876% |
| Aman Zavdovas | 2,000 | | | | 2,000.0000 | | 0 | | | | | 2,000.0000 | 0.22994% |
| Hiren Dhal | 2,000 | | | | 2,000.0000 | | 0 | | | | | 2,000.0000 | 0.22994% |
| Umesh Joshi | 1,000 | | | | 1,000.0000 | | 0 | | | | | 1,000.0000 | 0.11491% |
| Yogesh Morilar | 500 | | | | 500.0000 | | 0 | | | | | 500.0000 | 0.057428% |
| Snehal Dave | 500 | | | | 500.0000 | | 0 | | | | | 500.0000 | 0.057428% |
| Mrigank Shastri | 500 | | | | 500.0000 | | 0 | | | | | 500.0000 | 0.057428% |
| Rajeshwari Jani | 500 | | | | 500.0000 | | 0 | | | | | 500.0000 | 0.057426% |
| Albert Cahens | 2,000 | | | | 2,000.0000 | | 0 | | | | | 2,000.0000 | 0.22994% |
| Tayal Bar Gil | 2,000 | | | | 2,470.0000 | 478 | 478 | | | 478 | 478 | 2,470.0000 | 0.28485% |
| Samuel Leiber Inc | | | | | 4,780.0000 | 4780 | 4780 | | | 4,780 | 4,780 | 4,780.0000 | 0.54955% |
| Nicholas Overzetti | | | 2,390.0000 | 2,390.0000 | 2,390.0000 | 2390 | 2390 | | | 2,390 | 2,390 | 4,780.0000 | 0.54955% |
| Rubhberg Israel | 0 | | | | 0.0000 | 1434 | 1434 | | | 1,434 | 1,434 | 1,434.0000 | 0.54965% |
| Zeev Ariel | 0 | | | | 0.0000 | 717 | 717 | | | 717 | 717 | 717.0000 | 0.09243% |
| | 8,144 | 2,403.8871 | | 3,276.6840 | 27,324.5710 | 2380 | 2380 | | | 2,390 | 2,390 | 2,390.0000 | 0.27477% |
| Kolznekton Associates, LP | 0 | 36,720.9439 | 13,500 | 11,695.2231 | 46,596.2070 | 0 | 0 | 373,134 | 373,134 | 373,134 | 373,134 | 123,228.0070 | 14.167036% |
| Morax Investments, LLP | 0 | 128,704.9952 | | 41,576.6339 | 170,261.7431 | 0 | 0 | | | | | 170,261.7431 | 19.576995% |
| NSP Investments, LLC | 0 | 16,905.21168 | | 4,083.4427 | 22,988.6543 | 0 | 0 | | | | | 22,988.6543 | 2.64267% |
| LH Investors IV LLC | 0 | | | 750.0000 | 750.0000 | 0 | 0 | | | | | 750.0000 | 0.06933% |
| Lighthouse Funds, LLC | 0 | 4,044.1070 | | 8,914.4909 | 8,914.4909 | 0 | 0 | | | | | 8,914.4909 | 1.04525% |
| Ben Franklin Technology Partners | 0 | 8,897.2330 | | 3,276.6840 | 27,324.5710 | 0 | 0 | | | | | 27,324.5710 | 3.14465% |
| Jeff Snow | 0 | 3,215.3578 | | 1,309.3773 | 5,382.0750 | 0 | 0 | | | | | 5,382.6750 | 0.61654% |
| Rachulechlas Badreham | 0 | 4,053.2977 | | 6,578.4048 | 21,622.2975 | 0 | 0 | | | | | 21,622.2975 | 2.485888% |
| Rajendram Ravholan | 0 | 16,340.8677 | | 5,374.7156 | 5,374.7156 | 0 | 0 | | | | | 5,374.7156 | 0.61782% |
| Sameer Singh | 0 | 4,062.3985 | | 3,312.3172 | 8,374.7156 | 0 | 0 | | | | | 10,767.5821 | 1.24023% |
| Amber Boodioo and Kenke Singh | 0 | 6,153.6328 | | 2,833.9495 | 83,487.6382 | 0 | 0 | | | | | 93,487.6382 | 10.748105% |
| Mentan Tech Ventures | 0 | 73,574.5827 | 1,750 | 19,913.0165 | 8,530.6344 | 0 | 0 | | | | | 5,530.6344 | 0.61915% |
| Christian Ruppel | 0 | | 8,250 | 1,306.4374 | 11,771.9566 | 0 | 0 | | | | | 11,771.3350 | 1.33204% |
| Steven Sembler | 0 | | 750 | 2,874.1823 | 4,299.5075 | 0 | 0 | | | | | 750.0000 | 0.49312% |
| Brian Schenk | 0 | | 3,000 | 1,045.1499 | | 0 | 0 | | | | | 3,000.0000 | 1.44046% |
| Michael Lundberg | 0 | | 12,390 | | 12,390.0000 | 0 | 0 | | | | | 12,390.0000 | 2.247035% |
| Michael Swick | 0 | | 19,545 | | 19,545.0000 | 0 | 0 | | | | | 19,545.0000 | 1.343095% |
| Alex Peterbseti | 0 | | 11,682 | | 11,682.0000 | 0 | 0 | | | | | 11,682.0000 | 2.037638% |
| Dick Dori | 15,723 | | | 2,000.0000 | 17,723.0000 | 0 | 0 | | | | | 17,723.0000 | 0.20119% |
| Kamal Kent | 0 | 0.0000 | 1,750 | | 1,750.0000 | 0 | 0 | | | | | 1,750.0000 | 0.94964% |
| John Mendez | 0 | | 8,250 | | 8,250.0000 | 0 | 0 | | | | | 8,250.0000 | 0.08823% |
| Joe Kocharski | 0 | | 750 | | 750.0000 | 0 | 0 | | | | | 750.0000 | 0.08931% |
| Jason Jun | 0 | | 750 | | 750.0000 | 0 | 0 | | | | | 750.0000 | 0.34905% |
| RSA Ventures | 0 | | 3,000 | | 3,000.0000 | 0 | 0 | | | | | 3,000.0000 | 0.07688% |
| Dora Golden | 0 | | | 667.0000 | 667.0000 | 0 | 0 | | | | | 0.0000 | 0.00000% |
| Dan Dorati | 0 | 0.0000 | 0 | 0.0001 | 0.0000 | 0 | 0 | | | | | 0.0000 | |
| **Total** | 252,867 | 325,238.4483 | 75,594 | 125,308.2070 | 779,404.6592 | 16,774 | 16,774 | 373,134 | 373,134 | 368,908 | 90,401 | 869,805.6692 | 100.000000% |



**Fees & Expenses**

| Receiving Party<br>Last Name | First Name | Payment 1<br>Payment Amount | | Payment 2<br>Payment Amount | |
|---|---|---|---|---|---|
| **Third Party Fees & Expenses** | | | | | |
| Morgan, Lewis & Bockius | | $250,000.00 | | $0 | |
| Marks Baughan & Co., LLC | | $490,000.00 | 3.0% | $700,000 | 3.0% |
| Escrow Agent | | $0.00 | | $0.00 | |
| Other | | $0.00 | | | |
| | subtotal | $740,000.00 | | $700,000.00 | |
| | | | | | |
| **Other Company Fees and Expenses** | | | | | |
| MentorTech Contingent Fee | | $62,500.00 | | $0.00 | |
| Murex Loan Orig & Extension Fee | | $90,000.00 | | $0.00 | |
| N3P Loan Orig & Extension Fee | | $45,000.00 | | $0.00 | |
| LH Loan Orig & Extension Fee | | $22,500.00 | | $0.00 | |
| Corl Loan Orig & Extension Fee | | $45,000.00 | | $0.00 | |
| Duval Loan Orig & Extension Fee | | $31,500.00 | | $0.00 | |
| Meeting Room expense | | $0.00 | | $0.00 | |
| Data Room expense | | $0.00 | | $0.00 | |
| Other Expenses | | $0.00 | | $0.00 | |
| | subtotal | $296,500.00 | | $0.00 | |
| | | | | | |
| **Company Bonus Payments** | | | | | |
| Trivedi | Bhairav | $25,653.60 | | $159,456.40 | |
| Luebbert | Michael | $20,209.81 | | $125,619.19 | |
| Swink | Michael | $24,464.49 | | $152,189.51 | |
| Peterhans | Alex | $12,721.89 | | $79,076.11 | |
| Slowik | Jeff | $13,033.57 | | $81,013.43 | |
| Corl | Dick | $2,962.27 | | $18,412.73 | |
| Duval | Dan | | | $35,000.00 | |
| | subtotal | $99,065.63 | | $650,767.37 | |
| | | | | | |
| | TOTAL | $1,135,565.63 | | $1,350,767.37 | |

| | | Base Amount | Payment 1 | | Payment 2 | |
|---|---|---|---|---|---|---|
| Trivedi | Bhairav | $185,110.00 | $ 25,653.60 | 13.9% | $159,456.40 | 86.1% |
| Luebbert | Michael | $145,829.00 | $ 20,209.81 | 13.9% | $125,619.19 | 86.1% |
| Swink | Michael | $176,674.00 | $ 24,464.49 | 13.9% | $152,189.51 | 86.1% |
| Peterhans | Alex | $91,798.00 | $ 12,721.89 | 13.9% | $79,076.11 | 86.1% |
| Slowik | Jeff | $94,047.00 | $ 13,033.57 | 13.9% | $81,013.43 | 86.1% |
| Corl | Dick | $21,375.00 | $ 2,962.27 | 13.9% | $18,412.73 | 86.1% |
| Total | | $714,833.00 | $ 99,065.63 | | $515,767.37 | |

**ommon Stock Payments**

| on-Preference Amount | $5.57056038 | | |
|---|---|---|---|

| Stockholder | Common Stock | Non-Preference Amount | Payment |
|---|---|---|---|
| hairav Trivedi | 104,156 | $5.570560 | $580,207.29 |
| avid F. Noteware | 97,844 | $5.570560 | $545,045.91 |
| hanker Trivedi | 2,000 | $5.570560 | $11,141.12 |
| avid R. Noteware | 5,000 | $5.570560 | $27,852.80 |
| allesh G Joshi | 5,000 | $5.570560 | $27,852.80 |
| nand Balasubramanyam | 4,000 | $5.570560 | $22,282.24 |
| mon Dreyfuss | 2,000 | $5.570560 | $11,141.12 |
| arsh Dalal | 2,000 | $5.570560 | $11,141.12 |
| mesh Joshi | 1,000 | $5.570560 | $5,570.56 |
| ogesh Maniar | 500 | $5.570560 | $2,785.28 |
| nehal Dave | 500 | $5.570560 | $2,785.28 |
| rugank Shastri | 500 | $5.570560 | $2,785.28 |
| ajesgwari Jani | 500 | $5.570560 | $2,785.28 |
| ibert Cahana | 2,000 | $5.570560 | $11,141.12 |
| uval Bar Gil | 2,000 | $5.570560 | $11,141.12 |
| amuel LuBarr Inc | 0 | $5.570560 | $0.00 |
| icholas Quercetti | 0 | $5.570560 | $0.00 |
| uhrberg Israel | 0 | $5.570560 | $0.00 |
| eev Ariel | 0 | $5.570560 | $0.00 |
| atznelson Associates, LP | 0 | $5.570560 | $0.00 |
| urex Investments I, LP | 0 | $5.570560 | $0.00 |
| 3P Investments, LLC | 0 | $5.570560 | $0.00 |
| -I Investors IV LLC | 0 | $5.570560 | $0.00 |
| ghthouse Funds, LLC | 0 | $5.570560 | $0.00 |
| an Franklin Technology Partners | 0 | $5.570560 | $0.00 |
| off Slowik | 8,144 | $5.570560 | $45,366.64 |
| adhakrishan Sadasivam | 0 | $5.570560 | $0.00 |
| ajendram Ravindran | 0 | $5.570560 | $0.00 |
| ameer Singh | 0 | $5.570560 | $0.00 |
| mbhar Boodhoo and Kanika Singh | 0 | $5.570560 | $0.00 |
| entorTech Ventures | 0 | $5.570560 | $0.00 |
| hristian Ruppel | 0 | $5.570560 | $0.00 |
| teven Sembler | 0 | $5.570560 | $0.00 |
| rian Slowik | 0 | $5.570560 | $0.00 |
| ichael Luebbert | 0 | $5.570560 | $0.00 |
| ichael Swink | 0 | $5.570560 | $0.00 |
| lex Peterhans | 0 | $5.570560 | $0.00 |
| ick Corl | 15,723 | $5.570560 | $87,585.92 |
| amal Kant | 0 | $5.570560 | $0.00 |
| ohn Mendez | 0 | $5.570560 | $0.00 |
| oe Kucharski | 0 | $5.570560 | $0.00 |
| ason Jun | 0 | $5.570560 | $0.00 |
| SA Ventures | 0 | $5.570560 | $0.00 |
| on Gleklen | 0 | $5.570560 | $0.00 |
| on Gleklen | 0 | $5.570560 | $0.00 |
| **Total** | 252,867 | | $1,408,610.89 |

**Preferred Stock Payments**

| | |
|---|---|
| Series A Preference Amount Per Share | $20.920000 |
| Non-Preference Amount (for Series A) | $5.570560 |
| Non-Preference Amount times 0.2 (for Series B) | $1.114412 |

| | Series A | | Series B | | | | |
|---|---|---|---|---|---|---|---|
| Stockholder | Preferred Stock | Tot Series A Preference Amount Payment | Preferred Stock | Tot Series B Preference Amount Payment | Total Preference Amount Payment | Non-Preference Payments | Total Preferred Stock Payments |
| Murex Investments I, LP | | | 373,134 | $729,206.25 | $729,206.25 | $415,713.10 | $1,144,919.3? |
| Shanker Trivedi | 1,195 | $ 24,999.40 | | | $24,999.40 | $6,656.82 | $31,656.2? |
| David R. Noteware | 2,390 | $ 49,998.80 | | | $49,998.80 | $13,313.64 | $63,312.4? |
| Yuval Bar Gil | 478 | $ 9,999.76 | | | $9,999.76 | $2,662.73 | $12,662.4? |
| Samuel LuBarr Inc | 4,780 | $ 99,997.60 | | | $99,997.60 | $26,627.28 | $126,624.8? |
| Nicholas Cuercetti | 2,390 | $ 49,998.80 | | | $49,998.80 | $13,313.64 | $63,312.4? |
| Ruhrberg Israel | 1,434 | $ 29,999.28 | | | $29,999.28 | $7,988.18 | $37,987.4? |
| Zeev Ariel | 717 | $ 14,999.64 | | | $14,999.64 | $3,994.09 | $18,993.7? |
| Katznelson Associates, LP | 2,390 | $ 49,998.80 | | | $49,998.80 | $13,313.64 | $63,312.4? |
| Total | 15,774 | $329,992.08 | 373,134 | $729,206.25 | $1,059,198.33 | $503,583.11 | $1,562,781.4? |
| Total Series B | | | | | $729,206.25 | | |
| Total Series A | | | | | $329,992.08 | | |
| Check Total | | | | | $0.00 | | |

## Option Payments

| | |
|---|---|
| Non-Preference Amount (first payment) | $5.57058038 |
| Non-Preference Amount (second payment) | $29.73071128 |

First Payment

| Optionholder | Options | Exercise Price | In-the-money (ITM) Options | Exercise Cost ITM Options | Out-of-money Options | Notional Exercise Price OTM Options | Exercise OTM Options | Exercise Cost OTM Options | Total Exercise Cost | Difference between Exercise Price and Non-Preference Amount ITM Options | Payment Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bhairav Trivedi | 4,387 | $10.17 | 0 | $0.00 | 4,387 | $5.57 | $5.57 | $24,326.84 | $24,326.84 | $0.0000 | $0.1 |
| Jeff Slowik | 13,500 | $2.62 | 13,500 | $35,370.00 | 0 | $5.57 | $0.00 | $35,370.00 | $2.9506 | $39,832.1 |
| Michael Luebbert | 12,390 | $5.00 | 12,390 | $61,950.00 | 0 | $5.57 | $0.00 | $61,950.00 | $0.5706 | $7,069.1 |
| Michael Swirk | 19,545 | $10.17 | 0 | $0.00 | 19,545 | $5.57 | $108,878.60 | $108,878.60 | $0.0000 | $0.1 |
| Alex Petertians | 11,682 | $10.17 | 0 | $0.00 | 11,682 | $5.57 | $65,075.29 | $65,075.29 | $0.0000 | $0.1 |
| Kamal Kant | 1,000 | $10.17 | 0 | $0.00 | 1,000 | $5.57 | $5,570.56 | $5,570.56 | $0.0000 | $0.1 |
| Kamal Kant | 750 | $2.62 | 750 | $1,965.00 | 0 | $5.57 | $0.00 | $1,965.00 | $2.9506 | $2,212.1 |
| John Mendez | 8,260 | $5.00 | 8,260 | $41,300.00 | 0 | $5.57 | $0.00 | $41,300.00 | $0.5706 | $4,712.1 |
| Joe Kucharski | 750 | $5.00 | 750 | $3,750.00 | 0 | $5.57 | $0.00 | $3,750.00 | $0.5706 | $427.1 |
| Jason Jun | 750 | $5.00 | 750 | $3,750.00 | 0 | $5.57 | $0.00 | $3,750.00 | $0.5706 | $427.1 |
| RSA Ventures | 3,000 | $2.62 | 3,000 | $7,860.00 | 0 | $5.57 | $0.00 | $7,860.00 | $2.9506 | $8,851.1 |
| **Total** | 75,994 | | 39,400 | $155,945.00 | 38,594 | | | $203,049.09 | $355,794.09 | | $63,535.1 |



Schedule 4.2(a)
Common Warrant Payments

| | |
|---|---|
| Non-Preference Amount First Payment | $3,517,056.03 |
| Non-Preference Amount Second Payment | $28.7390712126 |
| Warrants From Notes Conversion Factor | 0.834 |

| Warrantholder | Warrant Shares | Warrant Shares From Note Principal and Interest | Total Warrant Shares | Exercise Price | In-the-money (ITM Warrants) | Exercise Cost of ITM Warrants | "Out-of-money" (OTM Warrants) | First Payment — Exercise Price of OTM Warrants | Total Exercise Cost of Warrants | Difference between Non-Preference Amount and Exercise Price | Payment |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Jeff Slowik (Orig. Part of Tech.) | 2,500 | | 2,500.0000 | $10.0000000 | 0.0000 | $0.00 | 2,500.0000 | $5.57 | $13,936.40 | $0.0000 | $4,318.24 |
| Jeff Slowik | | 776.6840 | 776.6840 | $0.0000000 | 776.6840 | $7.77 | 0.0000 | n/a | $7.77 | $8.5588 | $0.00 |
| Bhupinder Panesar (Orig. Part of Tech.) | 3,750 | | 3,750.0000 | $10.0000000 | 0.0000 | $0.00 | 3,750.0000 | $5.57 | $20,889.60 | $0.0000 | $0.00 |
| David F. Petersen (Orig. Part of Tech.) | 3,750 | | 3,750.0000 | $10.0000000 | 0.0000 | $0.00 | 3,750.0000 | $5.57 | $20,889.60 | $0.0000 | $55,130.07 |
| Ben Franklin Technology Partners (1) | 4,400 | 4,664.4899 | 9,114.4899 | $0.0000000 | 9,114.4899 | $99.14 | 0.0000 | n/a | $99.14 | $5.5588 | $19,317.68 |
| Nicholas Quennell | 2,390 | | 2,390.0000 | $0.0000000 | 2,390.0000 | $0.96 | 0.0000 | n/a | $0.96 | $5.5188 | $7,285.28 |
| Don Glaeken | 500 | | 500.0000 | $1.0000000 | 500.0000 | $500.00 | 0.0000 | n/a | $500.00 | $4.5788 | $0.00 |
| Don Glaeken | 187 | | 187.0000 | $10.0000000 | 0.0000 | $0.00 | 187.0000 | $5.57 | $350.28 | $0.0000 | $2,285.28 |
| Dick Coll | 500 | | 500.0000 | $1.0000000 | 500.0000 | $500.00 | 0.0000 | n/a | $500.00 | $4.5788 | $285.28 |
| Dick Coll | 650 | | 650.0000 | $4.0000000 | 650.0000 | $2,500.00 | 0.0000 | n/a | $2,590.00 | $4.5788 | $285.28 |
| Dick Coll | 1,000 | | 1,000.0000 | $10.0000000 | 0.0000 | $0.00 | 1,000.0000 | $5.57 | $5,573.56 | $0.0000 | $0.00 |
| Dick Coll | | 0.0000 | 0.0000 | $0.0000000 | 0.0000 | $0.00 | 0.0000 | n/a | $0.00 | $0.0000 | $0.00 |
| Don Duval | | 41,576.8339 | 41,576.8339 | $0.0000000 | 41,576.8339 | $415.77 | 0.0000 | n/a | $415.77 | $5.5588 | $231,190.59 |
| HBP Investments, LLC | | 11,868.2231 | 11,868.2231 | $0.0000000 | 11,868.2231 | $118.68 | 0.0000 | n/a | $118.68 | $5.5588 | $65,991.15 |
| Morse Investments IV LP | | 4,483.4427 | 4,483.4427 | $0.0000000 | 4,483.4427 | $44.83 | 0.0000 | n/a | $44.83 | $5.5588 | $24,930.45 |
| LH Investors IV LLC (1) | 760 | 760.0000 | 760.0000 | $0.0000000 | 760.0000 | $7.60 | 0.0000 | n/a | $7.50 | $5.5588 | $4,170.42 |
| Lighthouse Funds, LLC | | 1,309.3772 | 1,309.3772 | $0.0000000 | 1,309.3772 | $13.09 | 0.0000 | n/a | $13.09 | $5.5588 | $7,280.87 |
| Rachndkan Badesken | | 3,978.1750 | 3,978.1750 | $0.0000000 | 3,978.1750 | $39.78 | 0.0000 | n/a | $39.78 | $5.5588 | $22,120.88 |
| David R. Petersen | | 1,328.6538 | 1,328.6538 | $0.0000000 | 1,328.6538 | $13.29 | 0.0000 | n/a | $13.29 | $5.5588 | $7,388.06 |
| Shankar Dhond | | 5,279.4048 | 5,279.4048 | $0.0000000 | 5,279.4048 | $52.79 | 0.0000 | n/a | $52.79 | $5.5588 | $29,356.45 |
| Gregorian Bavdyan | | 1,312.3172 | 1,312.3172 | $0.0000000 | 1,312.3172 | $13.13 | 0.0000 | n/a | $13.12 | $5.5588 | $7,297.22 |
| Sameer Singh | | 2,633.9495 | 2,633.9495 | $0.0000000 | 2,633.9495 | $26.34 | 0.0000 | n/a | $26.34 | $5.5588 | $14,642.24 |
| Amihair Boochco and Kenba Singh | | 19,813.0155 | 19,813.0155 | $0.0000000 | 19,813.0155 | $198.13 | 0.0000 | n/a | $198.13 | $5.5588 | $110,171.01 |
| Mentel Tech Ventures | | 1,306.4374 | 1,306.4374 | $0.0000000 | 1,306.4374 | $13.06 | 0.0000 | n/a | $13.06 | $5.5588 | $7,264.62 |
| Chintan Rupani | | 2,874.1823 | 2,874.1823 | $0.0000000 | 2,874.1823 | $28.74 | 0.0000 | n/a | $28.74 | $5.5588 | $15,981.95 |
| Steven Sencken | | 1,045.1499 | 1,045.1499 | $0.0000000 | 1,045.1499 | $10.45 | 0.0000 | n/a | $10.45 | $5.5588 | $5,811.62 |
| Brian Slowik | | | | | | | | | | | |
| **Total** | **24,227** | **101,072.2070** | **125,052.3070** | | **114,133.3070** | **44,033.44** | | | **$44,609.89** | | **$631,213.34** |

(1) Pursuant to documentation entered into in May 2005, LH Investors IV LLC agreed to have the Company issue to Ben Franklin Technology Partners a warrant that would be exercisable for 22% of the principal and interest outstanding under the 2005 Convertible Note issued to LH Investors IV (community) therewith. This was done in order to induce BFTP to subordinate a lien on the Company's assets to a new lien created in favor of LH Investors.

**EXHIBIT 4**

07/09/2009 19:21 FAX 18587202555          PAUL HASTINGS                    ☑001/013

# Paul Hastings

Paul, Hastings, Janofsky & Walker LLP
4747 Executive Drive
12th Floor
San Diego, CA 92121
telephone 858-458-3000 • facsimile 858-458-3005 • www.paulhastings.com

## FACSIMILE TRANSMISSION

| to: | company/office: | facsimile: |
|---|---|---|
| Robert Fesnak | Fesnak and Associates, LLP | (267) 419-2222 |
| Philip G. Kane, Jr. | U.S. Bank National Association | (860) 241-6881 |
| | Corporate Trust Services | |

| cc: | company/office: | facsimile: |
|---|---|---|
| Barbara J. Shander | Morgan, Lewis & Bockius LLP | (215) 963-5001 |

| from: | facsimile: | telephone: | initials: |
|---|---|---|---|
| Claudia K. Simon | (858) 458-3005 | (858) 458-3041 | CKS |

| client name: | Citibank | client matter number: | 58210-00009 |
|---|---|---|---|
| date: | July 9, 2009 | pages (with cover): | 13 |

comments:

**If you do not receive all pages, please call immediately Facsimile Center:**

*This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, and return the original message to us at the above address via the U.S. Postal Service. Thank you.*

LEGAL_US_W # 62222669.1

# PaulHastings

Paul, Hastings, Janofsky & Walker LLP
4747 Executive Drive
12th Floor
San Diego, CA 92121
telephone 858-458-3000 • facsimile 858-458-3005 • www.paulhastings.com

Atlanta
Beijing
Brussels
Chicago
Frankfurt
Hong Kong
London
Los Angeles
Milan
New York
Orange County
Palo Alto
Paris
San Diego
San Francisco
Shanghai
Tokyo
Washington, DC

(858) 458-3041
claudiasimon@paulhastings.com

July 9, 2009                                                    58210.00009

VIA FACSIMILE AND OVERNIGHT MAIL

Fesnak and Associates, LLP
1777 Sentry Parkway
Gwynedd Hall, Suite 400
Blue b.   .. 19422
Attention: Mr. Robert Fesnak
Fax: 267.419.2222

U.S. Bank National Association
Corporate Trust Services
225 Asylum Street, 23rd Floor
Hartford, CT 06103
Attention: Philip G. Kane, Jr.
Fax: 860.241.6881

Re:    Citibank/PayQuik Escrow

Gentlemen:

This letter is being sent on behalf of our client, Citibank, N.A. (on behalf of itself and its affiliates "*Buyer*"), pursuant to Section 4(b) of the Escrow Agreement, dated as of January 9, 2008 (the "*Escrow Agreement*"), among Buyer, Fesnak and Associates, LLP, as the Stockholders' Representative, and U.S. Bank National Association, as the Escrow Agent. The Escrow Agreement was entered into in connection with that certain Merger Agreement, dated as of October 18, 2007 (the "*Merger Agreement*"), among Buyer, Penclo Acquisition Sub, Inc., PayQuik.com, Inc. (the "*Company*") and the Stockholders' Representative. Capitalized terms used but not otherwise defined in this letter have the meanings set forth in the Merger Agreement.

As more fully described below, (i) Buyer is entitled to indemnification pursuant to Article 11 of the Merger Agreement; (ii) Buyer is submitting this letter as an Indemnity Notice (as defined in the Escrow Agreement) pursuant to Section 4(b) of the Escrow Agreement; (iii) this letter also serves as a Notice of Claim pursuant to Section 11.4(a) of the Merger Agreement with respect to Losses described in the second paragraph of Section 1 and in Sections 3 and 4 below; (iv) Buyer's indemnifiable claims are not all liquidated in amount, but Buyer reasonably estimates that such claims well exceed $1,250,000; and (v) pursuant to Section 4(b) and Section 4(d) of the Escrow Agreement,

LEGAL_US_W # 62196428.6

07/09/2009 19:21 FAX 18587262555          PAUL HASTINGS                    ☑003/013

**Paul***Hastings*

July 9, 2009
Page 2

no portion of the Escrow Funds should be released to any party except in accordance
with (a) ... itten instructions from the Stockholders' Representative and Buyer or (b)
a Judgment Nouce (as defined in the Escrow Agreement).

The matters for which Buyer claims to be entitled to indemnification for Losses are as
follows:

1.      **QuikRemit Trademark Disputes and Opposition Proceedings**

As ad.c. ... of the Stockholders' Representative on March 19, 2008, Buyer received a
letter, dated February 29, 2008, from the law firm of Needle & Rosenberg, P.C., on behalf
of its client, Total System Services, Inc. ("*TSYS*"), regarding Buyer's applications to the
United States Patent and Trademark Office on February 1, 2008 to register the
"QuikRemit" and "Citi QuikRemit" service marks.  In the letter, TSYS alleged that it
owns rights in the trademark "QUICKREMIT" and that Buyer's use of the trademarks
"Qui.. .. ..al "Citi QuikRemit" is infringing its rights.  In addition, TSYS alleged in
the latte .... the prior use of "QUICKREMIT" would support oppositions in the
Trademark Trial and Appeal Board to Citi's applications to register "QuikRemit" and
"Citi QuikRemit."  Despite attempts to reach an amicable resolution, TSYS has not
advised us that it has changed its position on the matters described above.  As a result,
TSYS has not removed its threat to commence an opposition proceeding in the
Trademark Trial and Appeal Board against "Citi QuikRemit" and/or bring a lawsuit
against Buyer alleging that Buyer has interfered with, infringed or otherwise violated its
intellectual property rights.  To date, Buyer has incurred attorneys' fees of approximately
$56,422 in connection with the investigation and attempted resolution of TSYS's claim.
In the event that, as alluded to in its letter, TSYS commences an opposition proceeding
and also attempts to enforce its rights through litigation under Section 43(a) of the
Lanham Act as well as under state statutory and common law, Buyer would incur
additional attorneys' fees and other Losses in an amount reasonably estimated to exceed
$1,.. .

In addition, it has come to Buyer's attention that Buyer's use of the trademark
"QuikRemit" and/or variants in India potentially infringes or otherwise violates the
intellectual property rights of HDFC Bank Limited ("*HDFC*").  During the time period in
or about October 2005, HDFC filed six applications to register the "QUICKREMIT"
trademark in various formats with the Office of the Trade Marks Registry.  To preserve its
rights and continue to use the trademark "QuikRemit" and variants in India,
Buyer filed six opposition notices against HDFC's applications in India.  To date, Buyer
has incurred attorneys' fees and other Losses aggregating approximately $29,777 in
connection with obtaining advice of counsel and filing the opposition notices in India.
Additional attorneys' fees and other Losses will occur as the oppositions progress.

Pursuant to Section 11.2(a) of the Merger Agreement, the Buyer Indemnitees are entitled
to indu.. ... ... any Losses directly or indirectly resulting from, arising out of, or
rec.. .. . . ... ...

.....Hastings

July 9, 2009
Page 3

incurred by the Buyer Indemnitees in connection with, or otherwise with respect to any
breach of any representation or warranty of the Company contained in the Merger
Agreement. Section 4.11(b) of the Merger Agreement provides in relevant part that "The
Company and the Subsidiaries, as applicable, have sole title and ownership of all Owned
Intellectual Property, free and clear of all Liens (other than Permitted Liens), and have
licenses to or other valid rights to use all other Intellectual Property used in the business
as presently conducted. The Company and the Subsidiaries are the sole and exclusive
owners of the Owned Intellectual Property, and there are no outstanding options, claims,
encumbrances or shared ownership of interests of any kind relating to any Owned
Intellectual Property." In addition, Section 4.11(e) of the Merger Agreement provides in
relevant part that "The conduct of the business of the Company and the Subsidiaries as
presently conducted does not infringe, misappropriate or otherwise violate any Intellectual
Property ... of a third party." The Company identified the "QuikRemit" trademark as
Owned ... property on Schedule 4.11(b)(ii) of the Company Disclosure Schedule.
However, according to the letter received from TSYS's counsel, the Company was not the
sole and exclusive owner of the "QuikRemit" trademark and the Company's use of the
"QuikRemit" trademark and variants was alleged to infringe the intellectual property of
TSYS. In addition, the Company's use of the "QuikRemit" trademark and variants could
very well be found to infringe the intellectual property of HDFC. Accordingly, the
representations made by the Company in Section 4.11(b) and Section 4.11(e) of the
Merger Agreement were inaccurate and Buyer is entitled to indemnification for any Losses
arising out of such breaches pursuant to Section 11.2(a) of the Merger Agreement.

2.     **IDT Breach of Contract Claim**

It has come to the attention of Buyer that, prior to the Closing, the Company was in
default ... performance of material obligations contained in the Services Provider
Agreement (the "Agreement"), dated March 23, 2006, with IDT Money Management
Ltd. ("IDT"). As disclosed to the Stockholders' Representative on April 17, 2008, Buyer
received two letters, dated March 3, 2008 and April 1, 2008 from IDT alleging, among
other things, that (i) the Company breached the IDT Agreement by failing to timely
provide cash delivery to Ukraine, Russia, Georgia, Romania and Moldova; (ii) IDT began
expressing concerns regarding the Company's failure to provide the promised service in a
timely ... as early as November 4, 2007; and (iii) as a result of the Company's breach
of its ... agreement, IDT is entitled to a refund in the amount of $60,000.

Pursuant to Section 11.2(a) of the Merger Agreement, the Buyer Indemnitees are entitled
to indemnification for any Losses directly or indirectly resulting from, arising out of, or
incurred by the Buyer Indemnitees in connection with, or otherwise with respect to any
breach of any representation or warranty of the Company contained in the Merger
Agreement. Section 4.13(c) of the Merger Agreement provides in relevant part that
"Neither the Company nor any of its Subsidiaries, nor to the Knowledge of the Company,
any counterparty, is in default in the performance, observance or fulfillment of any

LEGAL_US_W # 62196426.6

07/09/2009 19:22 FAX 18587202555          PAUL HASTINGS                    ☑005/013

**Paul***Hastings*

Jul· ·
Pag· ·

material obligation, covenant or condition contained in any...Material Contracts." The
IDT Agreement qualifies as a "Material Contract" and is listed on Schedule 4.13(b)(ii) of
the Company Disclosure Schedule. As of the Closing Date, the Company was in default
in the performance of its material obligations under the IDT Agreement as described in
the letter from IDT. Accordingly, the representation made by the Company in
Section 4.13(c) of the Merger Agreement was inaccurate and Buyer is entitled to
indemnification for any Losses arising out of such breach pursuant to Section 11.2(a) of
the Merger Agreement.

3.     Undisclosed Agreement with SEH Advisors, Inc.

It is the contention of Buyer that the Company entered into a Sales ISR
Agreement, dated May 15, 2007, with SEH Advisors, Inc. ("*SEH*"). Pursuant to the Sales
ISR Agreement, if SEH refers a potential business relationship to the Company, and if the
Company and that third party enter into a contract, then SEH is entitled to a commission
based upon the volume of business between the Company and the referred party. SEH
referred Post Bank, a Polish financial institution, to the Company. Buyer received an
email in 2008 from Mr. Steven Halliwell, Principal of SEH, alleging that the
Company breached its obligations under the Sales ISR Agreement because it failed to
enter into an agreement with Post Bank, despite repeated assurances from Company
representatives that it was ready, willing and able to do so. Had the Company entered into
an agreement with Post Bank, Mr. Halliwell would have been entitled to a commission
equal to 10% of all amounts collected. The Buyer estimates that the potential value of
such commissions is approximately $100,000, calculated as 10% of the value of Buyer's
projected transactions in Poland over the next five years. In addition to lost commission,
Mr. Halliwell alleges that the Company's failure to enter into an agreement with Post Bank
damaged his reputation. To date, Buyer has been unable to resolve this matter with Mr.
Halliwell, who continues to assert that the Company breached its obligations under the
Sales ISR Agreement.

Pursuant to Section 11.2(a) of the Merger Agreement, the Buyer Indemnitees are entitled
to indemnification for any Losses directly or indirectly resulting from, arising out of, or
incurred by the Indemnitees in connection with, or otherwise with respect to any
breach of any representation or warranty of the Company contained in the Merger
Agreement. Section 4.15(a) of the Merger Agreement required the Company to provide a
true and complete list of all material Company Benefit Plans. The definition of Company
Benefit Plans includes any agreement providing for compensation which is maintained by
the Company for the benefit of any service provider. The Sales ISR Agreement qualified
as a Company Benefit Plan but was not identified on Schedule 4.15(a) of the Company
Disclosure Schedule. Accordingly, the representation made by the Company in
Section 4.15(a) of the Merger Agreement was inaccurate and Buyer is entitled to
indemnification pursuant to Section 11.2(a) of the Merger Agreement for the Losses
described above.

LEGAL_US_W # 62196426.6

07.09.2009 19:23 FAX 1855.2          PAUL HASTINGS                                @008/013

**Paul**Hastings

July 9, 2009
Page 5

Section          5. Escrow Agreement requires that, in the event of an unliquidated claim,
Buyer provide a reasonable estimate of the amount of the claim. The estimated dollar
amount of Losses with respect to the claim set forth above is $125,000, including the
value of lost commissions as described above and attorneys' fees resulting from the
defense of such claim.

Additionally, Buyer notes that pursuant to Section 11.2(d) of the Merger Agreement,
Buyer is entitled to indemnification for the full amount of the Losses described above
because such Losses are not subject to the Deductible.

4.     BANCServices Group, Inc. Breach of Contract Claim

It has come to the attention of Buyer that, prior to the Closing, the Company was in
default in the performance of material obligations contained in the Strategic Partnership
Services Agreement, dated July 31, 2007, with BANCServices Group Inc. (the
"BANCServices Agreement"). Pursuant to the BANCServices Agreement, the Company
was obligated to provide to BANCServices Group an internet based electronic funds
transfer system to allow for the initiation of the transmission of money to certain
recipients and design, operate and maintain a services website for the transmission of
electronic funds transfers. According to a complaint filed in April 2009 by BANCServices
Group, Inc. in the Circuit Court of Mississippi County (a copy of which is enclosed with
this letter), the Company failed to design and implement the website for BANCServices
Group, resulting in damages to BANCServices Group of approximately $118,000.

Pursuant to Section 11.2(a) of the Merger Agreement, the Buyer Indemnitees are entitled
to indemnification for any Losses directly or indirectly resulting from, arising out of, or
incurred by the Buyer Indemnitees in connection with, or otherwise with respect to any
breach of any representation or warranty of the Company contained in the Merger
Agreement. Section 4.13(c) of the Merger Agreement provides in relevant part that
"Neither the Company, nor any of its Subsidiaries, nor to the Knowledge of the Company,
any counterparty, is in default in the performance, observance or fulfillment of any
material obligation, covenant or condition contained in any…Material Contracts." The
BANCServices Agreement qualifies as a "Material Contract" and is listed on Schedule
4.13(b)(ii) of the Company Disclosure Schedule. As of the Closing Date, the Company
was in default in the performance of its material obligations under the BANCServices
Agreement and had failed to design and implement a website for BANCServices
Group as required by the Service Provider Agreement. Accordingly, the representation
made by the Company in Section 4.13(c) of the Merger Agreement was inaccurate and
Buyer is entitled to indemnification for any Losses arising out of such breach pursuant to
Section 11.2(a) of the Merger Agreement.

LEGAL_US_E # 1.2

*..... Hastings*

July 9, 2009
Page 6

Section ..., ' .. .Escrow Agreement requires that, in the event of an unliquidated claim, Buyer provide a reasonable estimate of the amount of the claim. The Buyer estimates that it will incur total Losses of $150,000 in connection with the lawsuit described above, including attorneys' fees resulting from the defense of such lawsuit.

5        .'. . .... Expenses

Pursuant to the Merger Agreement, the Losses for which the Buyer Indemnitees are entitled to indemnification include, among other things, any expense of any nature directly or indirectly resulting from, arising out of, or incurred by the Buyer Indemnitees in connection with any matter for which indemnification is available.   Accordingly, in connection with the investigation of the matters referenced above and the preparation of this 3rd    ..  Notice, Buyer has incurred Losses in addition to the Losses referenced in S.  .        . above in an amount of approximately $15,000, representing legal fees.

If you have any questions, please do not hesitate to contact me.

Sincerely

*Claudia ... — Simon*

Claudia K. Simon
for PAUL, HASTINGS, JANOFSKY & WALKER LLP

Encs.

cc:      . . ..., ....der, Morgan, Lewis & Bockius LLP (via fax:  215.963.5001)
         Vincent Coyle (via e-mail)

# JOHNSON & SCHNEIDER, L.L.C.

### ATTORNEYS AT LAW

**212 NORTH MAIN STREET**
CAPE GIRARDEAU, MO 63701
PH•573•335•3300
FAX•573•335•1978
www.johnsonschneider.com

MARK S. JOHNSON
JOHN R. SCHNEIDER
Licensed in Mo. & Ill.

309 Division Street
P.O. Box 826
Cairo, Illinois 62914
PH•618•734•1505
FAX•618•734•1521

April 17, 2009

PayQuik.co.
Attn:  Chief Executive Officer
150 Monument Rd., Suite 207
Bala Cynwyd, PA 19004

RE:    BANCServices v.PayQuik
       Mississippi Co., MO

To Whom It May Concern:

Enclosed please find the Petition being filed against your company.

Thank you.

Very truly yours,

John R. Schneider

JRS:slc

Enclosures

cc:Glenn Ault

07 09 2009 19:23 FAX 1858.2.....          PAUL HASTINGS                    ☒009/013

## Circuit Civil Court Party Information Sheet

**INSTRUCTIONS:**
√ You must provide the following information about yourself and the other party.
√ Type or neatly print in black ink
√ Fill in the two-letter Case Type code from the back of this form here: _____

Filing Date: ___

Title of Case: _____ Inc v. PayQuik.com, Inc. n/k/a Citibank _____
Union _____
_____

PARTIES (attach a separate sheet to include additional parties).
Initiating Party
Party Type: Plaintiff _____ _____ (i.e. Plaintiff, Petitioner, Applicant, etc.)

Last Name: _____ ___ First Name: Banc Services Group, Inc.

Middle Name: _____ Address: 115 N. Main _____

City: Charleston _____ State: Missouri _ Zip: 63834 __

DOB: _____ ___ SSN: _____
                                    (Required)
Respondent:

Party Type: Defendant _____ _____ (i.e. Defendant, Respondent, etc.)

Last Name: _____ ___ First Name: PayQuik.com, Inc.

Middle Name: _____ _____ Address: 2711 Centerville Rd., Suite 400

City: _____ _           : _ DE ___ Zip: __ 19808 _____

DOB: _____ SSN: _____
                                    (Required)
Additional Parties: _____

Party Type: _____ (i.e. Co-Defendant, Co-Respondent, etc.)

Last Name: _____ ___ ___ _____ First Name: _____

Middle Name: _____ Address: _____

City: _____ ___ State: _____ Zip: _____

DOB: _____ SSN: _____

Submitted b: ___        __ _____ Bar ID: 54194 _____

Phone: 573-335-5... ___ _____

Party Representing: Plaintiff _____

.. .u9. .0U9 19:23 FAX 18587202585        PAUL HASTINGS                                       ☑010/013

## IN THE CIRCUIT COURT OF MISSISSIPPI COUNTY, MISSOURI

| | | |
|---|---|---|
| BANC SERVICES GROUP, INC. | ) | |
| 115 North Main | ) | |
| Charleston . | ) | |
| | ) | |
| Plantit, | ) | |
| | ) | Case No.: _____ |
| v. | ) | |
| | ) | |
| PAYQUIK.COM. INC., | ) | |
| | ) | |
| ... ... | ) | |

### PETITION

Comes now the Plaintiff, BANCServices Group, Inc., by and through its

attorney, Joh.. . ..eder of Johnson & Schneider, L.L.C., and for its Petition

against the Defendant, PayQuik.com, Inc., states as follows:

1.      That .l..iff, BANCServices Group, Inc. is a Missouri Corporation

with its principal place of business located in Mississippi County, Missouri.  At all

times materia . . . '...ion, Plaintiff was doing business in the State of

Missouri and executed the Agreement attached hereto.

2.      That Defendant, PayQuik.com, Inc., is a Delaware Corporation

headquartered i. .... Cynwyd, Pennsylvania and executed the Agreement

attached hereto.

3.      That in the attached Agreement, Defendant agreed to the

jurisdiction of the State of Missouri if Plaintiff filed suit to enforce the Contract.

4.      . .      . . ..... July 31, 2007, Plaintiff, BANCServices Group,

Inc., executed and entered into an Agreement, commonly referred to as a

Strategic Partnership Services Provider Agreement with PayQuik.com, Inc., a

copy of said Strategic Partnership Services Provider Agreement is attached

hereto and mau.· ·.pa.t ne⋅aof marked "Plaintiff's Exhibit 1".

5.     That as consideration for Plaintiff, BANCServices Group, Inc.,

entering into t.ie Strategic Partnership Services Provider Agreement with

Defendant, P:. ⁻ ⁻ ⁻ ⸗ . Inc., Plaintiff paid directly to Defendant the sum of

$50,000.00.

6.     That as a part of their Agreement, Defendant had certain duties and

responsibilities, which are set forth in Article four of the attached contract, which

include, but are    ⸲. ⸴ed to the following:

      a)     Defendant had the responsibility of providing to Plaintiff, as a

           service, an internet based electronic funds transfer system to

           .il⸲./ for the initiation of the transmission of money to certain

           ⸴. ⸴.⸴ts; and

      b)     As a further obligation, Defendant was to design, operate

           and maintain a services website for the transmission of

           ⸴.⸴.:c funds transfers pursuant to the contract between

           the parties.

7.     That as a part of the responsibilities of Plaintiff, Plaintiff was to

solicit customers and market to potential customers the services to be provided

by Defendant.

8.     That in reliance on the execution of the Agreement by Defendant,

Plaintiff spent additional funds, to the detriment of Plaintiff, in an effort to prepare

for the future in      ⸲. ⸴es being provided by the Defendant and further

soliciting custom.... ..,o would receive and benefit from the services provided by Defendant. Plaintiff further hired an independent company called Ingeniux to design and develop certain technical computer programs to integrate software provided by ... .        ...ely QuikPay into computer systems.  This work performed was as a .esul of Plaintiff relying, to its detriment, on Defendant abiding by its Agreement under the contract attached hereto.

9.     As a result of requesting work from Ingeniux, Plaintiff is now obligated to ....        ... sum of $68,132.00, which is reflected in the attached invoice attached hereto and made a part hereof marked "Plaintiff's Exhibit 2".

10.     That in further expectation of Defendant providing the services as promised and further reliance and to Plaintiff's detriment, Plaintiff internally prepared for the marketing and solicitation of customers, which work resulted in additional sums of $68,000.00 being spent by Plaintiff in reliance on Defendant entering into a ..        ... attached hereto and promising to provide certain services to the benefit of Plaintiff.

11.     That Defendant has failed to perform under the contract attached hereto; has further failed to design and implement the website for the use of Plaintiff; has further failed to refund the $50,000.00 advanced to Defendant by Plaintiff at the time of execution of the Agreement; and has further failed to indemnify or otherwise reimburse Plaintiff for its losses as a result of Defendant's breach of the ...        ... further failing and refusing to abide by its promises to Plaintiff.

12.     That as a direct and proximate result of Defendant's breach of the

Agreement attached hereto, Plaintiff suffered actual and consequential damages

in excess of the jurisdictional amount of $25,000.00.

WHEREFORE, Plaintiff requests this Court to enter Judgment against

Defendant for a sum in excess of the jurisdictional amount of $25,000.00, for its

costs of suit and for such other and further relief as this Court determines just

and proper in the premises.

JOHNSON & SCHNEIDER, L.L.C.


JOHN R. SCHNEIDER #54194


JOHNSON & SCHNEIDER, L.L.C.
212 North Main Street
Cape Girardeau, MO 63701
Phone: 573-
Facsimile: 573-
www.johnsonschneider.com

4

**EXHIBIT 5**



James A. Keller
Phone: (215) 972-1964
Fax: (215) 972-4152
jkeller@saul.com
www.saul.com

August 6, 2009

**VIA FACSIMILE AND ELECTRONIC MAIL**

Citibank, N.A.
Citigroup Inc.
153 East 53rd Street, 25th Floor
New York, NY  10022
Attn:  Deputy General Counsel – M&A Legal
Fax:  212.793.2402
Electronic Mail:  Gonzalezr@citi.com
(Buyer)

U.S. Bank National Association
Corporate Trust Services
225 Asylum Street, 23rd Floor
Hartford, CT  06103
Attention:  Philip G. Kane, Jr.
Ref:  Citibank/PayQuik Escrow
Fax:  860.241.6881
Electronic Mail:  philip.kanejr@usbank.com
(Escrow Agent)

> Re:   Response to Indemnity Notice ("Indemnity Notice") of Citibank, N.A.
> ("Buyer")

Dear Buyer and Escrow Agent:

   We provide this Response Notice on behalf of Fesnak and Associates, LLP (the
"Stockholders' Representative").  This Response Notice responds to the above-referenced
Indemnity Notice purportedly sent pursuant to Section 4(b) of the January 9, 2008 Escrow
Agreement (the "Escrow Agreement")[1] among Buyer, the Stockholders' Representative, and the

---

[1]   As you are aware, the Escrow Agreement was entered into in connection with the Merger Agreement dated
October 18, 2007 (the "Merger Agreement") by and among Buyer, Penelope Acquisition Sub, Inc.,
PayQuik.com, Inc. ("PayQuik" or the "Company") and the Stockholders' Representative.  Capitalized

Centre Square West ♦ 1500 Market Street, 38th Floor ♦ Philadelphia, PA 19102-2186
Phone: (215) 972-7777 ♦ Fax: (215) 972-7725

DELAWARE     MARYLAND     NEW JERSEY     NEW YORK     PENNSYLVANIA     WASHINGTON, DC

A DELAWARE LIMITED LIABILITY PARTNERSHIP

1175503.4

Citibank, N.A.
U.S. Bank National Association
August 6, 2009
Page 2

Escrow Agent. This Response Notice is being provided consistent with Section 4(b) of the Escrow Agreement as the Stockholders' Representative disputes the basis for the claims set forth in the Indemnity Notice and denies liability for all of the Claimed Amounts. The Stockholders' Representative accordingly does not consent to the payment of any of the claims set forth in the Indemnity Notice and no funds shall be released by Escrow Agent to Buyer pursuant to that Indemnity Notice.

**A.   The Indemnity Notice Was Given Late.  The Escrow Funds Therefore Must Be Immediately Released, and Buyer's Indemnity Claim Is Moot.**

Buyer's claim for indemnification set forth in the Indemnity Notice was late in time under both the Merger Agreement and the Escrow Agreement.

**1.   Notice Requirements Of The Merger Agreement**

The representations and warranties in the Merger Agreement expired after 11:59 p.m. New York time on July 9, 2009, the 18-month anniversary of the Closing Date. Notice of a claim for indemnification with respect to any alleged breach of those representations and warranties had to be given prior to that date and time. See Section 11.1(a) of Merger Agreement.

Section 12.1 of the Merger Agreement controls when notice is deemed given under the Merger Agreement. If sent by facsimile, notice must be sent "during normal business hours of the recipient", otherwise, it is deemed given the next Business Day. Here, the Indemnity Notice was sent via facsimile to the Stockholders' Representative after normal business hours at 7:21 pm (ET) and after normal business hours to the Escrow Agent at 7:25 pm (ET) on July 9, 2009.[2] A copy of the Indemnity Notice was also sent via electronic mail to both Stockholders' Representative and the Escrow Agent at 11:25 pm (ET) on July 9, 2009. Electronic mail is not valid notice under the Merger Agreement. See Section 12.1.

The facsimile that was sent to the Escrow Agent and the Stockholders' Representative after normal business hours on July 9, 2009 constitutes notice under the Merger Agreement given on July 10, 2009. See Section 12.1. The claims for indemnification set forth in the Indemnity Notice were therefore late and are not enforceable. The representations and warranties in the Merger Agreement had already expired.

---

terms used but not otherwise defined in this letter have the meanings set forth in the Merger Agreement, the Escrow Agreement, or the Indemnity Notice.

[2]      Documents confirming the transmittal times to the Stockholders' Representative are attached at Exhibit 1.

Citibank, N.A.
U.S. Bank National Association
August 6, 2009
Page 3

### 2.   Notice Requirements Of The Escrow Agreement

The Indemnity Notice was also late under the similar notice provisions of the Escrow Agreement. Pursuant to Section 4(b) of the Escrow Agreement, "Buyer may, by giving written notice . . . to the Stockholders' Representative and the Escrow Agent, make a claim against the Escrow Funds . . . at any time prior to 11:59 pm New York time on the 18-month anniversary of the date of [the Escrow Agreement]." The 18-month anniversary of the Escrow Agreement also was July 9, 2009. The Escrow Agreement terminated as of that date.

Section 8 of the Escrow Agreement controls the timing of notices under the Escrow Agreement. According to Section 8, all notices, if sent by facsimile (with a .pdf or other copy by electronic mail), must be sent during "normal business hours of the recipient." If a notice is sent after normal business hours, the notice is deemed given the next Business Day. As noted above, the Indemnity Notice was sent via facsimile to the Stockholders' Representative at 7:21 pm (ET) and to the Escrow Agent at 7:25 pm (ET) on July 9, 2009. The Indemnity Notice was also sent via electronic mail to both at 11:25 pm (ET) on July 9, 2009. Thus, for purposes of the Escrow Agreement, the Indemnity Notice was given on July 10, 2009, after the Escrow Agreement had terminated. See Section 4(b) of Escrow Agreement. The Indemnity Notice was too late.

### 3.   Required Distribution Of Escrow Funds

Because Buyer's Indemnity Notice was delivered after the Escrow Agreement terminated, it is not valid. Accordingly, the Escrow Agent must distribute the balance of the Escrow Funds promptly consistent with Section 4(d) of the Escrow Agreement. By this letter, the Stockholders' Representative instructs that the Escrow Agent make that distribution immediately.

### 4.   The Indemnity Claims Are Also Moot

Pursuant to Section 11.2(e) of the Merger Agreement, "in no event shall the Stockholder Parties be obligated to indemnify Buyer . . . for any amounts in excess of, or with any funds other than, the Escrow Funds." In addition to being late, the Buyer's indemnification claims are also moot because, after the required release of the Escrow Funds, there will be no funds for indemnification.

**B.   The Written Response That Follows In Section C Is Without Prejudice To The Primary Argument In Section A That The Escrow Funds Must Be Immediately Released.**

For all of the reasons outlined in Section A of this letter, the Escrow Funds must be released and Buyer's indemnification claims and Indemnity Notice are moot. In an abundance of caution, and without prejudice to its primary position that the Indemnity Notice was late and

Citibank, N.A.
U.S. Bank National Association
August 6, 2009
Page 4

therefore invalid, the Stockholders' Representative will now provide a written description of the bases upon which it denies the claims set forth in the Indemnity Notice, had they been given timely.

**C.    Response To Buyer's Claims In The Indemnity Notice.**

The Stockholders' Representative does not agree that Buyer is entitled to indemnification pursuant to the Merger Agreement, and hereby disputes the basis for the claims set forth in the Indemnity Notice and denies liability for all of the Claimed Amounts. This conclusion is necessarily based on the documents and information in the Stockholders' Representative's possession, including the limited information about these alleged disputes provided to date by Buyer.

**1.    The "QuikRemit" Disputes**

Buyer claims that the Company breached the representations made in Section 4.11(b) of the Merger Agreement relating to ownership of intellectual property and Section 4.11(d)[3] relating to infringement of intellectual property of third parties by virtue of two alleged disputes concerning the unregistered trademark "QuikRemit". There was no breach.

a.    *Global Note About Section 4.11(b)*

In Section 4.11(b) the Company represented that "the Company and its Subsidiaries … have sole title and ownership of all Owned Intellectual Property, free and clear of all Liens …" and "[t]he Company and its Subsidiaries are the sole and exclusive owners of the Owned Intellectual Property, and there are no outstanding options, claims, encumbrances or shared ownership of interests of any kind relating to any Owned Intellectual Property". Section 4.11(b) referenced Schedule 4.11(b)(ii) to the Merger Agreement as the pertinent list of "Owned Intellectual Property." That Schedule stated that "[t]he Company owns the unregistered trademarks listed below in the United States", including "QuikRemit."

Section 4.11(b) made no representation that QuikRemit was registered, made no representation beyond the United States, and made no representation that there were no third parties that may assert rights to the same or similar trademarks. Section 4.11(b) simply represented that the Company had not granted to any third parties (or otherwise encumbered) any part of whatever ownership rights it had in the Owned Intellectual Property, including "QuickRemit." Buyer does not allege that either TSYS or HDFC claims that the Company granted TSYS or HDFC any ownership, in option to, or claims to the Company's unregistered trademark "QuikRemit". There was no breach of Section 4.11(b) here.

---

[3]    The Stockholders' Representative assumes that Buyer's citation to Section 4.11(e) in the Indemnity Notice is a mistake, as the language quoted by Buyer is that of Section 4.11(d).

Citibank, N.A.
U.S. Bank National Association
August 6, 2009
Page 5


b.   *Additional Response to Dispute with TSYS*

According to the information supplied by Buyer, in February 2008 TSYS claimed that it
had rights to a different trademark called "QUICKREMIT" and asserted that its prior use of
"QUICKREMIT" "would support" oppositions to Buyer's applications to register "QuikRemit"
and a distinct mark called "Citi QuikRemit."   TSYS also suggested that its use of
"QUICKREMIT" created rights that "may" be enforced under the Lanham Act and statutory and
common law.

The issues raised by TSYS more than seventeen (17) months ago concerned a potential
dispute specifically with Buyer's trademark applications for "QuikRemit" and "Citi QuikRemit",
not with the unregistered QuikRemit trademark identified in the Merger Agreement.  As noted,
the Merger Agreement clearly identified the relevant Owned Intellectual Property as an
unregistered trademark in QuikRemit.  The Buyer's applications for federal trademark
registration seek to expand the rights granted in the Merger Agreement and it is that expansion to
which TSYS objects.  Accordingly, the TSYS dispute does not even involve the Owned
Intellectual Property identified in the Merger Agreement, but other potential intellectual property
rights.

Moreover, publically available information confirms that Buyer *abandoned* the
application for "QuikRemit" on October 20, 2008.  Any claim relating to Buyer's trademark
application for "QuikRemit" is therefore moot, and only the issues surrounding the Buyer-
created trademark application for "Citi QuikRemit", which was not subject to the representation
in Section 4, could remain.

The Stockholders' Representative also believes that, in any event, TSYS did not have any
rights that would have rendered the Company's representations under Sections 4.11(b) and
4.11(d) of the Merger Agreement inaccurate.  TSYS could prevail in an opposition proceeding in
the Patent and Trademark Office or in a civil action only if it could establish (1) that the Buyer's
use of "QuikRemit" or "Citi QuikRemit" is confusingly similar to TSYS's use of
"QUICKREMIT" and (2) that TSYS's rights to "QUICKREMIT" are superior to Buyer's rights
to "QuikRemit" or "Citi QuikRemit".  We do not believe that either of these conditions can be
met.

Likelihood of Confusion.  Many factors must be considered in determining likelihood of
confusion.  These include: (1) strength of the marks in question, (2) degree of similarity between
the marks, (3) proximity of the goods and/or services in the market place, (4) quality of the
defendant's goods and/or services, (5) likelihood that the prior owner will "bridge the gap" in the
marketplace, (6) actual confusion between the marks, (7) good faith of the defendant, and (8)
sophistication of the buyers of the respective goods and/or services.  Publicly available
information indicates that TSYS uses "QUICKREMIT" in connection with credit card payment
remittance services, whereas buyer uses the different mark "Citi QuikRemit" in connection with

Citibank, N.A.
U.S. Bank National Association
August 6, 2009
Page 6

global remittance services provided via a global computer network; namely, providing electronic funds transfer, origination, funding, clearing, foreign exchange conversion, and money transfer services to banks, corporations and financial institutions to enable their customers to directly access accounts and remit money. TSYS's mark is unregistered and therefore entitled only to common law rights, if any. Also, TSYS's mark is weak because it is highly descriptive of its services and therefore afforded no or minimal protection. The two marks are also quite different insofar as Buyer's mark includes Buyer's well-known house mark "Citi" and Buyer spells "QuikRemit" differently than TSYS, thus minimizing the likelihood that a consumer would be confused as to the source of their respective services. Moreover, the customers for both services are believed to be sophisticated businesses that are unlikely to be confused easily. Finally, the Company had good faith in using the unregistered mark "QuikRemit" and we are unaware of any actual confusion.

Superiority of Rights: There is no information that TSYS ever used "QuikRemit" or "Citi QuikRemit". As to "QUICKREMIT", TSYS's assertions as to first use are merely that -- assertions. The Stockholders' Representative currently has little or no information as to whether TSYS could establish prior use of its mark anywhere in the United States. TSYS could only have superior rights in those geographic areas in the United States in which TSYS used its mark earlier than Buyer (or its predecessors in interest) used its mark.

- - -

For all of the reasons noted, there was no breach of Section 4 with regard to the putative TSYS claims and, in any event, the Stockholders' Representative does not believe that Buyer has suffered, or will suffer, any Loss in connection with TSYS's claims.

c.    *Additional Response to Dispute with HDFC Bank Limited ("HDFC")*

First of all, Buyer failed to provide proper notice of this purported HDFC claim to the Stockholders' Representative. Section 11.4 of the Merger Agreement provides that "[i]n the event that any claim or demand, or other circumstance or state of facts which could give rise to any claim or demand, for which an Indemnitor may be liable to an Indemnitee hereunder is asserted or sought to be collected by a third party . . . the Indemnitee shall as soon as practicable notify the Indemnitor in writing of such Third Party Claim" and "shall enclose with the Notice of Claim a copy of all papers served with respect to such Third Party Claim, if any, and any other documents evidencing such Third Party Claim." Contrary to this provision, and despite having had knowledge of this alleged HDFC issue for some time, Buyer provided no notice of this potential claim to the Stockholders' Representative prior to July 10, 2009. This may be because Buyer is cognizant that Schedule 4.11(b)(ii) only identified intellectual property interests in the United States, and made no representations about India or any jurisdiction outside of the United States.

Citibank, N.A.
U.S. Bank National Association
August 6, 2009
Page 7

To the extent it is necessary to reach the substance of the purported HDFC issue, it must be emphasized that HDFC has asserted no dispute with Buyer. Rather, publically available information indicates that Buyer proactively filed trademark opposition notices against six trademark applications of HDFC in India for "QuikRemit" and variants thereof for various different goods and services, including books and records, computers, computer hardware and data processors and reproducers, banking, financial, and monetary affairs. The Stockholders' Representative does not believe that the fees Buyer has incurred in voluntarily filing oppositions against the trademark applications of a third party in India can rightly be deemed costs recoverable under the Merger Agreement, even if the Company had breached one of its representations. These are expenses that Buyer voluntarily chose and cannot be considered Losses under the Merger Agreement.[4]

Moreover, we do not believe that the Company breached any representation in Sections 4.11(b) or 4.11(d) with regard to HDFC. HDFC does not have any trademark rights that effect Buyer's ownership of or ability to use the "QuikRemit" trademark in India. Publically available information indicates that HDFC alleges it first used the mark "QUICKREMIT" in India in March 2004. That is subsequent to the Company's first use of the "QuikRemit" trademark in India in or about July of 2001. Thus, to the extent that there was any actual conflict between Buyer and HDFC in India, it is HDFC who is the infringer, not Buyer or the Company. Even further, we doubt that there is any infringement as between Buyer and HDFC for largely the same reasons set forth above in connection with the dispute between TSYS and Buyer – a lack of likelihood of confusion because the marks are different, are being used in association with different goods and services, are weak marks, and so on.

- - -

For all of the reasons noted, there was no breach of Section 4 with regard to the putative HDFC claims and, in any event, the Stockholders' Representative does not believe that Buyer has suffered, or will suffer, any Loss in connection with the HDFC claims.

## 2.    IDT Money Management Ltd. ("IDT") Breach Of Contract Claim

Buyer next claims that the Company breached Section 4.13(c) of the Merger Agreement relating to material contracts entered into by the Company. Pursuant to Section 4.13(c), the Company represented that it was not "in default in the performance, observance or fulfillment of any material obligation, covenant or condition contained in any of the Contracts" listed on Schedule 4.13, including the IDT Agreement (emphasis added). Under Article IV of the Merger Agreement, the Company agreed that its representations and warranties would be true and correct as of the Closing Date (January 9, 2008). Moreover, pursuant to Section 11.2(b) of the

---

[4]    These should also be considered non-recoverable special, incidental or consequential damages pursuant to Section 11.2(f) of the Merger Agreement.

Citibank, N.A.
U.S. Bank National Association
August 6, 2009
Page 8

Merger Agreement, the representations and warranties were deemed to be made, at the latest, as of the Closing Date (January 9, 2008).

The documents Buyer has provided to the Shareholders' Representative do not indicate that the Company was in default of the IDT Agreement as of January 9, 2008. The letters that were sent from IDT were dated March 3, 2008 and April 1, 2008, months after the Closing Date. The April 1, 2008 letter did contend that IDT "began to express its concerns as early as November 4, 2007" that "the deliveries to the newly-promised Eastern European countries[5] would be mired in difficulties." Even if these contentions were true, IDT "expressing concerns" in November 2007 is a far cry from the Company being in default of the agreement as of that date.

Moreover, it is the Stockholders' Representative's understanding that everything was in place to fulfill the IDT Agreement as of January 2008, and that Buyer is aware of this fact.

The Shareholders' Representative therefore disputes this claim, and does not believe Buyer has suffered, or will suffer, any Loss in connection with IDT's claim.

3.    **Alleged Undisclosed Agreement With SEH Advisors, Inc. ("SEH")**

First of all, Buyer failed to provide proper notice of this purported claim to the Stockholders' Representative. Contrary to Section 11.4 of the Merger Agreement, and despite now claiming to have had knowledge of this purported claim since April 9, 2008, Buyer provided no prior notice of this potential claim to the Stockholders' Representative. For this reason alone, the claim is invalid.

Turning to the claim itself, Buyer contends that the Company failed to disclose an agreement with SEH in the Company's disclosures relating to Company Benefit Plans. This interpretation of a "Company Benefit Plan" defies common sense and is inconsistent with the definition in the Merger Agreement, which explains that Company Benefit Plan means what it says -- it is a benefit incidental to employment like "compensation, severance, termination pay, performance awards, stock or stock-related awards, fringe benefits" which "is or has been ... maintained and contributed to, or required to be contributed to, by the Company or any of its Subsidiaries or any ERISA Affiliate" under which "the Company ... has or may have liability with respect to such <u>employee</u>, <u>relative</u> or <u>dependent</u> ...." <u>See</u> Merger Agreement at pp. 3-4 (emphases added).

The Merger Agreement's definition of a Company Benefit Plan does not include a revenue-generating third-party contract. This conclusion is further supported by Sections 4.15

---

[5]     One of which was Moldova, not "Moklova", as stated in Buyer's Indemnity Notice.

Citibank, N.A.
U.S. Bank National Association
August 6, 2009
Page 9

(Employee Benefits), 6.3 (Employee Benefits) and Schedule 4.15(a) (list of Company Benefit Plans) of the Merger Agreement, each of which illustrates that a Company Benefit Plan refers to IRAs, health benefits, pension benefits, and the like.

To the extent it is necessary to reach the substance of the purported SEH dispute, it is the Stockholders' Representative's understanding that SEH only would have received a commission under the Sales ISR Agreement if a contract with a prospect, such as Post Bank, was consummated. The Sales ISR Agreement made no promise or representation that any such agreement was or would be consummated.

In sum, the Stockholders' Representative disputes this claim, and does not believe the Buyer has suffered, or will suffer, any Loss in connection with the "undisclosed" agreement with SEH.

### 4. BANCServices Group, Inc. ("BSG") Breach Of Contract Claim

First of all, Buyer again failed to provide proper notice of this purported claim to the Stockholders' Representative. Although the BSG lawsuit was apparently filed in April 2009, contrary to Section 11.4 of the Merger Agreement, Buyer provided no prior notice of this potential claim to the Stockholders' Representative. For this reason alone, the Stockholders' Representative considers this claim invalid.

Turning to the claim itself, Buyer contends that the Company breached Section 4.13(c) of the Merger Agreement in connection with the BSG Agreement. As with the IDT Agreement, however, pursuant to Section 4.13(c) of the Merger Agreement the Company represented that it was not "in default in the performance, observance or fulfillment of any material obligation, covenant or condition contained in any of the Contracts" listed on Schedule 4.13, including the BSG Agreement (emphasis added). That representation was made as of the Closing Date (January 9, 2008).

The only documentation provided by Buyer is a complaint by BSG for breach of contract against the Company that was filed in April 2009, more than 14 months after the Closing Date. That complaint contains allegations, not evidence of default, and it makes no statements about an alleged date of default. It is the Stockholders' Representative's understanding that the Company had fully performed under the BSG Agreement as of January 2008. Any action/inaction by Buyer regarding BSG thereafter does not relate to the Company's representations under Section 4.13(c).

For all of the foregoing reasons, the Stockholders' Representative disputes this claim, and does not believe the Buyer has suffered, or will suffer, any Loss in connection with the BSG Agreement.

Citibank, N.A.
U.S. Bank National Association
August 6, 2009
Page 10

5.    **Fees And Expenses**

Buyer claims that it is entitled to indemnification for the attorneys' fees it expended in connection with investigating the claims asserted in the Indemnity Notice. The Shareholders' Representative does not believe that Buyer is entitled to recover these fees and costs. Section 12.3 of the Merger Agreement provides that "[e]ach of the parties shall bear its own costs and expenses in connection with this Agreement and the transactions contemplated hereby, including all legal, accounting, financial advisory, consulting and all other fees and expenses of third parties, whether or not the Merger is consummated."

The "directly or indirectly" language cited by Buyer to support its claim to recover fees and expenses refers to a Loss payable to a third party by Buyer. See Merger Agreement, Section 11.2(a). That language does not authorize Buyer to recover "direct or indirect" expenses or costs incurred by Buyer itself. To the contrary, those types of indirect, special, and consequential damages borne by Buyer are specifically excluded from indemnification by Section 11.2(f) of the Merger Agreement.

6.    **Deductible Issue**

The Stockholders' Representative also notes that pursuant to Section 11.2(d) of the Merger Agreement, Buyer is only entitled to indemnification to the extent its Losses exceed $250,000. Based on the information in the Stockholders' Representative's possession at this time, even if Buyer's claims were timely and meritorious (both of which are denied), it does not appear that Buyer suffered Losses that in the aggregate exceed $250,000. Buyer is also not entitled to indemnification on that basis.

- - -

Citibank, N.A.
U.S. Bank National Association
August 6, 2009
Page 11


The Stockholders' Representative looks forward to immediate release of the remaining Escrow Funds. Any future correspondence regarding this matter addressed to the Stockholders' Representative should include a copy to the undersigned, as follows:

> Saul Ewing LLP
> Centre Square West
> 1500 Market Street, 38th Floor
> Philadelphia, PA 19102
> Attn: James A. Keller, Esquire
> Facsimile: (215) 972-4152

Regards,

*James A. Keller /sd+*

James A. Keller

SAUL EWING LLP
Attorneys for Fesnak and Associates, LLP
Stockholders' Representative


cc:    Sam Vinovich, Fesnak (via electronic mail)
       Carl R. Sanchez, Esq. (via facsimile and electronic mail)
       Claudia K. Simon, Esq. (via facsimile and electronic mail)
       Barbara J. Shander, Esq. (via facsimile and electronic mail)

1175501.4

# EXHIBIT 1

**Theberge, Shiloh D.**

| | |
|---|---|
| **From:** | Simon, Claudia [claudiasimon@paulhastings.com] |
| **Sent:** | Thursday, July 09, 2009 11:25 PM |
| **To:** | philip.kanejr@usbank.com; Vinovich Sam |
| **Cc:** | Coyle, Vincent ; Keller, Stacey Berg ; Koutzen, George ; Nelson, Rebecca J ; arthur.blakeslee@usbank.com; bshander@morganlewis.com; Sherman, Robert L. |
| **Subject:** | Citibank/PayQuik Escrow |
| **Attachments:** | Citi_PayQuik Indemnity Notice.pdf |

Philip and Sam,

In connection with the Citibank/PayQuik Escrow, attached please find a copy of the Indemnity Notice pursuant to Section 4(b) of the Escrow Agreement.

Please contact me with any questions.

Best regards,
Claudia

---

**Claudia Simon, Associate** | Paul, Hastings, Janofsky & Walker LLP | 4747 Executive Drive, 12th Floor, San Diego, CA  92121 | direct: 858 458 3041 | main: 858 458 3000 | direct fax: 858 458 3141 | claudiasimon@paulhastings.com | www.paulhastings.com

*Paul Hastings is committed to sustainable practices. Reducing printed waste saves resources.*

**********************************************************
IRS Circular 230 Disclosure:    As required by U.S.
Treasury Regulations governing tax practice, you are
hereby advised that any written tax advice contained
herein was not written or intended to be used (and cannot
be used) by any taxpayer for the purpose of avoiding
penalties that may  be imposed under the U.S. Internal
Revenue Code.
**********************************************************

This message is sent by a law firm and may contain
information that is privileged or confidential.  If you
received this transmission in error, please notify the
sender by reply e-mail and delete the message and any
attachments.

For additional information, please visit our website at
www.paulhastings.com.

8/6/2009

# Paul *Hastings*

Paul, Hastings, Janofsky & Walker LLP
4747 Executive Drive
12th Floor
San Diego, CA 92121
telephone 858-458-3000 • facsimile 858-458-3005 • www.paulhastings.com

## FACSIMILE TRANSMISSION

| to: | company/office: | facsimile: |
|---|---|---|
| Robert Fesnak | Fesnak and Associates, LLP | (267) 419-2222 |
| Philip G. Kane, Jr. | U.S. Bank National Association | (860) 241-6881 |
|  | Corporate Trust Services |  |

| cc: | company/office: | facsimile: |
|---|---|---|
| Barbara J. Shander | Morgan, Lewis & Bockius LLP | (215) 963-5001 |

| from: | facsimile: | telephone: | initials: |
|---|---|---|---|
| Claudia K. Simon | (858) 458-3005 | (858) 458-3041 | CKS |

| client name: | Citibank | client matter number: | 58210-00009 |
|---|---|---|---|
| date: | July 9, 2009 | pages (with cover): | 13 |

comments:

**If you do not receive all pages, please call immediately Facsimile Center:**

*This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, and return the original message to us at the above address via the U.S. Postal Service. Thank you.*

LEGAL_US_W # 62222669.1

# Paul*Hastings*

Paul, Hastings, Janofsky & Walker LLP
4747 Executive Drive
12th Floor
San Diego, CA 92121
telephone 858-458-3000 • facsimile 858-458-3005 • www.paulhastings.com

Atlanta
Beijing
Brussels
Chicago
Frankfurt
Hong Kong
London
Los Angeles
Milan
New York
Orange County
Palo Alto
Paris
San Diego
San Francisco
Shanghai
Tokyo
Washington, DC

(858) 458-3041
claudiasimon@paulhastings.com

July 9, 2009                                                    58210.00009

VIA FACSIMILE AND OVERNIGHT MAIL

Fesnak and Associates, LLP
1777 Sentry Parkway
Gwynedd Hall, Suite 400
Blue b.   ... 19422
Attention: Mr. Robert Fesnak
Fax: 267.419.2222

U.S. Bank National Association
Corporate Trust Services
225 Asylum Street, 23rd Floor
Hartford, CT 06103
Attention: Philip G. Kane, Jr.
Fax: 860.241.6881

Re:    Citibank/PayQuik Escrow

Gentlemen:

This letter is being sent on behalf of our client, Citibank, N.A. (on behalf of itself and its affiliates *"Buyer"*), pursuant to Section 4(b) of the Escrow Agreement, dated as of January 9, 2008 (the *"Escrow Agreement"*), among Buyer, Fesnak and Associates, LLP, as the Stockholders' Representative, and U.S. Bank National Association, as the Escrow Agent.  The Escrow Agreement was entered into in connection with that certain Merger Agreement, dated as of October 18, 2007 (the *"Merger Agreement"*), among Buyer, Penelo   ... qusition Sub, Inc., PayQuik.com, Inc. (the *"Company"*) and the Stockholders' Representative.  Capitalized terms used but not otherwise defined in this letter have the meanings set forth in the Merger Agreement.

As more fully described below, (i) Buyer is entitled to indemnification pursuant to Article 11 of the Merger Agreement; (ii) Buyer is submitting this letter as an Indemnity Notice (as defined in the Escrow Agreement) pursuant to Section 4(b) of the Escrow Agreement; (iii) this letter also serves as a Notice of Claim pursuant to Section 11.4(a) of the Merger Agreement with respect to Losses described in the second paragraph of Section 1 and in Sections 3 and 4 below; (iv) Buyer's indemnifiable claims are not all liquidated in amount, but Buyer reasonably estimates that such claims well exceed $1,250,000; and (v) pursuant to Section 4(b) and Section 4(d) of the Escrow Agreement,

LEGAL_US_W # 62196428.6

**Paul**Hastings

July 9, 2009
Page 2

no portion of the Escrow Funds should be released to any party except in accordance with (a) ... written instructions from the Stockholders' Representative and Buyer or (b) a Judgment Notice (as defined in the Escrow Agreement).

The matters for which Buyer claims to be entitled to indemnification for Losses are as follows:

1.      **QuikRemit Trademark Disputes and Opposition Proceedings**

As noted ... of the Stockholders' Representative on March 19, 2008, Buyer received a letter, dated February 29, 2008, from the law firm of Needle & Rosenberg, P.C., on behalf of its client, Total System Services, Inc. ("*TSYS*"), regarding Buyer's applications to the United States Patent and Trademark Office on February 1, 2008 to register the "QuikRemit" and "Citi QuikRemit" service marks.  In the letter, TSYS alleged that it owns rights in the trademark "QUICKREMIT" and that Buyer's use of the trademarks "QuikR... ... .al "Citi QuikRemit" is infringing its rights.  In addition, TSYS alleged in the lette ..... its prior use of "QUICKREMIT" would support oppositions in the Trademark Trial and Appeal Board to Citi's applications to register "QuikRemit" and "Citi QuikRemit."  Despite attempts to reach an amicable resolution, TSYS has not advised us that it has changed its position on the matters described above.  As a result, TSYS has not removed its threat to commence an opposition proceeding in the Trademark Trial and Appeal Board against "Citi QuikRemit" and/or bring a lawsuit against Buyer alleging that Buyer has interfered with, infringed or otherwise violated its intellectual property rights.  To date, Buyer has incurred attorneys' fees of approximately $56,422 in connection with the investigation and attempted resolution of TSYS's claim. In the event that, as alluded to in its letter, TSYS commences an opposition proceeding and also attempts to enforce its rights through litigation under Section 43(a) of the Lanham Act as well as under state statutory and common law, Buyer would incur additional attorneys' fees and other Losses in an amount reasonably estimated to exceed $1,0  0.

In addition, it has come to Buyer's attention that Buyer's use of the trademark "QuikRemit" and/or variants in India potentially infringes or otherwise violates the intellectual property rights of HDFC Bank Limited ("*HDFC*").  During the time period in or about October 2005, HDFC filed six applications to register the "QUICKREMIT" trademark in various formats with the Office of the Trade Marks Registry.  To preserve its rights and ... to continue to use the trademark "QuikRemit" and variants in India, Buyer filed six opposition notices against HDFC's applications in India.  To date, Buyer has incurred attorneys' fees and other Losses aggregating approximately $29,777 in connection with obtaining advice of counsel and filing the opposition notices in India. Additional attorneys' fees and other Losses will occur as the oppositions progress.

Pursuant to Section 11.2(a) of the Merger Agreement, the Buyer Indemnitees are entitled to indem...  ... : f any Losses directly or indirectly resulting from, arising out of, or rela...  .  f  's )

.....*lastings*

July 9, 2009
Page 3

incurred by the Buyer Indemnitees in connection with, or otherwise with respect to any breach of any representation or warranty of the Company contained in the Merger Agreement. Section 4.11(b) of the Merger Agreement provides in relevant part that "The Company and the Subsidiaries, as applicable, have sole title and ownership of all Owned Intellectual Property, free and clear of all Liens (other than Permitted Liens), and have licenses to or other valid rights to use all other Intellectual Property used in the business as presently conducted. The Company and the Subsidiaries are the sole and exclusive owners of the Owned Intellectual Property, and there are no outstanding options, claims, encumbrances or shared ownership of interests of any kind relating to any Owned Intellectual Property." In addition, Section 4.11(e) of the Merger Agreement provides in relevant part that "The conduct of the business of the Company and the Subsidiaries as presently conducted does not infringe, misappropriate or otherwise violate any Intellectual Property ... third party." The Company identified the "QuikRemit" trademark as Ow... ... property on Schedule 4.11(b)(ii) of the Company Disclosure Schedule. However, according to the letter received from TSYS's counsel, the Company was not the sole and exclusive owner of the "QuikRemit" trademark and the Company's use of the "QuikRemit" trademark and variants was alleged to infringe the intellectual property of TSYS. In addition, the Company's use of the "QuikRemit" trademark and variants could very well be found to infringe the intellectual property of HDFC. Accordingly, the representations made by the Company in Section 4.11(b) and Section 4.11(e) of the Merger Agreement were inaccurate and Buyer is entitled to indemnification for any Losses arising out of such breaches pursuant to Section 11.2(a) of the Merger Agreement.

**2.    IDT Breach of Contract Claim**

It has come to the attention of Buyer that, prior to the Closing, the Company was in ded... performance of material obligations contained in the Services Provider Ag... ... *Agreement*"), dated March 23, 2006, with IDT Money Management Ltd. ("IDT"). As disclosed to the Stockholders' Representative on April 17, 2008, Buyer received two letters, dated March 3, 2008 and April 1, 2008 from IDT alleging, among other things, that (i) the Company breached the IDT Agreement by failing to timely provide cash delivery to Ukraine, Russia, Georgia, Romania and Moldova; (ii) IDT began expressing concerns regarding the Company's failure to provide the promised service in a ... early as November 4, 2007; and (iii) as a result of the Company's breach of ... ... ..., IDT is entitled to a refund in the amount of $60,000.

Pursuant to Section 11.2(a) of the Merger Agreement, the Buyer Indemnitees are entitled to indemnification for any Losses directly or indirectly resulting from, arising out of, or incurred by the Buyer Indemnitees in connection with, or otherwise with respect to any breach of any representation or warranty of the Company contained in the Merger Agreement. Section 4.13(c) of the Merger Agreement provides in relevant part that "Neither ... Company nor any of its Subsidiaries, nor to the Knowledge of the Company, any counterparty, is in default in the performance, observance or fulfillment of any

LEGAL_US_W # 62199424.6

Paul*Hastings*

Jul  
Pag.

material obligation, covenant or condition contained in any…Material Contracts." The IDT Agreement qualifies as a "Material Contract" and is listed on Schedule 4.13(b)(ii) of the Company Disclosure Schedule.  As of the Closing Date, the Company was in default in the per    tance of its material obligations under the IDT Agreement as described in the lette    .om. ID1.  Accordingly, the representation made by the Company in Section 4.13(c) of the Merger Agreement was inaccurate and Buyer is entitled to indemnification for any Losses arising out of such breach pursuant to Section 11.2(a) of the Merger Agreement.

3.      Undisclosed Agreement with SEH Advisors, Inc.

It is s.        ..ention of Buyer that the Company entered into a Sales ISR Agreement, dated May 15, 2007, with SEH Advisors, Inc. ("*SEH*").  Pursuant to the Sales ISR Agreement, if SEH refers a potential business relationship to the Company, and if the Comp.any and that third party enter into a contract, then SEH is entitled to a commission based upon the volume of business between the Company and the referred party.  SEH referred Post Bank, a Polish financial institution, to the Company.  Buyer received an email      .. 2008 from Mr. Steven Halliwell, Principal of SEH, alleging that the Comp..       .. .. ... honor its obligations under the Sales ISR Agreement because it failed to enter into an agreement with Post Bank, despite repeated assurances from Company representatives that it was ready, willing and able to do so.  Had the Company entered into an agreement with Post Bank, Mr. Halliwell would have been entitled to a commission equal to 10% of all amounts collected.  The Buyer estimates that the potential value of such commissions is approximately $100,000, calculated as 10% of the value of Buyer's projecte.. ..ansactions in Poland over the next five years.  In addition to lost commission, Mr. riat.. n alleges that the Company's failure to enter into an agreement with Post Bank damaged his reputation.  To date, Buyer has been unable to resolve this matter with Mr. Halliwell, who continues to assert that the Company breached its obligations under the Sales ISR Agreement.

Pursuant to Section 11.2(a) of the Merger Agreement, the Buyer Indemnitees are entitled t   .       ..... .ng Losses directly or indirectly resulting from, arising out of, or incurre..      ..,. ... Indemnitees in connection with, or otherwise with respect to any breach of any representation or warranty of the Company contained in the Merger Agreement.  Section 4.15(a) of the Merger Agreement required the Company to provide a true and complete list of all material Company Benefit Plans.  The definition of Company Benefit Plans includes any agreement providing for compensation which is maintained by the Company for the benefit of any service provider.  The Sales ISR Agreement qualified as a Cor. ...y Benefit Plan but was not identified on Schedule 4.15(a) of the Company Disclosure Schedule.  Accordingly, the representation made by the Company in Section 4.15(a) of the Merger Agreement was inaccurate and Buyer is entitled to indemnification pursuant to Section 11.2(a) of the Merger Agreement for the Losses described above.

LEGAL_US_W # 62196426.4

**Paul**Hastings

July 9, 2009
Page 5

Section        .  1  crow Agreement requires that, in the event of an unliquidated claim,
Buy  r  r  .  .  reasonable estimate of the amount of the claim.  The estimated dollar
amount of Losses with respect to the claim set forth above is $125,000, including the
value of lost commissions as described above and attorneys' fees resulting from the
defense of such claim.

Additionally, Buyer notes that pursuant to Section 11.2(d) of the Merger Agreement,
Buyer is entitled to indemnification for the full amount of the Losses described above
because said Losses are not subject to the Deductible.

4.     BANCServices Group, Inc. Breach of Contract Claim

It has come to the attention of Buyer that, prior to the Closing, the Company was in
default in the performance of material obligations contained in the Strategic Partnership
A.  .        .ement, dated July 31, 2007, with BANCServices Group Inc. (the
"B.   .  .  .. Agreement"). Pursuant to the BANCServices Agreement, the Company
was obligated to provide to BANCServices Group an internet based electronic funds
transfer system to allow for the initiation of the transmission of money to certain
recipients and design, operate and maintain a services website for the transmission of
electronic funds transfers.  According to a complaint filed in April 2009 by BANCServices
Group, Inc. in the Circuit Court of Mississippi County (a copy of which is enclosed with
this letter the company failed to design and implement the website for BANCServices
Group, resulting in damages to BANCServices Group of approximately $118,000.

Pursuant to Section 11.2(a) of the Merger Agreement, the Buyer Indemnitees are entitled
to indemnification for any Losses directly or indirectly resulting from, arising out of, or
incurred by the Buyer Indemnitees in connection with, or otherwise with respect to any
breach of an representation or warranty of the Company contained in the Merger
A.      .   .   .3(c) of the Merger Agreement provides in relevant part that
"Neither    .   .   .  .  nor any of its Subsidiaries, nor to the Knowledge of the Company,
any counterparty is in default in the performance, observance or fulfillment of any
material obligation, covenant or condition contained in any...Material Contracts."  The
BANCServices Agreement qualifies as a "Material Contract" and is listed on Schedule
4.13(b)(ii) of the Company Disclosure Schedule.  As of the Closing Date, the Company
was in default in the performance of its material obligations under the BANCServices
Agreement   .   .   . had failed to design and implement a website for BANCServices
Group as required by the Service Provider Agreement.  Accordingly, the representation
made by the Company in Section 4.13(c) of the Merger Agreement was inaccurate and
Buyer is entitled to indemnification for any Losses arising out of such breach pursuant to
Section 11.2(a) of the Merger Agreement.

LLGAL_  .   .   .  3 .  .

*Paul Hastings*

July 9, 2009
Page 6

Section __, __ __ __escrow Agreement requires that, in the event of an unliquidated claim, Buyer provide a reasonable estimate of the amount of the claim. The Buyer estimates that it will incur total Losses of $150,000 in connection with the lawsuit described above, including attorneys' fees resulting from the defense of such lawsuit.

5       __ __ __ __ Expenses

Pursuant to the Merger Agreement, the Losses for which the Buyer Indemnitees are entitled to indemnification include, among other things, any expense of any nature directly or indirectly resulting from, arising out of, or incurred by the Buyer Indemnitees in connection with any matter for which indemnification is available. Accordingly, in connection with the investigation of the matters referenced above and the preparation of this __ __ __ __ __otice, Buyer has incurred Losses in addition to the Losses referenced in S. __ __               __ above in an amount of approximately $15,000, representing legal fees.

If you have any questions, please do not hesitate to contact me.

Sincerely,

*Claudia K. Simon*

Claudia K. Simon
for PAUL, HASTINGS, JANOFSKY & WALKER LLP

Encs.

cc:     __ __ __, Sander, Morgan, Lewis & Bockius LLP (via fax: 215.963.5001)
        Vincent Coyle (via e-mail)

07 '09/2000 19:23 FAX 1858‑202555      PAUL HASTINGS                    @008/013

## JOHNSON & SCHNEIDER, L.L.C.

ATTORNEYS AT LAW

MARK S. JOHNSON
JOHN R. SCHNEIDER
' licensed in Mo. & Ill.

212 NORTH MAIN STREET
CAPE GIRARDEAU, MO 63701
PH•573•335•3300
FAX•573•335•1978
w.ww.johnsonschneider.com

309 Division Street
P.O. Box 826
Cairo, Illinois 62914
PH•618•734•1505
FAX•618•734•1521

April 17, 2009

PayQuik.co.
Attn:  Chief Executive Officer
150 Monument Rd., Suite 207
Bala Cynwyd, PA 19004

RE:    BANCServices v.PayQuik
       Mississippi Co., MO

To Whom It May Concern:

Enclosed please find the Petition being filed against your company.

Thank you.

Very truly yours,

John R. Schneider

JRS:slc

Enclosures

cc:Glenn Ault

07 09 2009 19:23 FAX 1858! 2.8....          PAUL HASTINGS                          ☑ 009/013

### ...... Civil **Court Party Information Sheet**

**INSTRUCTIONS:**
√ You must provide the following information about yourself and the other party.
√ Type or neatly print in black ink
√ Fill in the two-letter Case Type code from the back of this form here: _____

Filing Date: _

Title of Case: ____ ........ Group Inc v. PayQuik.com, Inc. n/k/a Citibank _____
Union _____

PARTIES (attach a separate sheet to include additional parties).
Initiating Party
Party Type: Plaintiff     ___ __ ___     (i.e. Plaintiff, Petitioner, Applicant, etc.)

Last Name: _____ __  First Name: Banc Services Group, Inc. _____

Middle Name: _____     Address: 115 N. Main _____

City: Charleston ____ State: Missouri ___ Zip: 63834 ___

DOB: _____ __ .               SSN: _____
_____                              (Required)
Respondent:            .         _ _____

Party Type: Defendant _____ _____ (i.e. Defendant, Respondent, etc.)

Last Name: _____ ___ First Name: PayQuik.com, Inc. ____

Middle Name: _____     Address:  2711 Centerville Rd., Suite 400

City: _____ ·          .: _DE___ Zip: __19808 _____

DOB: _____     SSN: _____
                                        (Required)
Additional Parties: _____

Party Type: _____ (i.e. Co-Defendant, Co-Respondent, etc.)

Last Name: ____ _  . __ __ _____ First Name: _____

Middle Name: _____ Address: _____

City: _____ . . __ State: _____ Zip: _____

DOB: _____ SSN: _____

Submitted r, . .         .. _____ Bar ID: 54194 ____

Phone: 573-33: 3.._ __ _____

Party Representing: Plaintiff _____

## IN THE CIRCUIT COURT OF MISSISSIPPI COUNTY, MISSOURI

| | | |
|---|---|---|
| BANC SERVICES GROUP, INC.<br>115 North Main<br>Charleston . | )<br>)<br>) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: _____ |
| v. | ) | |
| | ) | |
| PAYQUIK.COM, INC., | ) | |
| | ) | |
| ... ... | ) | |

### PETITION

Comes now the Plaintiff, BANCServices Group, Inc., by and through its attorney, John . ...eider of Johnson & Schneider, L.L.C., and for its Petition against the Defendant, PayQuik.com, Inc., states as follows:

1.      That Plaintiff, BANCServices Group, Inc. is a Missouri Corporation with its principal place of business located in Mississippi County, Missouri.  At all times material ... . . ... ..., Plaintiff was doing business in the State of Missouri and executed the Agreement attached hereto.

2.      That Defendant, PayQuik.com, Inc., is a Delaware Corporation headquartered i. .... Cynwyd, Pennsylvania and executed the Agreement attached hereto.

3.      That in the attached Agreement, Defendant agreed to the jurisdiction of the State of Missouri if Plaintiff filed suit to enforce the Contract.

4.      ... .. . . ... July 31, 2007, Plaintiff, BANCServices Group, Inc., executed and entered into an Agreement, commonly referred to as a Strategic Partnership Services Provider Agreement with PayQuik.com, Inc., a

copy of said Strategic Partnership Services Provider Agreement is attached hereto and mac.. ,.... net aof marked "Plaintiff's Exhibit 1".

5.      That as consideration for Plaintiff, BANCServices Group, Inc., entering into the Strategic Partnership Services Provider Agreement with Defendant, P:. ⁓ ⁓ : . Inc., Plaintiff paid directly to Defendant the sum of · $50,000.00.

6.      That as a part of their Agreement, Defendant had certain duties and responsibilities, which are set forth in Article four of the attached contract, which include, but are      :. ..ed to the following:

        a)      Defendant had the responsibility of providing to Plaintiff, as a
                service, an internet based electronic funds transfer system to
                .ils./ for the initiation of the transmission of money to certain
                .. ..iits; and

        b)      As a further obligation, Defendant was to design, operate
                and maintain a services website for the transmission of
                .....:c funds transfers pursuant to the contract between
                the parties.

7.      That as a part of the responsibilities of Plaintiff, Plaintiff was to solicit customers and market to potential customers the services to be provided by Defendant.

8.      That in .eliance on the execution of the Agreement by Defendant, Plaintiff spent additional funds, to the detriment of Plaintiff, in an effort to prepare for the future in      =. ..ces being provided by the Defendant and further

2

soliciting custon..... ..... would receive and benefit from the services provided by Defendant. Plaintiff further hired an independent company called Ingeniux to design and develop certain technical computer programs to integrate software provided by ... .    ..... ..ely QuikPay into computer systems. This work performed was ... .. .esu.. of .laintiff relying, to its detriment, on Defendant abiding by its Agreement under the contract attached hereto.

9.    As a result of requesting work from Ingeniux, Plaintiff is now obligated .. ...    .   ...... sum of $68,132.00, which is reflected in the attached invoice attached hereto and made a part hereof marked "Plaintiff's Exhibit 2".

10.    That in further expectation of Defendant providing the services as promised and further reliance and to Plaintiff's detriment, Plaintiff internally prepared for the marketing and solicitation of customers, which work resulted in additional sums of $68,000.00 being spent by Plaintiff in reliance on Defendant entering into a .    . ... attached hereto and promising to provide certain services to the benefit of Plaintiff.

11.    That Defendant has failed to perform under the contract attached hereto; has further failed to design and implement the website for the use of Plaintiff; has further failed to refund the $50,000.00 advanced to Defendant by Plaintiff at the time of execution of the Agreement; and has further failed to indemnify or otherwise reimburse Plaintiff for its losses as a result of Defendant's breach of the ...    .. further failing and refusing to abide by its promises to Plaintiff.

3

07/09/2009 19:24 FAX 18587202505          PAUL HASTINGS                    ☒013/013

12.   That as a direct and proximate result of Defendant's breach of the

Agreement attached hereto, Plaintiff suffered actual and consequential damages

in excess of a jurisdictional amount of $25,000.00.

WHEREFORE, Plaintiff requests this Court to enter Judgment against

Defendant for a sum in excess of the jurisdictional amount of $25,000.00, for its

costs of suit and for such other and further relief as this Court determines just

and proper in the premises.

JOHNSON & SCHNEIDER, L.L.C.

JOHN R. SCHNEIDER #54194

JOHNSON & SCHNEIDER, L.L.C.
212 North Main Street
Cape Girardeau, MO 63701
Phone: 573
Facsimile:
www.johnsonschneider.com

4

**EXHIBIT 6**



# SHIPMAN & GOODWIN LLP.

### COUNSELORS AT LAW

William G. Rock
Phone: (860) 251-5121
Fax: (860) 251-5212
wrock@goodwin.com

August 11, 2009

<u>VIA FACSIMILE,
ELECTRONIC MAIL
AND REGULAR MAIL</u>

Claudia K. Simon
Paul, Hastings, Janofsky & Walker LLP
4747 Executive Drive
12th Floor
San Diego, CA 92121
Fax:  858-458-3005
E-mail:  claudiasimon@paulhastings.com

James A. Keller
Saul Ewing LLP
Centre Square West
1500 Market Street
38th Floor
Philadelphia, PA 19102
Fax:  215-972-4152
E-mail:  jkeller@saul.com

Re:   <u>Citibank, N.A. / Fesnak and Associates, LLP</u>

Dear Ms. Simon and Mr. Keller:

This firm represents U.S. Bank National Association, in its capacity as escrow agent (the "Escrow Agent") under that Escrow Agreement, dated as of January 9, 2008 (the "Escrow Agreement"), among Citibank, N.A. (the "Buyer"), Fesnak and Associates, LLP (the "Stockholders' Representative"), and the Escrow Agent.  Capitalized terms used in this letter and not otherwise defined shall have the meanings set forth in the Escrow Agreement.

Claudia K. Simon
James A. Keller
August 11, 2009
Page 2

On July 9, 2009, the Escrow Agent received from Ms. Simon a notice on behalf of the Buyer purporting to be an Indemnity Notice pursuant to Section 4(b) of the Escrow Agreement.  We acknowledge that whether this notice was delivered in a timely manner is a matter of dispute between the Buyer and the Stockholders' Representative.  On August 6, 2009, the Escrow Agent received a Response Notice under Section 4(b) from Mr. Keller on behalf of the Stockholders' Representative.  This Response Notice (i) claimed that Buyer's Indemnity Notice was invalid because it was received by the Escrow Agent after the Termination, and (ii) challenged Buyer's claims for indemnification on various substantive grounds, even if the Indemnity Notice had been delivered in a valid manner.

Under Section 4(c) of the Escrow Agreement, if the Escrow Agent has received in a timely manner an Indemnity Notice from the Buyer and a corresponding Response Notice from the Stockholders' Representative, then the Escrow Agent shall only distribute any disputed amount upon receipt of either joint direction from the Buyer and the Stockholders' Representative or a final, non-appealable award of a court of competent jurisdiction.  Accordingly, the Escrow Agent will continue to hold the funds in question until either of such items has been delivered to it.

The Stockholders' Representative has asserted that, notwithstanding the terms of Section 4(c), the Escrow Agent should distribute the escrow fund pursuant to Section 4(d) because the Termination Date occurred prior to the Buyer's delivery of the Indemnity Notice.  The Escrow Agent takes no position at this time as to whether the Indemnity Notice was timely delivered, but acknowledges that a genuine dispute over contract interpretation exists.  Section 7(d) of the Escrow Agreement provides that "[i]n the event that the Escrow Agent shall be uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands from any party hereto which, in its reasonable opinion, conflict with any of the provisions of this Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held under the terms of this Agreement until it shall be directed otherwise in writing by all of the other parties hereto or by a final order or judgment of a court of competent jurisdiction."  The Escrow Agent shall proceed in accordance with such provision.

1211246v1

Claudia K. Simon
James A. Keller
August 11, 2009
Page 3

Please feel free to direct all inquiries to the undersigned.

Very truly yours,

William G. Rock

cc:    Fesnak and Associates, LLP
1777 Sentry Parkway
Gwynedd Hall, Suite 400
Blue Bell, PA 19422
Attn:  Mr. Robert Fesnak
Fax:  267-419-2222

Citibank, N.A.
Citigroup Inc.
153 East 53rd Street
25th Floor
New York, NY 10022
Attn:  Deputy General Counsel - M&A Legal
Fax:  212-793-2402

U.S. Bank National Association
Corporate Trust Services
225 Asylum Street, 23rd Floor
Hartford, CT 06103
Attn:  Philip G. Kane, Jr.
Fax:  860-241-6881

1211246v1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FESNAK AND ASSOCIATES, LLP          :
                                    :
    Plaintiff,                     :
                                    :
    v.                             :    C.A. No.
                                    :
U.S. BANK N.A.,                     :
                                    :
    and                            :
                                    :
CITIBANK, N.A.                      :
                                    :
    Defendants.                    :

## FESNAK AND ASSOCIATES, LLP'S CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1, Plaintiff Fesnak and Associates, LLP

states that no parent corporation and no publicly held corporation owns 10% or more of its stock.

Respectfully submitted,

**SAUL EWING LLP**

/s/ Whitney W. Deeney
Whitney W. Deeney (No. 5055)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE  19899
Telephone: (302) 421-6800
Facsimile: (302) 421-6813
wdeeney@saul.com

DATED: September 14, 2009

584468.1